**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MORAN INDUSTRIES, INC.** )<br>**and MEINEKE CAR CARE CENTERS,** )<br>**INC.,** )<br> )<br>　　　　**Plaintiffs,** )<br> )<br>　　**v.** )<br> )<br>**MARK E. BAKER,** )<br> )<br>　　　　**Defendant.** ) | **Case No. 10-CV-7653**<br>**Hon. Judge Hibbler** |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR TRANSFER**

Plaintiffs Moran Industries, Inc. ("Moran") and Meineke Car Care Centers, Inc. ("Meineke") respectfully submit their memorandum in opposition to defendant Mark E. Baker's motion to dismiss for lack of personal jurisdiction or to transfer venue.[1]

## INTRODUCTION

Defendant's motion to dismiss for lack of personal jurisdiction or to transfer the case to Florida should be denied because he consented to jurisdiction in this Court and has not come close to carrying his burden to demonstrate that transfer is warranted. The mandatory forum-selection clause in the franchise agreement between defendant and Moran, standing alone, confers personal jurisdiction on this Court and waived any objection thereto as a matter of law. Even ignoring the forum-selection clause, however, and as confirmed by settled and indistinguishable Supreme Court

---

[1] In support of their opposition, plaintiffs have filed with this memorandum the declarations of Barbara Moran as Exhibit A hereto ("Moran Decl.") and Ted P. Pearce as Exhibit B hereto ("Pearce Decl.").

authority, this Court has personal jurisdiction over defendant by virtue of his deliberate decision to enter into a long-term franchise relationship with an Illinois franchisor and his systematic contacts with his franchisor during the term of the franchise agreement. Defendant's motion to transfer fares no better. The forum-selection clause is to be given controlling weight in ruling on a motion to transfer, and defendant has failed to demonstrate that the convenience of the parties or witnesses or the interests of justice support transfer of this action to Florida. For these reasons, discussed more fully below, defendant's motion must be denied.

## I.   THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT.

Defendant's challenge to this Court's *in personam* jurisdiction simply ignores the dispositive fact of the mandatory forum-selection clause contained in his franchise agreement with Moran. Standing alone, the forum-selection clause confers personal jurisdiction and constitutes a waiver of any challenge to its exercise, *as a matter of law*. Defendant's motion likewise ignores settled and indistinguishable Supreme Court authority establishing that this Court has personal jurisdiction independent of the forum-selection clause. For these reasons, defendant's motion to dismiss for lack of personal jurisdiction must be denied.[2]

### A.   The Franchise Agreement's Illinois Forum-Selection Clause Confers Personal Jurisdiction Over Defendant.

The franchise agreement between defendant and Moran contains a mandatory forum-selection clause specifically requiring that this action be brought in this Court or in another court in Cook County, Illinois. Section 34 of that agreement expressly provides:

---

2    In considering defendant's motion to dismiss for lack of personal jurisdiction, "the 'court accepts all well-pleaded allegations in the complaint as true.'" *GE Bus. Fin. Servs. Inc. v. Schiffman*, No. 09C4368, 2010 U.S. Dist. LEXIS 7167, *6 (N.D. Ill. Jan. 27, 2010) (quoting *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 712-713 (7th Cir. 2002)). Moreover, any conflicts in the parties' respective declarations or affidavits must be resolved in plaintiffs' favor. *Chilmark Partners, LLC v. MTS, Inc.*, No. 02C5339, 2003 U.S. Dist. LEXIS 7077, *16 (N.D. Ill. Apr. 23, 2003).

34.  <u>APPLICABLE LAW</u>.  The parties have finalized this Agreement in the City of Midlothian, County of Cook, State of Illinois, and agree that this contract and their actions hereunder shall be governed by and construed in accordance with the laws of the State of Illinois.  *The parties further agree that any proceedings which arise out of or are connected in any way with this Agreement and/or operation of the Mr. Transmission franchise licensed hereunder shall be submitted to the United States District Court for the Northern District of Illinois or any court of record of Cook County, Illinois.*

(Moran Franchise Agreement, Ex. 1 to Moran Decl. ¶ 6, at 25 § 34) (emphasis supplied).  This provision alone defeats defendant's personal jurisdiction challenge and requires that his motion to dismiss for lack of personal jurisdiction be denied.

The personal jurisdiction requirement is a waivable right.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14, 105 S. Ct. 2174 (1985).  Challenges to personal jurisdiction may be waived by either express or implied consent.  *Heller Fin. Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1290 (7th Cir. 1989).  "[A] valid forum-selection clause, even standing alone, can confer personal jurisdiction."  *Heller Fin. Inc.*, 883 F.2d at 1292 n.4 (citing *Burger King Corp*, 471 U.S. at 472 n. 14); *see FCStone, LLC v. Adams*, No. 10C508, 2011 U.S. Dist. LEXIS 1371, *9 (N.D. Ill. Jan. 6, 2011) (defendants "are bound by the forum selection clause, and thus, subject to the personal jurisdiction of this Court"); *GE Bus. Fin. Servs. Inc*, 2010 U.S. Dist. LEXIS 7167 at *9-10 ("The court has personal jurisdiction over Defendants based upon the terms of the Guaranty, which provides that Defendants 'submit to the non-exclusive jurisdiction of the state and federal courts having jurisdiction in the city of Chicago, county of Cook and state of Illinois.'").  Moreover, any objection to a court's exercise of *in personam* jurisdiction is waived by a forum-selection clause specifying that litigation shall or may be brought in that court.  *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 589 (7th Cir. 2005); *see R.A.R., Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1280 (7th Cir. 1997) ("personal jurisdiction is waivable and . . . parties can, through forum selection clauses and the like, easily contract around any rule we promulgate"); *Wausau Container Corp. v. Westview*

*Packaging, LLC*, No. 10C360, 2010 U.S. Dist. LEXIS 117223, *12 (E.D. Wis. Nov. 2, 2010) ("Having consented to venue in the State of Wisconsin in a contract, Thomas has waived any objection to personal jurisdiction in that State"); *Chilmark Partners, LLC*, 2003 U.S. Dist. LEXIS 7077 at *16 ("Parties whose cause of action is grounded in a contract containing a forum selection clause will be deemed to have waived any objection to personal jurisdiction.")

Section 34 of the franchise agreement between defendant and Moran is a mandatory forum-selection clause broadly requiring that any action either arising out of or connected in any way with the franchise agreement between defendant and Moran be brought in this Court or in another court located in Cook County, Illinois.[3]  Obviously, this action arises out of the franchise agreement between defendant and Moran.  The complaint asserts three separate causes of action for breach of that agreement, and seeks damages for defendant's breach of the agreement, specific performance of his post-termination obligations thereunder, and injunctive relief to enjoin his continuing violations of the agreement's post-termination obligations.  And while the action also involves federal trademark claims and claims under defendant's franchise agreement with Meineke, the action is undeniably "connected in any way with" the franchise agreement between defendant and Moran.  As a matter of law, therefore, the forum-selection clause confers personal jurisdiction on this Court and waives any objection thereto defendant might make.  His motion to dismiss must therefore be denied.

---

[3]    The fact that the forum-selection clause is set forth in a provision titled "Applicable Law" and which includes an Illinois choice-of-law clause is irrelevant. *Heller Fin. Inc.*, 883 F.2d at 1292 n.4 (holding that forum-selection clause contained in a clause titled "choice of law; service of process" conferred personal jurisdiction over defendant).

**B.     The Court Also Has Personal Jurisdiction**
**        Independent Of The Forum-Selection Clause.**

The Court has personal jurisdiction over defendant even apart from the forum-selection clause.  The United States Supreme Court determined more than a quarter century ago that a franchisee entering into a long-term commercial relationship with his franchisor may be sued in the franchisor's home state consistent with any due process concerns.  *Burger King Corp*, 471 U.S. at 479-483, 105 S. Ct. at 2186-2188.  In *Burger King*, the defendant Michigan franchisee "eschew[ed] the option of operating an independent local enterprise" and deliberately chose instead to reach out beyond Michigan and negotiate with a Florida franchisor for the acquisition of a "long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization."  471 U.S. at 479-80.  He entered into a twenty-year franchise agreement "that envisioned continuing and wide-reaching contacts" with his Florida franchisor.  *Id.* at 480.  Moreover, his refusal to make payments to his franchisor in Florida and his continued use of his franchisor's trademarks and confidential business information after termination caused foreseeable injuries to his franchisor in Florida.  *Id.*  "For these reasons it was, at the very least, presumptively reasonable for [the franchisee] to be called to account [in Florida] for such injuries."  *Id.*

The circumstances here are even more compelling than those in *Burger King*.  As in *Burger King*, rather than operate an independent transmission repair shop, defendant – who previously had operated another franchised shop and who had subsequently litigated for over two years with his Pennsylvania franchisor in a Pennsylvania federal court[4] – chose to reach out to Moran, an Illinois corporation located in Illinois, for the purpose of acquiring a Mr. Transmission® franchise and the "manifold benefits" of association with the Mr. Transmission® brand.  At the time he did so, Moran was (and remained throughout) an Illinois corporation headquartered in Midlothian, Illinois.  (Moran

Decl. ¶¶ 2-7.) After he was approved to become a Moran franchisee, defendant entered into a twenty-year franchise agreement, the length of which standing alone is enough to confer personal jurisdiction. *See Bodine Elec. Co. v. Viking Access Sys., LLC*, No. 09C3055, 2009 U.S. Dist. LEXIS 119176, *9-10 (N.D. Ill. Dec. 17, 2009) ("Viking Access's five-year relationship with Bodine gave it fair warning that it might be haled into court in Illinois, Bodine's home state.").

Moreover, the Moran Franchise Agreement, like the franchise agreement at issue in *Burger King Corp.*, "envisioned continuing and wide-reaching contacts" with Moran in Illinois. 471 U.S. at 480. These contacts included (i) the use of Moran's trademarks and trade names, confidential information, and operating systems (Moran Franchise Agreement, Ex. 1 to Moran Decl. at p. 1; p. 2, § 1; p. 6, § 7), (ii) the enjoyment of the ongoing assistance and support Moran deemed appropriate (*id.* at p. 4, § 6; ), (iii) the training both he and his spouse attended and received in Illinois (Moran Decl. ¶¶ 9-10), (iv) the obligation to adhere to Moran's standards and specifications in the operation of his franchise (Moran Franchise Agreement, at p. 7, § 8), (v) the submission to Moran's offices in Midlothian, Illinois of weekly gross sales reports (*id.*, at p. 9, § 11), and (vi) the submission to Moran's offices of weekly royalty payments (*id.*).[5] As in *Burger King Corp.*, defendant's breaches of the Moran Franchise Agreement, continued use of Moran's name and marks post-termination, and his failure to perform his other post-termination obligations under the franchise agreement, "caused foreseeable injuries" to Moran in Illinois, where its headquarters has remained throughout its

---

4       *See AAMCO Transmissions, Inc. v. Baker*, No, 2:06-cv-05252-TR (E.D. Pa.).

5       These very same contacts were deemed sufficient to subject another Moran franchisee to this Court's personal jurisdiction in *Moran Indus., Inc. v. Higdon*, No. 07C6092, 2008 U.S. Dist. LEXIS 51430 (N.D. Ill. June 26, 2008). In that case, the Court denied defendants' motion to dismiss for lack of personal jurisdiction based in large part on the provisions of a substantially identical form of franchise agreement, which, the Court concluded, established defendants' "continuous, substantive contact with Moran in [Illinois]." *Moran Indus., Inc.,* 2008 U.S. Dist. LEXIS 51430 at *11-15. In the *Higdon* case, however, the Court misinterpreted the forum-selection clause as being permissive rather than mandatory, and then dismissed the case for improper venue despite the forum-selection clause's plain language. Because the case settled shortly thereafter, that ruling was not tested by motion for reconsideration or on appeal.

relationship with defendant.  Furthermore, the franchise agreement's Illinois choice-of-law provision "reinforce[s]" defendant's "deliberate affiliation with [Illinois] and the reasonable foreseeability of possible litigation [here]."  *Burger King Corp.*, 471 U.S. at 482.  In fact, the sole distinction between *Burger King* and this case is that here, unlike in *Burger King*, defendant also expressly consented to the exclusive and mandatory forum-selection clause specifying that any action would be brought in Illinois, which alone is sufficient to defeat defendant's objection to this Court's exercise of *in personam* jurisdiction.

In short, the forum-selection clause contained in the Franchise Agreement confers personal jurisdiction on this Court, and defendant has waived any objection thereto.  Moreover, under *Burger King*, the Court has personal jurisdiction over defendant independent of the forum-selection clause. Defendant deliberately affiliated with an Illinois corporation headquartered in Illinois; signed a long-term franchise agreement that "envisioned continuing and wide-reaching contacts" with his Illinois franchisor; accepted and enjoyed the "manifold benefits derived" from his association with an Illinois-based brand; voluntarily accepted the long-term and exacting regulation of his business from Moran's Illinois headquarters; and caused foreseeable injury to Moran by the actions on which the complaint is based.  For these reasons it is, as it was in *Burger King*, presumptively reasonable for defendant to be called to account for these injuries in Illinois.  His motion to dismiss for lack of personal jurisdiction must therefore be denied.

## II.    DEFENDANT'S MOTION TO TRANSFER SHOULD BE DENIED.

Under 28 U.S.C. § 1404(a), a court may transfer a civil action to another proper forum for the convenience of the parties or witnesses or in the interests of justice.  *Bodine Elec. Co.,* 2009 U.S. Dist. LEXIS 119176 at *10-11.  The party seeking such transfer bears "the burden of demonstrating that the 'transferee forum is clearly more convenient.'"  *Id.* at *11 (quoting *Coffey v. Van Dorn Iron*

*Works*, 796 F.2d 217, 219-20 (7th Cir. 1996)).  In evaluating a motion to transfer, "the Court considers several factors: (1) the plaintiff's choice of forum, (2) the convenience of the parties, (3) the convenience of witnesses, (4) the interests of justice, and (5) the location of the material events giving rise to the case." *Bodine Elec. Co.*, 2009 U.S. Dist. LEXIS 119176 at *11.  Defendant has not come close to meeting his burden of demonstrating that transfer is warranted.

As an initial matter, defendant's motion to transfer, like his motion to dismiss, ignores the fact of the forum-selection clause contained in his franchise agreement with Moran.  A forum-selection clause is "a significant factor that figures centrally in the district court's calculus" in considering a § 1404(a) motion to transfer.  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S. Ct. 2239, 2244 (1988); *see Ace American Ins. Co. v. Wendt, LLP*, 724 F. Supp. 2d 899, 903 (N.D. Ill. 2010) (denying transfer motion based on forum-selection clause).  A "forum-selection clause is given controlling weight [in the § 1404(a) analysis] 'in all but the most exceptional cases.'"  *Heller Fin. Inc.,* 883 F.2d at 1291 (quoting *Stewart Org., Inc.*, 487 U.S. at 34, 108 S. Ct. at 2246 (concurring opinion)).  "Thus, absent a showing that trial in the 'contractual forum will be so gravely difficult and inconvenient that [the party challenging the clause] will for all practical purposes be deprived of his day in court . . . there is no basis for concluding that it would be unfair, unjust or unreasonable to hold that party to his bargain.'"  *Heller Fin Inc.,* 883 F.2d at 1291 (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 18, 92 S. Ct. 1907 (1972)).

Defendant has not even attempted to show that litigation of this case in this forum consistent with the forum-selection clause contained in his franchise agreement with Moran would effectively deprive him of his day in court.  Instead, he simply makes the conclusory claim that it would be more inconvenient for him and unidentified witnesses to try the case here.  But defendant's own "financial status or the inconvenience he would face in having to litigate the case in Chicago" is

irrelevant to the analysis in light of the forum-selection clause. *Bankers Life & Cas. Co. v. Polonczyk*, No. 10C2523, 2010 U.S. Dist. LEXIS 84997, *4 (N.D. Ill. Aug. 16, 2010) (movant's "agreement to the forum selection term amounts to a waiver of his 'right to assert *his own* inconvenience as a reason to transfer a case.'") (emphasis in original) (quoting *Heller Fin. Inc.*, 883 F.2d at 1293). And even if his own convenience were considered, "the convenience of witnesses and of defendant [] are not sufficient to outweigh the significance of a valid forum selection clause." *Ace American Ins. Co.*, 724 F. Supp. 2d at 903.

Consideration of the factors relevant to the § 1404(a) analysis show that transfer would be improper even absent the controlling forum-selection clause. First, "a court affords a plaintiff's choice in forum substantial weight, and should rarely disturb it 'unless the balance is strongly in favor of defendant.'" *Bodine Elec. Co.*, 2009 U.S. Dist. LEXIS 119176 at *11 (quoting *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 663-64 (7th Cir. 2003)); *see Nalco Co. v. Envtl. Mgmt., Inc.*, 694 F. Supp. 2d 994, 998 (N.D. Ill. 2010) ("Generally, courts give substantial deference to a plaintiff's choice of forum, especially if, as here, it is the plaintiff's home forum").

Defendant cannot show that plaintiffs' choice of forum should be disturbed. They chose a proper forum that is Moran's home forum and the mandatory forum specified in defendant's franchise agreement with Moran. Moran and Meineke might have brought two separate actions, one on behalf of Moran alone in this Court and a second on behalf of Meineke alone in the federal court in Charlotte, North Carolina, where Meineke is located.[6] That undoubtedly would have been far more inconvenient to defendant than this single action in a forum he agreed to. However, because of the overlapping set of facts out of which Moran's and Meineke's claims arise, a single action was brought in a proper forum to avoid a multiplicity of actions and the added inconvenience and

---

6       (*See* Meineke Franchise Agreement, Ex. 1 to Pearce Decl, at 40, § 17.5 (relating to venue); Pearce

expense multiple actions would entail. (*See* Pearce Aff. ¶¶ 4-5.) That reasonable choice of forum is entitled to substantial deference and militates strongly against transfer.

Second, defendant cannot show that a transfer would be more convenient for the parties or witnesses. As this Court noted in *Bodine Elec. Co.*, "when a plaintiff and a defendant reside in different states there is no choice of forum that will avoid imposing inconvenience." 2009 U.S. Dist. LEXIS 119176 at *12. And, as noted above, defendant's own inconvenience is irrelevant. *Bankers Life Cas. Co.*, 2010 U.S. Dist. LEXIS 84997 at *4. Moreover, he has failed to identify any witness who he claims would be inconvenienced by trial in this forum. Moran has identified eight witnesses, and Meineke three witnesses. (Moran Aff. ¶¶ 14-22; Pearce Aff. ¶¶ 6-9.) Clearly, trial in Florida would be far more inconvenient for Moran's eight witnesses than trial in Chicago would be for defendant (whose inconvenience is not considered) or any witness (whom defendant has not even identified). Accordingly, this factor also militates strongly against transfer.

Third, although defendant refers in his affidavit to "documents and other proofs," he fails to identify these documents or proofs, or to explain why they cannot be transported for trial. Obviously, it would be at least as inconvenient for Moran and Meineke to "transport" their documents to Florida as it would be for defendant to transport his here. In reality, however, "[d]ocuments and records are easily transportable (and, indeed, must be copied and delivered to the opponent no matter where the case will be litigated) and their location generally is not a persuasive reason for transfer." *Simonoff v. Kaplan, Inc.*, No. 09C5017, 2010 U.S. Dist. LEXIS 26884, *5 (N.D. Ill. Mar. 17, 2010). Thus, this consideration does not support transfer.

Fourth, the inconvenience of witnesses strongly militates against transfer. Moran has identified eight witnesses and the topics of their knowledge and likely testimony. None of these

Decl. ¶¶ 3-4.)

witnesses lives or works in Florida. Seven of the eight live and work in the Chicago area. One lives in Tennessee, but visits Moran's headquarters in Midlothian, Illinois frequently. (Moran Decl. ¶¶ 14-22.) Meineke has identified three witnesses and the subjects of the testimony of each, all of whom live and work in North Carolina. (Pearce Decl. ¶¶ 6-9.) By contrast, defendant, who bears the burden of demonstrating that transfer would be more convenient for witnesses, has not identified a single witness or the topic of his or her testimony. This factor therefore also militates against transfer.

Perhaps most importantly, *see Nissan Motor Co., Ltd. v. BMW (US) Holding Corp.*, No. 02C1245, 2002 U.S. Dist. LEXIS 20744, *11 (N.D. Ill. Oct. 25, 2002) ("'interest[s] of justice . . . may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result'") (quoting *Coffey*, 796 F.2d at 221), the interests of justice support denial of defendant's motion to transfer. First, the United States District Court for the Northern District of Florida is more congested than the United States District Court for the Northern District of Illinois. (*See* U.S. District Court – Judicial Caseload Profiles: Florida Northern and Illinois Northern attached hereto as Exhibit C, available at http://www.uscourts.gov/cgi-bin/cmsd2010Sep.pl.) In the twelve months ending September 30, 2010, and on a per judgeship basis, there were a total of 511 new cases filed in the Northern District of Florida, while 447 new cases were filed in this Court. (*Id.*) New civil case filings totaled 422 in the Northern District of Florida, compared with 402 in this Court. Weighted filings[7] were higher in the Northern District of Florida (546) than in this Court (517). (*Id.*) Moreover, the period of time from filing to disposition for civil cases was longer in the Northern District of Florida (8.0 months) than in this Court (6.2 months). (*Id.*)

---

7    According to the Judicial Caseload Profile Report, weighted filings statistics account for the different amounts of time district judges require to resolve various types of civil and criminal actions.

Second, Illinois law governs Moran's claims. North Carolina law governs those of Meineke. Florida law governs no claims or issues in this case. This Court's familiarity with Illinois law is a compelling factor in favor of denial of defendant's motion. *Bodine Elec. Co.*, 2009 U.S. Dist. LEXIS 119176 at *15 (likely applicability of Illinois law militates against transfer to California); *Nissan Motor Co., Ltd.*, 2002 U.S. Dist. LEXIS 20744 at *11 (applicability of Illinois law militates against transfer to New Jersey).

Finally, this district has at least as compelling an interest in resolving this dispute as might Florida. Moran is an Illinois corporation headquartered here. Illinois has an interest "in ensuring that corporations that call it home are justly tried – neither allowed to scoff at the law nor punished without cause." *Simonoff*, 2010 U.S. Dist. LEXIS 26884 at *7. Denial of defendant's motion to transfer will protect that compelling interest.

In short, defendant has not and cannot meet his burden of demonstrating that transfer is warranted under § 1404(a). The forum-selection clause requires denial of his motion absent a showing that litigation here would effectively deprived him his day in court. He has not come close to make any such showing. Indeed, to transfer this case in the face of the mandatory forum-selection clause specifying this Court would stand on its head the Supreme Court's pronouncement that the clause is to be given controlling weight. Even ignoring the forum-selection clause, however, plaintiffs' choice of forum is entitled to substantial deference, and defendant has not demonstrated that convenience or interest of justice factors support transfer. To the contrary, it is clear that it would be far more inconvenient for Moran and its witnesses to litigate this action in Florida than it would be for defendant to litigate here, and the interests of justice considerations, including court congestion data and applicable law, further support denial of defendant's motion.

## CONCLUSION

For all the foregoing reasons, Moran and Meineke respectfully request the Court deny defendant's motion to dismiss for lack of personal jurisdiction or to transfer.

Respectfully submitted,

**MORAN INDUSTRIES, INC. and
MEINEKE CAR CARE CENTERS, INC.**


By:_____s/Fredric A. Cohen_____
        One of their Attorneys


Fredric A. Cohen (#6198606)
Amy C. Haywood (#6288230)
**CHENG COHEN LLC**
311 N Aberdeen St, Suite 400
Chicago, IL 60607
(312) 243-1717
fredric.cohen@chengcohen.com
amy.haywood@chengcohen.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing *PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR TRANSFER* was electronically filed and served via this court's ECF system on Defendant, Mark Baker, on this 2nd day of March 2011.

<u>*s/Fredric A. Cohen*</u>
Fredric A. Cohen

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MORAN INDUSTRIES, INC. and MEINEKE CAR CARE CENTERS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 10-CV-7653 Hon. Judge Hibbler |
| MARK E. BAKER, | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF BARBARA MORAN

1. My name is Barbara Moran. I am an individual over the age of eighteen (18) years. I am the President and Chief Executive Officer of Moran Industries, Inc. ("Moran"), one of the plaintiffs in this case. I have served as President and Chief Executive Officer of Moran since 1999. I have personal knowledge of the facts set forth in this declaration and would be willing and able to testify thereto if and when called upon to do so. I submit this declaration in support of Moran's opposition to defendant Mark E. Baker's motion to dismiss for lack of personal jurisdiction or transfer this case to Florida.

2. Moran is an Illinois corporation headquartered in Midlothian, Illinois.

3. Moran is the franchisor of specialized automotive after-market service centers, including its "Mr. Transmission Service Centers."

4. Moran owns the trademark, service mark, and trade name "Mr. Transmission" (the "Mr. Transmission Mark").

1

5.     The Mr. Transmission Mark has been registered by Moran on the Principal Register of the United States Patent and Trademark Office with Registration Nos. 0917866, 2726414, and 2829274.

6.     On October 6, 2008, Moran granted defendant a franchise to establish and operate a Mr. Transmission Service Center in Tallahassee, Florida under the terms and conditions of a written franchise agreement ("Franchise Agreement"), a copy of which is annexed to my declaration as Exhibit 1. In connection with his execution of the Franchise Agreement, defendant also executed a written guaranty by which he personally guaranteed performance and payment of all obligations under the Franchise Agreement, including the performance and observance of all covenants, conditions and obligations contained in the Franchise Agreement.

7.     The Franchise Agreement specifically provides that it was made in Midlothian, Illinois, and, in fact, the Franchise Agreement took effect when I countersigned the agreement that defendant had signed. I counter-signed the Franchise Agreement at Moran's offices in Midlothian, Illinois.

8.     During the entire time defendant communicated with Moran about acquiring a Moran franchise, Moran was headquartered in Midlothian, Illinois. When defendant signed the Franchise Agreement and sent it to Moran for counter-signature, Moran was headquartered in Midlothian, Illinois. And after acquiring his Moran franchise, Moran remained headquartered in Midlothian, Illinois and defendant at all times dealt and communicated with Moran, whether by telephone, e-mail or the submission of reports and payments, at Moran's headquarters in Midlothian, Illinois.

9.     In connection with his becoming a Moran franchisee, defendant was required to complete the training program provided by Moran. Defendant attended "Owners Class" training

2

provided by Moran at Moran's headquarters in Midlothian, Illinois. That training program took place from January 26, 2009 through January 30, 2009. Defendant was present at Moran's headquarters in Midlothian, Illinois the entire week of training.

10. Defendant's spouse, Lisa Baker, also attended training at Moran's headquarters in Midlothian, Illinois. She attended Moran's "Center Manager Class." That program was conducted from November 10, 2008 through November 14, 2008, and Mrs. Baker was present at Moran's Midlothian, Illinois headquarters the entire week for training.

11. Under the Franchise Agreement, defendant was required to provide Moran with weekly reports of gross sales and to remit to Moran a weekly royalty in an amount equal to a specified percentage of gross sales. During the term of the Franchise Agreement, defendant provided those weekly reports to Moran at Moran's headquarters in Midlothian, Illinois. Likewise, the weekly royalty payments due and owing under the Franchise Agreement were made by ACH bank draft to Moran at its headquarters in Midlothian, Illinois. The Franchise Agreement expressly provides that the reports of weekly gross sales and payment of the weekly royalty due and owing "shall be received by [Moran] in the offices of [Moran]" in Midlothian, Illinois, and that is in fact how the reports and payments were sent and received each week during the term of the Franchise Agreement. Section 12 of the Franchise Agreement also calls for certain other reports to be provided by defendant to Moran, and all reports that defendant ever provided to Moran were provided by him to Moran at Moran's headquarters in Midlothian, Illinois.

12. Section 34 of the Franchise Agreement states that Moran and defendant "agree that this contract and their actions hereunder shall be governed by and construed in accordance with the laws of the State of Illinois."

3

13. Moran and defendant also expressly agreed in the Franchise Agreement that "any proceedings which arise out of or are connected in any way with this Agreement and/or operation of the Mr. Transmission franchise licensed hereunder shall be submitted to the United States District Court for the Northern District of Illinois or any court of record of Cook County, Illinois." This choice of forum provision is very important to Moran. Moran includes this choice of forum provision in its form franchise agreements in order to ensure that any franchise-related litigation will be conducted in the court nearest Moran's headquarters in order to minimize the expense associated with such litigation and reduce the cost and distraction of Moran personnel who might be required to participate in or testify at such litigation. Moran maintains franchise relationships with franchisees across the country. Were Moran required to participate in franchise-related litigation in courthouses across the country, it would be forced to increase the royalties and other fees paid by franchisees in order to cover such increased costs, and such increased royalties and other fees would likely be passed through to consumers by Moran franchisees. Simply put, the business terms of the franchise relationship between Moran and its franchisees is based in part on Moran's ability to manage or contain litigation-related costs by ensuring that franchise-related litigation will take place in a courthouse close to Moran's headquarters in Midlothian, Illinois.

14. In this case, Moran anticipates that no fewer than seven (7) Moran employees and one (1) former employee will likely be called to testify should this case proceed to trial. All but one of these witnesses live in the Chicagoland area and work at Moran' headquarters in Midlothian, Illinois. One (Tim Rodifer) lives in Tennessee.

15. These witnesses include me, Moran's President and Chief Executive Officer. I have personal knowledge of the offer and sale to defendant of a Moran franchise, defendant's breaches of

4

that agreement, and Moran's decision to terminate the Franchise Agreement for cause based on those breaches and defendant's failure to cure them. I personally spoke with defendant on several occasions (and made repeated efforts to speak with him on other occasions) concerning topics that relate directly to his performance and non-performance of his obligations under the Franchise Agreement, including conversations concerning co-branding, the relocation of his franchised Mr. Transmission Service Center, and his refusal to allow Tim Rodifer, Moran's Vice President of Operations, into his Mr. Transmission Service Center (in violation of the terms of the Franchise Agreement). It was ultimately my decision to terminate the Franchise Agreement for cause based on defendants' breaches of the Franchise Agreement. I live in the Chicago area, and work at Moran's headquarters in Midlothian, Illinois.

16.     Another witness for Moran will be Ron Frydrychowski, Moran's Chief Operating Officer. Ron dealt with defendant extensively in connection with defendant's operation of his franchised Mr. Transmission Service Center, and has personal knowledge of defendant's breaches of the Franchise Agreement, Moran's efforts to get defendant to cure those breaches, and he participated in the decisions to place defendant in default, provide him an opportunity to cure his defaults, and, after defendant failed to cure his defaults, to terminate the Franchise Agreement. Ron lives in the Chicago area and works at Moran's Midlothian, Illinois headquarters.

17.     Patricia Cheever is Moran's controller. She has personal knowledge of all matters concerning defendant's accounts with Moran, and his payment and non-payment of amounts owed and compliance and non-performance of his reporting obligations under the Franchise Agreement. Patricia is the person most knowledgeable concerning the above matters. Patricia lives in the Chicago area and works at Moran's Midlothian, Illinois headquarters.

5

18.　　Virginia Garcia is in charge of Moran's IT Administration. Virginia was personally involved with and in charge of the sale to defendant of his Moran franchise. She will testify concerning defendant's misrepresentations about the status of his Meineke franchise at the time he sought and was granted a Moran franchise, among other things. Virginia lives in the Chicago area and works at Moran's Midlothian, Illinois headquarters.

19.　　Tim Rodifer, as mentioned above, is Moran's Vice President of Operations. Tim was the operations advisor assigned to defendant. Tim provided the training defendant received at Moran's headquarters in Midlothian, Illinois. Tim is also the person whom defendant refused access to his Mr. Transmission Service Center, an event that led to the termination for cause of defendant's Moran franchise. Tim lives in Tennessee, but he frequently works out of Moran's Midlothian, Illinois headquarters.

20.　　Marsha Ruske is Moran's Marketing Director. Marsha dealt with defendant with regard to all marketing related matters, including Yodle (referral) set-up, and yellow-pages and other advertising, and she is the person most knowledgeable about the defendant's continued use of Moran's trade names and trademarks through various internet and electronic mediums after termination of the Franchise Agreement. Marsha lives in the Chicago area and works at Moran's headquarters in Midlothian, Illinois.

21.　　Seamus Ryan is Moran's former General Counsel. While employed by Moran, Seamus worked at Moran's Midlothian, Illinois headquarters. He now works and lives in the Chicago area. While with Moran, Seamus dealt with defendant with regard to defendant's request to relocate his Mr. Transmission Service Center, the requirements Moran imposed concerning the relocation, and the representations defendant made to Moran in connection with that relocation.

6

22.     Kelly Gee is Moran's Compliance Director.  Kelly lives in the Chicago area and works at Moran's Midlothian, Illinois headquarters.  Kelly personally handled and coordinated the preparation and execution of the Franchise Agreement, responded to defendant's several requests for copies of certain documents, monitored defendant's compliance with his monetary and operational obligations under the Franchise Agreement during the term of the Franchise Agreement, handled the default and termination process that culminated in Moran's termination of the Franchise Agreement for cause based on defendant's defaults and failure to cure those defaults and will testify to Moran's compliance with the Franchise Agreement's provisions regarding default and termination.

23.     All of the tangible evidence that Moran will offer at trial, which consists of business records, franchise files, correspondence, and similar materials, are maintained at Moran's headquarters in Midlothian, Illinois.

24.     I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 1, 2011.

BARBARA MORAN

# EXHIBIT 1

### FRANCHISE AGREEMENT

This Franchise Agreement made and entered into this 6th day of **October 2008**, by and between MORAN INDUSTRIES, INC., an Illinois corporation, with its principal office in Midlothian, Illinois, hereinafter called FRANCHISOR, and **Mark Baker** a resident of the state of Florida, whose address is **3137 Lisa Court, Tallahassee, Florida 32312**, hereinafter called FRANCHISEE;

### WITNESSETH:

WHEREAS, FRANCHISOR has expended time, effort, and substantial sums of money for the benefit of itself and its franchisees to acquire experience, knowledge and a reputation with the public with respect to the operation of specialized transmission service centers for automobiles, which centers sell automotive products and provide specialized automotive services in a unique and distinctive manner; and

WHEREAS, FRANCHISOR has built up valuable goodwill throughout portions of the United States in the name of "MR. TRANSMISSION" and in various products which are sold under the name of "MR. TRANSMISSION"; and

WHEREAS, the success of MR. TRANSMISSION and all authorized MR. TRANSMISSION franchisees depends upon the continuation of this goodwill and upon the continued operation of specialized transmission service centers adhering to the highest standards of business practices on the part of MR. TRANSMISSION's franchisees, and the maintenance by franchisees of efficient, prompt and courteous service to the public; and

WHEREAS, FRANCHISOR is the owner of the entire right, title and interest, together with all goodwill connected therewith, in and to a widely recognized trade name, trademarks, and service marks, know-how and information, including trade secrets, relating to the operation of specialized transmission service centers; and

WHEREAS, FRANCHISOR is engaged in the business of granting franchises/licenses for the operation of specialized transmission service centers (herein sometimes called "MR. TRANSMISSION SERVICE CENTER(S)" or "Center(s)" or "Service Center(s)") together with the right to use the know-how, decor and color scheme, trademarks, service marks, and trade names owned and developed by FRANCHISOR; and

WHEREAS, FRANCHISEE desires to obtain a license from FRANCHISOR for the use of said know-how, trade names, trademarks, service marks, and other rights in connection with the business of operating a MR. TRANSMISSION SERVICE CENTER in accordance with the highest business and ethical standards; and

WHEREAS, FRANCHISEE recognizes and acknowledges the unique relationship of each franchisee to the other, and to prospective franchisees and to the FRANCHISOR under the trade name of "MR. TRANSMISSION," and further recognizes and acknowledges the mutual benefits to be derived through the maintenance of certain uniform standards and policies set by the FRANCHISOR and derived through open communication and disclosures with the other franchisees and with the FRANCHISOR, and in reliance of each upon the other for the faithful performance of the terms and conditions of this agreement; and

WHEREAS, FRANCHISEE has made a full and complete independent investigation of this opportunity and consulted with any professionals deemed necessary by FRANCHISEE in FRANCHISEE's discretion; and

WHEREAS, FRANCHISOR has made no promises or inducements to FRANCHISEE not reflected in this Franchise Agreement, including but not limited to, projections or promises of any actual or prospective profits of this opportunity.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein contained, FRANCHISOR and FRANCHISEE agree as follows:

1. **GRANT.** FRANCHISOR grants to FRANCHISEE, and FRANCHISEE hereby accepts a franchise for a MR. TRANSMISSION SERVICE CENTER, together with the right to use FRANCHISOR's know-how, trade names, trademarks, and service marks. The MR. TRANSMISSION SERVICE CENTER shall be operated from the following location:

**In and/or around the city of Tallahassee, Florida (exact location to be determined)**

If the above-described location is a market area rather than the exact premises on which the MR. TRANSMISSION SERVICE CENTER shall actually be constructed or operated, then FRANCHISEE must obtain an exact location approved in writing by FRANCHISOR within the said market area and must commence operations of the Service Center all within a reasonable time, not to exceed one year from the date hereof. FRANCHISOR may, however, in FRANCHISOR's sole discretion extend such one year period. Such extension, if granted, shall be in writing. FRANCHISOR's approval of an exact location selected by FRANCHISEE shall not be unreasonably withheld. This Agreement shall, at FRANCHISOR's option, terminate if Franchisee has not obtained an exact location approved in writing by FRANCHISOR and operations at an exact location within the market area described above have not been commenced by FRANCHISEE, all within said one year period, unless extended as described above.

Upon approval by FRANCHISOR of the exact location, it is agreed that the market area designated above in this paragraph shall then read as if the exact location and address were inserted herein at the time of the execution of this Agreement.

If the above-described location is an exact location which is to be leased by FRANCHISEE, FRANCHISEE further acknowledges that this Agreement is contingent upon the execution by all parties named therein of the attached Lease and Addendum, identified as Exhibit "A" and incorporated herein by reference.

The MR. TRANSMISSION SERVICE CENTER shall be operated under the terms and conditions of this Franchise Agreement solely at the location described herein or such other exact location as is approved by FRANCHISOR and at no other location during the term of this Agreement and any renewals. Relocation of the Center shall be selected and approved, including but not limited to completion of a market analysis and demographics study, in writing by FRANCHISEE and FRANCHISOR. FRANCHISOR reserves the right to grant additional franchises in the same City or County where said Center is situated, subject to the rights granted to FRANCHISEE in paragraph 2 below.

If the above-described location is not a market area, but an exact location containing a street address or other precise description of the location of the MR. TRANSMISSION SERVICE CENTER, then FRANCHISEE must commence operations of the center within 120 days from the date hereof. If FRANCHISEE fails to commence operations within said 120 day period, this Agreement may, at FRANCHISOR's option, terminate.

FRANCHISEE acknowledges that the Franchise Fee to FRANCHISOR has been earned by FRANCHISOR and FRANCHISOR shall not be obligated under any circumstances to refund said Franchise Fee.

FRANCHISEE further understands and agrees that FRANCHISEE is solely responsible for the acquisition of a location for the operation of the MR. TRANSMISSION SERVICE CENTER

2

licensed hereunder and that FRANCHISOR's sole duty and responsibility hereunder shall be to approve or disapprove any location submitted by FRANCHISEE. FRANCHISEE acknowledges hereby that it has not been guaranteed or promised that FRANCHISOR will seek or obtain any such location; that FRANCHISOR has not guaranteed or promised FRANCHISEE that any such location submitted to FRANCHISOR will be approved; and that FRANCHISEE has been fully informed by FRANCHISOR, and understands and agrees hereby, that obtaining such approved location is FRANCHISEE's sole responsibility, and not the responsibility of FRANCHISOR.

2. NON-EXCLUSIVITY. FRANCHISOR shall not open another company-owned or other franchise center within three-mile radius of FRANCHISEE'S location. No exclusive area or territory is granted otherwise hereunder. FRANCHISOR shall have the right to establish company-owned Service Centers, convert any existing automotive repair facility to a Mr. Transmission Service Center, or to franchise additional Service Centers in any location FRANCHISOR deems desirable, subject to the procedures described below.

FRANCHISOR may, at any time, sell and/or develop additional MR. TRANSMISSION SERVICE CENTERS in the City or County in which FRANCHISEE's Service Center is located. If FRANCHISOR elects to increase the number of Service Centers in said City or County, it shall notify FRANCHISEE in writing. This written notice shall state the amount of franchise fee to be charged by FRANCHISOR in connection with the development of the additional MR. TRANSMISSION SERVICE CENTER(S) within said City or County. FRANCHISEE may apply for the franchise to be established within said City or County, but will not have the exclusive right to the franchise. FRANCHISOR shall evaluate FRANCHISEE's application and, in its sole discretion, either approve or disapprove purchase of the new franchise or franchises by the FRANCHISEE. If FRANCHISEE is approved for the purchase of such additional franchise or franchises, FRANCHISEE shall, within ten (10) days after FRANCHISEE receives notice of such approval, execute FRANCHISOR's then current Franchise Agreement and pay to FRANCHISOR the then current franchise fee for additional MR. TRANSMISSION SERVICE CENTERS (or such other fee as the parties may have agreed to in writing).

In the event FRANCHISOR acquires a chain of established businesses similar to or competitive with Mr. Transmission, and a location already exists in your area, FRANCHISOR reserves the right to keep that location open, either by operating it or selling it to another franchisee.

3. TERM. Unless terminated earlier in accordance with the terms described herein, this Agreement and the franchise granted hereunder shall have a term of twenty (20) years from the date hereof. At the expiration of such twenty (20) year period the franchise shall be automatically renewed for one additional twenty (20) year term, unless FRANCHISEE notifies FRANCHISOR in writing not less than six (6) months prior to the expiration of the initial term that FRANCHISEE does not wish to renew the franchise. Such franchise shall be renewed on the terms and conditions described in FRANCHISOR's then current Franchise Agreement and pay current renewal fee. Provided, however, that FRANCHISOR shall have the option to refuse to renew FRANCHISEE's franchise, unless all of the following conditions are met:

(a)     FRANCHISEE shall not be in default of any provision of this Agreement or any amendment or successor hereto or any other agreement between FRANCHISEE and FRANCHISOR or its subsidiaries and affiliates, and FRANCHISEE shall have fully and faithfully performed all of its obligations throughout the term hereof; and

(b)     FRANCHISEE shall execute FRANCHISOR's then current franchise agreement, which agreement shall supersede in all respects this Agreement, and pay any and all renewal fees which may be imposed by FRANCHISOR; provided, however, that FRANCHISEE shall not have any additional renewal rights; and provided further that any royalty fees

shall be in accordance with the rate then in effect for new franchisees; and

(c)    FRANCHISEE will complete to FRANCHISOR's satisfaction all maintenance, refurnishing, renovation, modernizing and remodeling of the MR. TRANSMISSION SERVICE CENTER as FRANCHISOR shall reasonably require so as to reflect the then current image of a MR. TRANSMISSION SERVICE CENTER; and

(d)    FRANCHISEE shall be current in the payment of all obligations to FRANCHISOR and any of its affiliates or subsidiaries; and

(e)    Prior to renewal, FRANCHISEE, FRANCHISEE's manager or a designee of FRANCHISEE approved in advance in writing by FRANCHISOR shall at FRANCHISEE's expense, attend and successfully complete to FRANCHISOR's reasonable satisfaction any retraining program FRANCHISOR may require; and

(f)    FRANCHISOR shall be satisfied as to the operational and financial good standing both of FRANCHISEE and any MR. TRANSMISSION SERVICE CENTERS operated by FRANCHISEE pursuant to a license from FRANCHISOR.

4.  <u>CONSTRUCTION</u>.  If the building in which the MR. TRANSMISSION SERVICE CENTER is to be located is to be constructed subsequent to the execution hereof, FRANCHISOR shall furnish FRANCHISEE with its standard plans and specifications for MR. TRANSMISSION SERVICE CENTERS upon written request of FRANCHISEE. Before commencing construction FRANCHISEE shall, at its expense, furnish to FRANCHISOR a copy of FRANCHISEE's plans and specifications for construction of the Service Center in proposed final form, which plans and specifications shall have been adopted from FRANCHISOR's standard plans and specifications and which, if approved, shall not thereafter be changed without FRANCHISOR's prior written consent.

5.  <u>SIGNS</u>.  FRANCHISEE recognizes that uniformity in the image projected to the public through signs is essential in creating goodwill among the public for MR. TRANSMISSION SERVICE CENTERS on a national basis. FRANCHISEE agrees to comply strictly with the specifications provided by FRANCHISOR from time to time for all signs used on the premises. FRANCHISOR will make available to FRANCHISEE for purchase signs meeting FRANCHISOR's specifications, but FRANCHISEE shall not be obligated to purchase signs from FRANCHISOR. FRANCHISOR reserves the right to modify any specifications in accordance with any applicable local, city, county, state and/or federal codes, laws, rules, regulations, ordinances and/or requirements. Such modifications may include size, construction, material, lighting, etc.

6.  <u>TRAINING AND SITE LOCATION ASSISTANCE</u>.  (a) Prior to the public opening of FRANCHISEE's Service Center, FRANCHISOR will make available to the FRANCHISEE training courses consisting of two weeks of classroom training and two weeks of "hands-on" observe and learn in-center training course, the "franchisee's school." FRANCHISEE agrees that FRANCHISEE will, if FRANCHISEE is an individual, or one of the partners of FRANCHISEE if FRANCHISEE is a partnership, attend and complete the franchisees' school to FRANCHISOR's reasonable satisfaction prior to the opening of the MR. TRANSMISSION SERVICE CENTER. If FRANCHISEE is a corporation or partnership, the officer or partner in charge of the operations of FRANCHISEE must attend and complete the franchisees' school to FRANCHISOR's reasonable satisfaction. FRANCHISEE further agrees that the person who will manage the MR. TRANSMISSION SERVICE CENTER, whether such person is the FRANCHISEE or his designee, must attend and complete the managers' school prior to the opening of the MR. TRANSMISSION SERVICE CENTER licensed herein. Any person whom the FRANCHISEE

4

desires to appoint as manager of the Service Center after its opening must also attend the next available managers' course after assuming his duties as manager.

(b) In the event the franchise is not operational within 180 days after the completion of the franchisees' school by the appropriate individual, in addition to any other rights FRANCHISOR may have under this Agreement for such failure to open, said individual must re-attend and complete to FRANCHISOR's reasonable satisfaction such portions of the franchisees' school as FRANCHISOR deems necessary.

(c) FRANCHISEE shall also attend such further training and instructional courses, together with any meetings, as FRANCHISOR may from time to time determine to be necessary in order to ensure that the FRANCHISEE continues to provide high standards of expertise and service to the public.

(d) FRANCHISOR's training courses shall take place at such location as FRANCHISOR shall designate and shall be at no charge to FRANCHISEE; however, FRANCHISEE shall be responsible for his own expenses in attending such courses including, without limitation, travel, meals, lodging, and transportation.

(e) FRANCHISEE acknowledges that attendance at FRANCHISOR's training programs is important to the success of both FRANCHISOR and FRANCHISEE, and FRANCHISEE agrees to attend these programs. The failure of FRANCHISEE to attend any required training course or meeting may result in the termination of this Agreement.

(f) FRANCHISOR may, upon request, and according to FRANCHISOR's established procedure, and based solely on its scheduling requirements, visit any site upon which FRANCHISEE proposes to establish his MR. TRANSMISSION SERVICE CENTER for the sole purpose of approving said site for said purpose; provided, however, that the responsibility for selecting a location acceptable to FRANCHISOR is the sole responsibility of FRANCHISEE and by providing such site approval, FRANCHISOR does not guarantee, promise or warrant in any way that FRANCHISEE will be successful in selecting or obtaining an acceptable site. It is expressly agreed that such site approval does not affect FRANCHISEE's obligations for commencement of operations in accordance with paragraph 1 hereof and shall not be construed as, in any way, giving rise to a claim by FRANCHISEE for refund of any monies paid by FRANCHISEE to FRANCHISOR, or any other such claim, including, but not limited to, failure of consideration, estoppel or that FRANCHISEE should not be required to open its Service Center as required in this Franchise Agreement.

(g) FRANCHISOR may, at FRANCHISOR's sole discretion as to time after the opening of FRANCHISEE's Service Center, provide a qualified representative of FRANCHISOR who shall, at FRANCHISOR's expense, assist FRANCHISEE in the operation of FRANCHISEE's Service Center for such period of time as deemed necessary by FRANCHISOR. After the initial opening, FRANCHISOR shall continue to provide supervisory assistance to FRANCHISEE, at FRANCHISOR's expense, at such times and in such manner as the FRANCHISOR shall consider advisable or appropriate. In order to facilitate this assistance and increase its effectiveness, the FRANCHISEE shall allow a representative or representatives of the FRANCHISOR on FRANCHISEE's premises at any time during normal working hours, and shall make available to such representative(s) any information requested and permit said representative(s) to inspect the premises, equipment, inventory, supplies, and merchandising methods, as well as to make such tests or surveys as the representative(s) considers necessary. FRANCHISEE understands and agrees that FRANCHISOR does not promise, warrant or guarantee any such visits or the number thereof, and acknowledges hereby that any such visits will be at the sole and absolute discretion of FRANCHISOR as to timing and number, and that no minimum number of visits is required hereby.

(h) FRANCHISOR may, at its option, also from time to time schedule conferences to which all franchisees or their representatives shall be invited. FRANCHISEE understands the importance of such meetings scheduled by the FRANCHISOR, and FRANCHISEE agrees to attend these conferences. These conferences will normally cover such topics as merchandising techniques, training of personnel, performance standards, advertising programs, and procedures. All such training sessions shall be at the expense of FRANCHISOR, but FRANCHISEE shall be responsible for his own expenses for transportation, food, lodging and other costs in attending said training.

(i) FRANCHISEE understands and agrees that his actual participation in the operation of the MR. TRANSMISSION SERVICE CENTER shall be either on a full-time basis or as an owner-investor. If as a full-time operator, FRANCHISEE agrees hereby to operate the MR. TRANSMISSION SERVICE CENTER licensed hereunder on a full-time basis and agrees that he shall not engage in, or be interested in, or participate in, any other business or employment in any way, unless FRANCHISOR gives its prior, written consent thereto. If an owner-investor, such owner-investor shall be obligated to have a trained center manager at all times. This center manager will have attended a training program through Moran Industries, Inc. or be approved by the Corporate Services Department by Moran Industries, Inc. due to the center manager's previous experience within the system. The owner-investor must attend the one-week franchise management training school in Midlothian, Illinois or designate an individual to attend. Should the trained, operating franchisee no longer be able to serve in that capacity, the owner-investor must designate another individual. That individual must arrange to attend the one-week franchise management training school in Midlothian, Illinois within ninety (90) days of the departure of the current trained, operating partner. (If FRANCHISEE is a partnership or corporation, then the managing partner or corporate officer in charge of operation agree to the terms hereof.)

7. AGREEMENT OF FRANCHISEE WITH REGARD TO FRANCHISOR'S NAME AND PROPRIETARY MARK. FRANCHISEE hereby acknowledges the validity of the proprietary mark "MR. TRANSMISSION," and also acknowledges that it is the property of FRANCHISOR. FRANCHISEE will commit no acts which in any respect infringe upon, harm or contest the right of FRANCHISOR in the proprietary mark or in any other mark or name which incorporates the name "MR. TRANSMISSION." FRANCHISEE agrees to purchase all materials with FRANCHISOR'S proprietary marks from FRANCHISOR or have all materials with FRANCHISOR'S proprietary marks approved by FRANCHISOR.

All the rights and privileges granted to FRANCHISEE herein are for FRANCHISEE's enjoyment at the location described in paragraph 1 and nowhere else, and FRANCHISEE shall never (either during the term of this Franchise Agreement or after its expiration or termination) use or attempt to use the name "MR. TRANSMISSION" or "MR. TRANSMISSION SERVICE CENTER" or any variation of such names or any other trade name, trademark or service mark of FRANCHISOR in any manner whatsoever, except in connection with the operation of the MR. TRANSMISSION SERVICE CENTER herein licensed, including, but not limited to, use of any telephone numbers listed in any directory under FRANCHISOR's trade names, trademarks or service marks, use of advertising in any form which states, in any way, that any operation was formerly connected with or known as MR. TRANSMISSION, or the representation to any person or entity that the business being conducted therein is the same or similar to that which operated previously.

The Service Center operated by FRANCHISEE under the terms of this Franchise Agreement and at the location specified herein (or if no location is specified herein, at the location where FRANCHISEE opens or operates any MR. TRANSMISSION SERVICE CENTER for any period of time whatsoever) shall be conducted under the name "MR. TRANSMISSION" and under no other name. However, FRANCHISEE shall not use the expression "MR. TRANSMISSION" in its firm name or corporate name, notwithstanding the fact that FRANCHISOR grants to the FRANCHISEE the right to incorporate in paragraph 21(e) of this Agreement. Further,

FRANCHISEE agrees to make no domain registration or establish a website utilizing the FRANCHISOR'S servicemarks.

FRANCHISEE recognizes that the use by him of the proprietary mark, or any other mark or name that incorporates the words "MR. TRANSMISSION," inures to the benefit of FRANCHISOR, and that any goodwill arising from such use by FRANCHISEE belongs to FRANCHISOR and shall revert to FRANCHISOR in the event that this Agreement is terminated for any reason. If it becomes advisable at any time in our sole discretion to modify or discontinue the use of any name or mark and/or use one or more additional or substitute name or marks, you will be responsible for the tangible costs (such as replacing signs and materials) associated therewith.

8.   UNIFORM STANDARDS.   In order to protect the goodwill associated with the FRANCHISOR's name and to prevent any deception to the public, the FRANCHISEE shall operate his business in accordance with the standards and requirements of quality, appearance, cleanliness, and service as are from time to time prescribed by the FRANCHISOR.   The FRANCHISEE shall maintain the interior and exterior of the premises in a neat, sanitary, orderly and clean condition satisfactory to FRANCHISOR, and shall make such repairs and renovations as FRANCHISOR may reasonably request including, without limitation, repair and painting of the exterior and interior of the MR. TRANSMISSION SERVICE CENTER.   In the event that the FRANCHISEE fails to comply with FRANCHISOR's standards within ten (10) days after written notice thereof from FRANCHISOR, FRANCHISOR may, notwithstanding any other rights FRANCHISOR may have pursuant to this Agreement, have such repair, painting or other renovation done at FRANCHISEE's expense.   FRANCHISEE will install and maintain all lighting, including that for the interior and exterior of the building, in strict accordance with FRANCHISOR's specifications; FRANCHISEE shall also perform in all respects its obligations in any Lease of the premises to which FRANCHISEE is a party.

In order to ensure the continued uniformity of operation, FRANCHISEE shall use, at FRANCHISEE's expense, only such repair order forms and sales invoice forms as are furnished by the FRANCHISOR.

FRANCHISEE recognizes that the continuous and daily availability of products and services to the public is essential to the adequate promotion of the MR. TRANSMISSION SERVICE CENTERS and that any failure to provide such products and services affects the goodwill of FRANCHISOR both locally and nationally.   Therefore, FRANCHISEE agrees (a) to maintain adequate inventory (as more fully described herein) and trained personnel to serve the public; and (b) except to the extent that any law may require otherwise, to keep open and in normal operation the MR. TRANSMISSION SERVICE CENTER for and during the hours of 8:00 a.m. to 5:30 p.m. Monday through Friday and 9:00 a.m. to 1:00 p.m. on Saturday, or for such other hours as may be specified by FRANCHISOR, which hours shall not be unreasonable in accordance with the standards of the transmission repair industry.   FRANCHISEE shall not be required to operate its business on New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving or Christmas.   In an area market with multiple service centers, additional hours and holidays shall be determined by the majority of the service centers in the market area, subject to FRANCHISOR's approval.

FRANCHISEE further agrees that it will sell or distribute from the MR. TRANSMISSION SERVICE CENTER only such types of products or services as are approved by FRANCHISOR; provided, however, that FRANCHISEE shall have the sole right to determine the prices for resale to its patrons for such products or services.   FRANCHISEE shall purchase its parts and inventory from FRANCHISOR or such approved vendors as are identified in paragraph 13.

Without limiting any of the language elsewhere in this Agreement, FRANCHISEE agrees at all times to require a high moral and ethical standard of conduct from its employees and to maintain the premises and all equipment, fixtures and facilities in such a manner as required by

7

municipal, state and county regulations. FRANCHISEE further agrees to provide all customers of the MR. TRANSMISSION SERVICE CENTER efficient, courteous and high quality service to the end that the Service Center shall help create goodwill among the public for MR. TRANSMISSION SERVICE CENTERS as a whole, and that FRANCHISOR, FRANCHISEE, and each franchise holder shall be benefited and the public assured of uniform, efficient, courteous and easily recognizable high quality service on a standardized national basis. Towards this end, the employees of FRANCHISEE shall at all times during said employment wear only uniforms which meet the exact requirements of FRANCHISOR, present a neat and clean appearance and render competent, sober, honest, and courteous service to FRANCHISEE's patrons.

FRANCHISEE agrees that it shall thoroughly investigate the employment history of all employees hired to work for FRANCHISEE and shall not hire any person who has been convicted of any felony, larceny, or other acts of moral turpitude. FRANCHISEE agrees to immediately discharge any employee upon notification from FRANCHISOR that said employee has been convicted of any felony involving fraud, embezzlement, larceny or any other act involving moral turpitude or upon notification by FRANCHISOR that the employee has previously been terminated by FRANCHISOR or any other franchisee of FRANCHISOR because of conduct involving fraud, embezzlement or larceny, or other acts of moral turpitude. Failure to immediately discharge such an employee after the aforesaid notification by FRANCHISOR shall constitute an event of default hereunder.

FRANCHISEE agrees at all times to diligently promote the business of the MR. TRANSMISSION SERVICE CENTER and to make every reasonable effort to maximize the sales of its products and services. To this end, except as described in paragraph 6 of this Agreement, FRANCHISEE agrees that he (or the partnership or corporation, if applicable) shall not engage in any other business, employment, or occupation, and shall operate and manage the business licensed hereunder on a full-time basis. The FRANCHISEE acknowledges that strict conformity with the standards described in this paragraph will assist in accomplishing this goal.

9. ADDITIONAL OBLIGATIONS OF FRANCHISOR. FRANCHISOR agrees that it may, in its discretion, in addition to all the obligations hereinabove recited, make available the following services to FRANCHISEE:

(1) Furnish from time to time, at FRANCHISOR's sole discretion, counseling and advisory services and suggestions in the planning and development of FRANCHISEE's business;

(2) At FRANCHISOR's sole discretion, apprise FRANCHISEE from time to time of FRANCHISOR's plans, policies, research, and new developments by means of bulletins, brochures, reports, and at FRANCHISOR's option, by periodic visits of FRANCHISOR's field representatives;

(3) Permit FRANCHISEE to attend, at FRANCHISEE's cost and expense, any national or regional meetings sponsored by FRANCHISOR for other franchise holders;

(4) Conduct from time to time, at FRANCHISOR's sole discretion and expense, research and development into the areas of production and methods of operation, and make the results of this research and development available to FRANCHISEE;

(5) Provide newspaper mats, decals and all other advertising and promotional tools which may be developed from time to time by FRANCHISOR through the MR. TRANSMISSION COOPERATIVE ADVERTISING FUND to FRANCHISEE or to the chairman of the local advertising group if one exists in FRANCHISEE's area;

(6) Provide protection of the FRANCHISEE against trademark, service mark, or patent infringement as regards any trade name, service mark or trademark of FRANCHISOR, including the institution of suit or complaint when the same is deemed advisable by FRANCHISOR.

8

(7) Defend and save harmless FRANCHISEE against all claims which may hereinafter be asserted for service mark or trademark infringement of any of the trademarks or service marks authorized by FRANCHISOR for use by FRANCHISEE.

10. <u>FRANCHISEE FEE</u>. The FRANCHISE FEE is payable upon the execution of this agreement by FRANCHISEE in full. FRANCHISEE understands, acknowledges and agrees that the Franchise Fee payable hereunder is fully earned by FRANCHISOR upon receipt, is in payment of the franchise granted hereunder, and is not refundable at any time for any reason whatsoever. FRANCHISEE hereby expressly waives any and all rights which it now has or may in the future acquire, in law or equity, to demand the return of all or any part of the Franchise Fee paid hereunder, for any reason whatsoever. FRANCHISOR acknowledges the receipt of Twenty Seven Thousand Five Hundred Dollars ($27,500.00) from FRANCHISEE as payment of the Franchise Fee hereunder. FRANCHISEE acknowledges and agrees that additional franchise fees, the amount of which shall be established by FRANCHISOR, shall be required if and when franchises for additional locations are granted to FRANCHISEE, and renewal fees may be required in order to renew this Franchise Agreement for the additional term provided for herein.

11. <u>ROYALTY FEE</u>. Following the commencement of operations by FRANCHISEE, FRANCHISEE shall pay to FRANCHISOR, in weekly amounts (to be received by FRANCHISOR by Friday of each week), a royalty fee in a sum equal to seven percent (7%) of the gross sales, as hereinafter defined, made by FRANCHISEE during the preceding calendar week.

The expression "gross sales" as used in this Agreement shall consist of all sales of any kind whatsoever made regardless of whether cash payment is actually received by FRANCHISEE at the time of the transaction, including credit card sales and accounts receivable sales, in connection with the exercise of the franchise granted hereunder including, but not limited to sales of automotive supplies, accessories, gas, oil, repair parts and/or any service or product sold within or without the Service Center being operated by the FRANCHISEE under this franchise, excluding intra-company warranty repairs. The term "gross sales" shall not include sales tax, excise tax or other tax with respect to such sales, but shall include "business interruption" insurance payments.

FRANCHISEE shall submit to FRANCHISOR (i) an accurate business report showing the gross sales received by it during the preceding calendar week on such forms as are provided by FRANCHISOR at FRANCHISEE's expense, (ii) full payment of all royalty fees due via ACH bank draft, and (iii) such other forms and/or reports as are specified in paragraph 12. The preceding items shall be received by FRANCHISOR in the offices of FRANCHISOR no later than Friday of each week. Royalties shall be paid without penalty if received by FRANCHISOR on or before Friday of each week. FRANCHISEE shall pay any and all fees and other charges in connection with this Franchise Agreement (including, without limitation, the continuing franchise fees, royalty fees, continuing advertising fee, equipment, supplies and advertising charges, and any applicable late fees and interest charges) by ACH debiting, and FRANCHISEE shall undertake all action necessary to accomplish such transfers. If FRANCHISEE fails to pay its royalties as required above, FRANCHISEE shall pay the following late payment charges to FRANCHISOR: (1) a one percent (1%) additional gross sales royalty shall be paid by the FRANCHISEE in any week where the royalty payment is not paid, an additional one percent (1%) gross sales royalty shall accrue against the current week's royalty and the past due royalty, i.e., if late one (1) week, the royalty shall be eight percent (8%); if late two (2) weeks, the royalty shall be nine percent (9%); if late three (3) weeks, the royalty shall be ten percent (10%). At the expiration of the first five year period and at the expiration of each five year period thereafter during the term of this Agreement, FRANCHISOR, may adjust said royalty fee provided, that said royalty fee will not exceed ten percent (10%) of gross sales at any time during the term of this Agreement.

FRANCHISOR, FRANCHISOR's accounting firm, other representatives who may be designated by FRANCHISOR, or other duly authorized agents of FRANCHISOR, shall have the

right during business hours to audit or examine, without limitation, at FRANCHISOR's expense, the repair orders, receipts, bank records, accountant's or bookkeeper's records, credit bureau records, books, business machines, records, tax returns and other returns of FRANCHISEE; and FRANCHISEE agrees to keep complete and accurate books and records of its operation of the MR. TRANSMISSION SERVICE CENTER. FRANCHISEE shall immediately remit to FRANCHISOR any service charges which such audit reveals are due plus interest on such service charges at the highest rate allowed by law from the date any such service charges became due. In the event that any such audit discloses an error in the computation of the total gross sales made from or on the premises in excess of two percent (2%), the FRANCHISEE shall also pay or reimburse FRANCHISOR for any and all expenses incurred by FRANCHISEE in connection with the audit, including, but not limited to, legal and accounting fees. This right of inspection by FRANCHISOR, its accountants or authorized agents shall continue for a period of one hundred eighty (180) days after expiration or termination of this Agreement by either party.

In the event any audit discloses that FRANCHISEE has any repair orders which are missing or unaccounted for, FRANCHISEE agrees to pay the then current royalty fee/percentage on each such repair order based upon an amount equal to $2,000 for each repair order sale or the amount equal to the average repair order for the MR. TRANSMISSION SERVICE CENTER, whichever is greater, the same as if such repair order or orders had been submitted to FRANCHISOR with such amount thereon.

In the event that FRANCHISEE is more than ten (10) days late in paying any service charge, other than royalty fees, interest shall accrue on said service charge at the highest rate allowed by law from the date payment was due. All reports required to be furnished pursuant to this paragraph and paragraph 12 must be signed by the FRANCHISEE.

FRANCHISOR or its designated agent shall have the right at all times to conduct investigations of the operations of FRANCHISEE, at FRANCHISOR's expense. In conducting such investigations FRANCHISEE shall permit FRANCHISOR or FRANCHISOR's designated representative complete access to its books, business machines, records, premises and operations, and shall allow FRANCHISOR to interview FRANCHISEE's employees. In the event that such investigation reveals that the FRANCHISEE has committed any fraudulent or illegal act with respect to the operation of the MR. TRANSMISSION SERVICE CENTER, the FRANCHISOR, in addition to all other rights and remedies it may have pursuant to this Agreement, shall be reimbursed by FRANCHISEE for the expense of the investigation.

Should any of the FRANCHISEE's checks be returned by his bank to FRANCHISOR for any reason whatsoever, FRANCHISEE shall pay FRANCHISOR, in addition to any other charges or expenses incurred by FRANCHISOR, a Twenty-Five Dollar ($25.00) returned check charge. Should FRANCHISOR receive two (2) or more insufficient funds to stop payment checks in any twelve (12) month period during the term of this agreement, then in addition to any other rights FRANCHISOR has, FRANCHISOR may require FRANCHISEE to make all further payments to FRANCHISOR by cashier's check or money order.

12. <u>REPORTS</u>. In addition to the reports required pursuant to the preceding paragraphs, FRANCHISEE agrees to furnish FRANCHISOR with the following reports: (i) a weekly report, signed by FRANCHISEE, setting forth the amount of all deposits, repair orders and sales invoices for every type and nature of repair and sale; FRANCHISEE shall attach to this report copies of all deposit slips, repair orders and sales invoices; (ii) a monthly report, in a form specified by FRANCHISOR, signed by FRANCHISEE, containing a monthly balance sheet and profit and loss statement as well as a monthly accounting, numerically, of all repair orders; such report shall be furnished to FRANCHISOR within thirty (30) days of the end of each calendar month; (iii) an annual financial statement covering the operation of FRANCHISEE's MR. TRANSMISSION SERVICE CENTER, such financial statement to be prepared by an independent public account and to be certified as to its correctness by the FRANCHISEE, or in the event the FRANCHISEE is a corporation, by an officer of the FRANCHISEE. Said financial statement shall be furnished

10

within one hundred twenty (120) days after the end of FRANCHISEE's fiscal year. The profit and loss statement and balance sheet shall contain such information as FRANCHISOR shall reasonably request, including, for example, the information necessary to verify payments due FRANCHISOR under any provision of this Agreement; (iv) upon request of FRANCHISOR, FRANCHISEE shall furnish more frequent reports of gross sales and/or sales by telephone or other means of communication specified by FRANCHISOR; (v) in order to ensure the uniformity of operation and to make maximum effectiveness of the available information concerning Service Center operation, marketing and financial data, and FRANCHISEE shall also submit to FRANCHISOR such additional financial and operating information as FRANCHISOR shall request from time to time.

All written reports shall be made only on forms approved by FRANCHISOR or supplied by FRANCHISOR to FRANCHISEE, at FRANCHISEE's expense. All reports or other information furnished by FRANCHISEE shall be received and treated confidentially by FRANCHISOR; provided, however, that FRANCHISOR may use any such information for the compilation of operating statistics on all of FRANCHISOR's franchises, or groups thereof, for intra-company and public distribution.

FRANCHISEE may keep his books and records on either a calendar year or fiscal year basis. All references in this paragraph to the "year" of FRANCHISEE shall mean either the calendar or fiscal year adopted by FRANCHISEE.

13. INVENTORY AND QUALITY CONTROL. In order to insure consumer acceptance both on a local and national level, FRANCHISEE recognizes the necessity of quality control and standardization as essential conditions of the Franchise Agreement. FRANCHISEE agrees to purchase all items used in the operation of a MR. TRANSMISSION SERVICE CENTER, including equipment, inventory, parts and supplies from FRANCHISOR, or any subsidiary or division of FRANCHISOR, the original equipment manufacturer ("OEM"), or such other vendors as are approved by FRANCHISOR, which approval shall not be unreasonably withheld when such other vendors can meet FRANCHISOR's standards and specifications, including inspection standards. Should FRANCHISEE desire to purchase any item from a source not previously approved by FRANCHISOR, FRANCHISEE shall notify FRANCHISOR in writing and submit such details and specifications regarding the item as FRANCHISOR may require. FRANCHISOR will advise FRANCHISEE within a reasonable time whether the item FRANCHISEE proposes to buy meets FRANCHISOR's approval. The terms of all purchases from FRANCHISOR or its divisions (hereinafter sometimes collectively referred to as the "Company Suppliers") shall be COD or "net ten (10) days" or such other terms as the Company Suppliers shall establish. The Company Suppliers shall have the right to require prepayment, if, in their opinion, FRANCHISEE's financial condition or other circumstances do not warrant shipment in advance of payment.

FRANCHISEE shall submit its orders for inventory to the Company Suppliers in sufficient time to enable them to fill the orders in the usual course of business. The Company Suppliers shall not be liable for any delay in the delivery of any orders, including the delivery of said parts, if such delay is occasioned by any cause whatsoever beyond the Company Suppliers' reasonable control.

14. ORIGINAL EQUIPMENT AND SUPPLIES. Prior to the opening of FRANCHISEE's Service Center, FRANCHISEE shall acquire equipment, supplies and inventory authorized by the FRANCHISOR. FRANCHISEE may purchase the equipment from any authorized OEM, the Company Suppliers or other vendors approved by FRANCHISOR (which approval shall not be unreasonably withheld when it can be demonstrated that said vendor meets FRANCHISOR's standards and specifications, including inspection standards).

15. DISCLAIMER OF WARRANTY AND LIMITATION OF LIABILITY. THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, MADE BY FRANCHISOR

OR THE COMPANY SUPPLIERS COVERING ITEMS SOLD BY FRANCHISOR OR ANY OF THE COMPANY SUPPLIERS TO FRANCHISEE PURSUANT TO THIS AGREEMENT AND HEREAFTER. FRANCHISEE's remedy for defective items is limited to replacement of the defective items and neither FRANCHISOR nor any of the Company Suppliers shall be liable for any incidental or consequential damages, whether brought in warranty, negligence, misrepresentation, strict liability, or any other theory, as a result of selling or supplying any items pursuant to this Agreement. Any warranty which is furnished to the customer by the MR. TRANSMISSION SERVICE CENTER is extended by FRANCHISEE to the customer and not FRANCHISOR to either the FRANCHISEE or the customer, and is a personal obligation of FRANCHISEE.

16. SERVICE CENTER WARRANTIES. FRANCHISEE shall honor each warranty agreement presented by a customer at FRANCHISEE's center in accordance with the terms thereof, irrespective of whether the transmission was originally repaired at FRANCHISEE's Service Center or any other authorized MR. TRANSMISSION SERVICE CENTER. In addition, FRANCHISEE shall comply at all times with FRANCHISOR's policies in force and effect from time to time concerning the MR. TRANSMISSION WARRANTY PROGRAM. Without limitation, FRANCHISEE shall also satisfy legitimate customer complaints concerning any service performed or parts sold pursuant to the warranty program.

FRANCHISEE, upon complying with provisions in this paragraph with respect to the customer of another authorized MR. TRANSMISSION SERVICE CENTER, shall be reimbursed by the other Service Center upon making written demand upon such Service Center in accordance with FRANCHISOR's intershop warranty policies and procedures.

FRANCHISEE agrees to pay any other MR. TRANSMISSION franchisee the amount due to such franchisee for the honoring of a warranty to a customer of FRANCHISEE via credit card within twenty-four (24) hours after such demand by the repairing franchisee. If FRANCHISEE fails to timely pay such amount, FRANCHISEE shall be in default of this Franchise Agreement, and in addition to any remedies it may have for breach of this agreement, FRANCHISOR shall be entitled to recover such amount from FRANCHISEE for the benefit of the franchisee which honored the warranty, by FRANCHISOR shall not be obligated to do so.

Prior to the opening of its service center, FRANCHISEE shall pay to FRANCHISOR the amount of Three Thousand Dollars ($3,000.00) to be held by FRANCHISOR in a warranty fund to pay any claims for warranty repairs which FRANCHISEE may fail to honor, on service center warranties or reimbursements that are unpaid and for warranties which are the responsibility of any center which has closed for any reason and not reopened.

If this franchise has been transferred, FRANCHISEE agrees to honor all warranties issued by his predecessor as if the warranty had been issued by FRANCHISEE under the guidelines of the FRANCHISOR'S current policies and procedures in effect concerning the MR. TRANSMISSION CENTER warranty program. In the event of a transfer of the franchise, the FRANCHISEE'S existing deposit may be assigned to the purchaser, or the purchaser must pay this deposit directly to FRANCHISOR. If the purchaser pays the deposit, FRANCHISEE'S deposit may be refundable 90 days after completion of resale or transfer if terms and conditions are met.

17. ADVERTISING.

(a) Transmission USA Creative Marketing Fund. Recognizing the value of creating advertising concepts and the importance of the standardization of advertising, FRANCHISEE agrees to participate in a TRANSMISSION USA creative marketing fund for the creation and production of marketing concepts and distribution of creative advertising and shall contribute thereto $100.00 per month. FRANCHISEE agrees that the amount to be paid to such advertising fund by the FRANCHISEE may be adjusted by FRANCHISOR from time to time but in no event

shall exceed 1% of gross sales per month during the term of this Agreement. FRANCHISEE shall remit the appropriate amount with the first payment of royalties for the month via ACH debit payable to the TRANSMISSION USA CREATIVE MARKETING FUND, a separate creative marketing account which has been opened for the exclusive use of FRANCHISOR, FRANCHISEE, and other TRANSMISSION USA franchisees or to such other entity as FRANCHISOR shall designate. FRANCHISEE further agrees to have all franchises owned or controlled by FRANCHISEE participate in the TRANSMISSION USA CREATIVE MARKETING FUND.

The TRANSMISSION USA CREATIVE MARKETING FUND will be used for the production and distribution of advertising materials, personal appearances, and other promotional or related materials which FRANCHISOR, in its sole discretion, deems desirable to advertise and promote TRANSMISSION USA SERVICE CENTERS nationally or regionally. FRANCHISOR shall be entitled to direct the utilization of the TRANSMISSION USA CREATIVE MARKETING FUND for the benefit of FRANCHISOR in the sole discretion of FRANCHISOR.

FRANCHISOR reserves the right to consult an advisory alliance of franchisees on the use and spending of this fund.

FRANCHISEE agrees that FRANCHISOR, in its own name, shall be entitled to recover the sum of monies due from the FRANCHISEE for the benefit of TRANSMISSION USA CREATIVE MARKETING FUND and/or FRANCHISOR's advertising agency.

FRANCHISEE further understands and agrees that the TRANSMISSION USA CREATIVE MARKETING FUND exists solely for the production and distribution of advertising materials or other such uses as may be approved by the FRANCHISOR, and that FRANCHISEE is solely responsible for placement of said materials in the media and the costs related thereto.

(b) Local Advertising and Advertising Pools. FRANCHISEE acknowledges that its participation in advertising programs and promotional activities is essential. The FRANCHISEE shall make the expenditures required by and otherwise fully comply with a local advertising budget to be developed for it with the assistance of FRANCHISOR. If there are no other MR. TRANSMISSION franchisees located in the same metropolitan area as FRANCHISEE, FRANCHISEE agrees to budget approximately $500 per week, or 7% of gross sales, to locally advertise and market its MR. TRANSMISSION SERVICE CENTER.

FRANCHISEE agrees, at its expense, to advertise in the classified or yellow pages of the local telephone directory under the listing of "Transmissions," "Automobile Repairing and Service," and such additional listings as may be designated by FRANCHISOR. In such advertising, FRANCHISEE agrees to use only ad mats approved by FRANCHISOR. The size of an advertisement to be placed in a market area with multiple service centers will be determined by a majority of the service centers in the market area, subject to the approval of FRANCHISOR.

FRANCHISEE agrees in its advertising to use and reproduce FRANCHISOR's trademarks, service marks and other symbols exactly and accurately and in a manner which will best protect these rights and to refrain from the use of FRANCHISEE's own name, or any name other than "MR. TRANSMISSION" in connection with any of FRANCHISOR's trademarks, service marks or other symbols.

Without limiting any of the language found elsewhere in this Agreement, FRANCHISEE agrees to adhere to such advertising regulations as FRANCHISOR may impose from time to time, to obtain FRANCHISOR's approval of FRANCHISEE's local advertising, and to use only advertising materials provided or approved by FRANCHISOR.

FRANCHISEE agrees to share local advertising expenses with other franchisees in related, adjoining or overlapping Designated Marketing Area (as designated by FRANCHISOR),

to participate fully in and cooperate with any MR. TRANSMISSION local advertising group now in existence or hereinafter established and to execute any documents in connection with such local advertising which FRANCHISEE is reasonably requested to execute by FRANCHISOR or the local advertising group. FRANCHISEE shall execute an Agreement to Participate in a Local Advertising Group at the time of FRANCHISEE's execution of this Franchise Agreement. Should FRANCHISEE fail or refuse to execute any such documents, FRANCHISEE hereby appoints any officer of FRANCHISOR as its attorney-in-fact to execute such documents in FRANCHISEE's place and stead. All decisions of the local advertising pool shall be final as to FRANCHISEE, and all such decisions shall be based upon majority rule, with each Service Center in the pool having one (1) vote. If the FRANCHISEE fails to pay promptly any amount due his advertising agency or his local advertising group or pool, then either FRANCHISOR or all other franchisees of FRANCHISOR in the local advertising group or pool of which FRANCHISEE is a member, or the local advertising group or pool shall be entitled to recover the amount due from the FRANCHISEE. The FRANCHISEE recognizes that all local advertising inures to his benefit and to the benefit of all franchisees in the local advertising group. FRANCHISEE acknowledges that despite failure to contribute his proportionate share, local advertising expenditures confer substantial benefits on him, and further acknowledges his responsibility for payment therefor. FRANCHISOR, in addition to any remedies available to it for default under this Franchise Agreement, reserves the right to have or allow the local advertising group to seek the enforcement of this obligation, and FRANCHISEE shall be liable for and pay all costs and expenses thereof, including, but not limited to, attorney's fees and court costs.

18. HOLD HARMLESS AND INSURANCE. FRANCHISEE agrees that it will indemnify and save harmless FRANCHISOR, its officers, directors, agents, employees, servants, divisions and its subsidiaries from all liabilities, taxes, losses, fines, costs, damages, expenses (including reasonable attorney's fees and court costs), as well as all claims, demands, actions, suits or proceedings, of any kind or nature, asserted by any entity or anyone whomsoever, arising or growing out of or otherwise connected with FRANCHISEE's operation of the MR. TRANSMISSION SERVICE CENTER. FRANCHISEE shall immediately upon receipt furnish FRANCHISOR with copies of all complaints, subpoenas, and other legal documents alleging or relating to any civil or criminal suit or administrative action it receives brought against FRANCHISEE, FRANCHISOR or their affiliates or principals.

FRANCHISEE shall, prior to the opening of the Service Center, and at all times during the term of this Agreement (and any renewals thereof), at its own expense, maintain and keep in force comprehensive general liability insurance, including the Broad Form CGL (Comprehensive General Liability) coverage endorsement, which endorsement must include product liability insurance, against the claims of all persons, including but not limited to employees and/or customers, with such limits as may from time to time be determined by FRANCHISOR, which limits shall not be less than One Million Dollars ($1,000,000.00) combined single limit coverage for bodily injury and property damage resulting from each occurrence. FRANCHISEE shall maintain and keep in force a One Million Dollar Umbrella Policy over said general liability policy. All insurance shall name both FRANCHISOR and U.S.T.P.﹐division of Transmission City, Inc. as additional insureds and shall protect FRANCHISOR, U.S.T.P. and FRANCHISEE against any liability which may accrue against them or any of them by reason of the ownership, maintenance, or operation by FRANCHISEE of its MR. TRANSMISSION SERVICE CENTER or on account of FRANCHISOR'S or FRANCHISEE'S operations or activities related thereto, at any place whatever.

FRANCHISEE shall also obtain the following insurance coverage: garagekeeper's direct primary insurance coverage in the amount of not less than $10,000 per service bay at FRANCHISEE'S Service Center and include business interruption insurance and all risk insurance on the MR. TRANSMISSION SERVICE CENTER, including improvements, furnishings, fixtures and inventory for the full value thereof. Franchisee shall also obtain workmen's compensation and employer's liability coverage with employer's liability limits of One Hundred

14

Thousand Dollars ($100,000.00), or statutory amounts, whichever is greater and Employee Practices Liability Insurance.

All of said insurance coverage required by this Agreement shall be at the expense of FRANCHISEE, shall be for the benefit of FRANCHISEE and FRANCHISOR and U. S. TRANS PARTS; shall be placed only with an insurance carrier or carriers satisfactory to FRANCHISOR; shall not be subject to cancellation or any material change except after thirty (30) days written notice to FRANCHISOR; shall provide that no failure of the FRANCHISEE to comply with any term, condition or covenant of this Agreement or other conduct of the FRANCHISEE, or those for whose conduct it is responsible, shall terminate or otherwise affect the protection afforded under said policy to FRANCHISOR. A certificate of insurance, reflecting full compliance with the requirements of this paragraph shall at all times be kept on deposit at the general offices of FRANCHISOR. If FRANCHISEE fails to comply with this paragraph, FRANCHISOR may, in addition to any other remedies available to it for breach of this Franchise Agreement, obtain such insurance and require FRANCHISEE to pay the costs thereof upon demand.

Upon request by FRANCHISOR, FRANCHISEE shall furnish FRANCHISOR with suitable evidence that the insurance premiums have been paid. If FRANCHISEE fails to comply with any of these requirements, FRANCHISOR may terminate this Agreement immediately, or in the alternative, at FRANCHISOR's option, FRANCHISOR may obtain such insurance and keep the same in full force and effect, and the premiums thereof shall be immediately due from FRANCHISEE to FRANCHISOR.

FRANCHISEE'S obligation to indemnify FRANCHISOR, as described in this paragraph, is not limited to the extent of or amount of insurance coverage obtained by FRANCHISEE. Notwithstanding any language to the contrary, FRANCHISOR shall be obligated to defend and save harmless FRANCHISEE against claims for trademark infringement as provided in paragraph 9 hereinabove.

FRANCHISOR reserves the right to alter or amend the insurance requirements hereunder upon written notice thereof to FRANCHISEE.

19. INDEPENDENT CONTRACTOR.

(a) The only relationship between the parties shall be that of independent contractors. It is understood and agreed that no agency, employment, or partnership is hereby created between the parties, and the business to be operated by FRANCHISEE is separate and apart from any which may be operated by FRANCHISOR. No representations will be made by either party which would create an apparent agency, employment or partnership relationship, and neither party shall have the authority to act for the other in any manner to create obligations which would be binding upon the other. Neither party shall be responsible for any obligations or expenses whatsoever of the other (except as described herein), nor shall either party be responsible for any act or omission of the other or for any act or omission of an employee or agent of the other.

(b) In all dealings with third parties, including, without limitation, employees, suppliers and guests, FRANCHISEE shall disclose in an appropriate manner acceptable to FRANCHISOR that it is an independent entity. FRANCHISEE agrees to display on the premises of the MR. TRANSMISSION SERVICE CENTER in a prominent place in public view, a plaque prepared at its expense and approved by FRANCHISOR, stating the name and address of the FRANCHISEE and the fact that FRANCHISEE is operating the Service Center under a Franchise Agreement with FRANCHISOR and to take such additional steps as FRANCHISOR may reasonably require to establish its independent contractor relationship.

(c) In all advertising, stationery, printed materials, signage and other such items used in connection with the operation of his business, FRANCHISEE must show thereon that the MR. TRANSMISSION SERVICE CENTER licensed hereunder is independently owned and operated.

15

20. <u>CONFIDENTIAL INFORMATION</u>. The FRANCHISEE acknowledges the confidential nature of the information, manuals, trade secrets, Trans Plus Management (TPM) Software, Intranet access and procedures which will be made available to FRANCHISEE by FRANCHISOR. FRANCHISEE agrees not to divulge, directly or indirectly (except to authorized employees of the FRANCHISEE), any trade secret, or other confidential information, furnished to FRANCHISEE by FRANCHISOR. Upon request of FRANCHISOR, FRANCHISEE will require all of its employees, agents or other persons employed by it, to execute an agreement acknowledging and recognizing FRANCHISOR'S copyright, the confidential nature of certain information, manuals, trade secrets, TPM Software, Intranet access and procedures made available to FRANCHISEE by FRANCHISOR. FRANCHISEE shall promptly cause its employees to execute said agreement and return it upon execution to FRANCHISOR.

Any confidential literature, manuals, TPM Software, Intranet access or passwords given FRANCHISEE will be returned to FRANCHISOR at the expiration or termination of this Franchise Agreement. FRANCHISEE specifically acknowledges that the operating manuals which it receives at the training session described in paragraph 6 is copyright material of FRANCHISOR, is the property of the FRANCHISOR, contains matters which constitute trade secrets, and FRANCHISEE agrees that upon expiration or termination of this Franchise Agreement it will return the operating manuals to FRANCHISOR.

FRANCHISEE agrees not to disclose to anyone for the duration of this Franchise Agreement or any renewal, or at any time after the expiration of termination of this Franchise Agreement or any renewal thereof, directly or indirectly, the confidential information received from FRANCHISOR, whether furnished at the training school, conferences sponsored by FRANCHISOR, or elsewhere, which information relates to methods of operation, servicing, advertising, publicity, promotional ideas, profits, financial status, TPM Softweare, Intranet access or present and future plans for expansion. FRANCHISEE specifically acknowledges that such information is confidential and constitutes part of the trade secrets of FRANCHISOR.

21. <u>ASSIGNMENT BY FRANCHISEE</u>. This Agreement is a personal obligation to the undersigned FRANCHISEE. The FRANCHISEE'S rights to the use of MR. TRANSMISSION'S trade name, trademarks and service marks are not assignable or transferable under any circumstances except in strict compliance with the procedures enumerated in this paragraph and FRANCHISOR shall not unreasonably withhold consent to transfer:

(a) In the event of death of a FRANCHISEE, any person who through intestacy or inheritance acquires the entire interest of FRANCHISEE in the franchise herein granted (hereinafter referred to as the "Heir or Devisee") may continue to retain all rights granted FRANCHISEE in this Agreement, provided that the Heir or Devisee, as a new FRANCHISEE, executes the then current MR. TRANSMISSION Franchise Agreement, assumes all debts and liabilities of any nature owed by FRANCHISEE to FRANCHISOR, and that the Heir or Devisee and the person who is to manage the MR. TRANSMISSION SERVICE CENTER on behalf of the Heir or Devisee shall attend such MR. TRANSMISSION training courses as required by FRANCHISOR and at such times as FRANCHISOR may designate.

In the event that the Heir or Devisee and/or the person who shall manage the MR. TRANSMISSION SERVICE CENTER fails to attend said training courses as required by this paragraph, then the FRANCHISOR at its sole option may terminate all rights conferred in this Agreement and retain any and all license fees or other sums paid by FRANCHISEE to FRANCHISOR. All rights granted to said Heir or Devisee in this paragraph shall be null, void, and of no force and effect in the event that said Heir or Devisee fails to assume all debts or liabilities of any nature owed by FRANCHISEE to FRANCHISOR. Assumption of said liability by the Heir or Devisee shall in no respect constitute a waiver of any rights that the FRANCHISOR may have to recover such sums from the estate of the FRANCHISEE or from other persons or firms who may be liable for said debts or liabilities. The rights conferred to the Heir or Devisee in

16

this paragraph are contingent upon the Heir or Devisee's assumption of the lease of the MR. TRANSMISSION SERVICE CENTER premises signed by FRANCHISEE.

If the Heir or Devisee does not elect to operate the MR. TRANSMISSION SERVICE CENTER or fails to comply with all of the conditions outlined hereinabove, then said Heir or Devisee, or his authorized representative shall sell all of the rights and interests of the Heir or Devisee acquired under this Agreement to FRANCHISOR or to any other purchaser in strict compliance with the procedures enumerated in subparagraphs (c) and (d) below.

(b) In the event of the incapacity of the FRANCHISEE, the guardian or other legally appointed representative (the "Guardian") may continue to operate the MR. TRANSMISSION SERVICE CENTER under the Franchise Agreement and the Franchise Agreement shall continue in effect provided the Guardian or his designee is approved by FRANCHISOR to continue operation of the Service Center (which approval will be not unreasonably withheld) and provided said Guardian or his designee attends the owner's training school required by FRANCHISOR at such times as FRANCHISOR may designate. If the Guardian or his designee is not approved by FRANCHISOR, or fails to attend the owner's training school as required by FRANCHISOR, or if the Guardian elects not to continue operation on behalf of the FRANCHISEE, then the Guardian shall sell all of the rights and interests of the FRANCHISEE acquired hereunder to the FRANCHISOR or other purchaser in strict compliance with subparagraphs (c) and (d) below.

(c) The FRANCHISEE shall not sell, lease, transfer, or assign his rights and interest under this Agreement, or any part hereof, nor any of the assets of same, including, but not limited to, inventory, equipment, parts, fixtures, and the premises, if owned by FRANCHISEE, without in each instance first offering the same to FRANCHISOR on the same terms as FRANCHISEE shall previously have received in a bona fide, written offer from a responsible, fully disclosed prospective purchaser, and thereafter the FRANCHISOR shall have thirty (30) days within which to determine if it wishes to accept said offer. If the FRANCHISOR should decline or fail to accept said offer, the FRANCHISEE may sell, lease, transfer, or assign to the prospective purchaser within sixty (60) days thereafter, on the same terms and conditions as contained in said offer and subject to the conditions enumerated in (d) below.

(d) In the event that FRANCHISOR does not acquire FRANCHISEE'S rights hereunder, as described in (c) hereinabove, FRANCHISEE may assign and transfer his rights to a prospective purchaser provided first that the purchaser is approved by FRANCHISOR and provided further that the purchaser executes FRANCHISOR'S then standard Franchise Agreement. FRANCHISOR agrees to approve said prospective purchaser if the prospective purchaser has a satisfactory credit rating, is of good moral character, has a good business reputation and the business ability to operate the MR. TRANSMISSION SERVICE CENTER, and further provided that any and all obligations of the FRANCHISEE hereunder are fully paid and satisfied, that outstanding accounts which FRANCHISEE may have with any advertising agency are fully paid and satisfied, that FRANCHISEE'S payments to the MR. TRANSMISSION CREATIVE MARKETING FUND and any local advertising group of licensees are paid in full, that the FRANCHISEE is not in default under any provisions of this Agreement, that the FRANCHISEE and the person or persons having control of the affairs of a corporate FRANCHISEE or other entity shall execute a general release of all claims of any nature against FRANCHISOR, and that the FRANCHISEE shall pay FRANCHISOR the then current transfer fee for its legal and other expenses in connection with the transfer and assignment of FRANCHISEE'S rights. The ownership of the MR. TRANSMISSION SERVICE CENTER may not be transferred to the purchaser, nor shall the purchaser be allowed to take any action with respect to the ownership or operation of the MR. TRANSMISSION SERVICE CENTER licensed hereunder, until (i) the purchaser has completed such training course as may be provided for in the then current Franchise Agreement; and (ii) the purchaser has executed the then current Franchise Agreement, (iii) the then current transfer fee has been paid by FRANCHISEE or purchaser before purchaser attends any required training courses; and (iv) the purchaser and FRANCHISEE have arranged for said purchaser to assume FRANCHISEE'S obligations under

17

any lease of the MR. TRANSMISSION SERVICE CENTER premises; and (v) all payments due FRANCHISOR are paid or adequate arrangements have been made with FRANCHISOR for payment of same. Franchisee agrees to remain personally obligated to Franchisor for any and all of purchaser's or assignee's debts to Franchisor for a period of one year after the date of any assignment and transfer of the Franchise Agreement, the guarantee period. In the event of a default by purchaser or assignee, then the guarantee period will be extended for an additional year from that event of default. Assignment of this Agreement to a purchaser shall not constitute a waiver by FRANCHISOR of any claims, whether known or unknown, that the FRANCHISOR may have against the FRANCHISEE relating to or in any way connected with FRANCHISEE'S obligations under this Agreement, and shall not be construed as a release of FRANCHISEE or a novation of this Franchise Agreement.

(e) If FRANCHISEE is a individual and desires to assign and transfer his rights to a corporation, he may do so notwithstanding the limitations on assignment and transfer listed above, upon the following terms and conditions:

(i) The corporation is newly organized and its activities are confined exclusively to operating the MR. TRANSMISSION SERVICE CENTER licensed under this Agreement;

(ii) The FRANCHISEE is the owner of all the stock of the corporation and is the principal executive officer thereof (unless such requirement is waived in writing by FRANCHISOR), and the names and addresses of all officers, directors and shareholders shall be furnished to FRANCHISOR together with the Affidavit of the Secretary of said corporation as to such information;

(iii) All accrued money obligations of the FRANCHISEE to FRANCHISOR are satisfied;

(iv) The corporation and all the officers thereof shall sign an agreement with FRANCHISOR on forms furnished by the FRANCHISOR assuming personally, jointly and severally, all obligations of the FRANCHISEE as described in this Franchise Agreement. It is expressly understood that assumption of FRANCHISEE'S obligations by the corporation does not limit the FRANCHISEE'S personal obligations under the Franchise Agreement, and the FRANCHISEE and the corporation shall be jointly and severally liable hereafter; and

(v) The FRANCHISEE shall sign an agreement with FRANCHISOR on forms to be provided by FRANCHISOR guaranteeing full payment of the corporation's money obligations to FRANCHISOR, agreeing to be bound individually by the obligations assumed by the corporation, and agreeing to continue to be bound by the obligations assumed by FRANCHISEE under this Agreement.

(f) If the FRANCHISEE is a corporation or if FRANCHISEE organizes a corporation as provided for in (e) of this paragraph, the capital stock thereof shall not be sold, assigned, pledged, mortgaged or transferred without the prior written consent of FRANCHISOR, except that there may be a sale of all of FRANCHISEE'S capital stock on the same conditions enumerated above in sub-paragraphs (c) and (d) relative to the transfer of FRANCHISEE'S rights hereunder to a purchaser. All stock certificates shall have endorsed on them the following:

"The transfer of the stock is subject to the terms and conditions of a Franchise Agreement dated the _____ day of _____, 20____, by and between _____, Franchisee and MORAN INDUSTRIES, INC., an Illinois corporation, Franchisor."

(g) If the FRANCHISEE is a partnership and all the members of the partnership desire to assign and transfer the license of the partnership to a corporation, the partners may do so under the same terms and conditions as in subparagraph (e) of this paragraph, provided that the partners own all of the stock of the corporation and are the principal Executive Officers thereof.

18

In addition, if the FRANCHISEE is a partnership, the right of any partner to sell, assign, pledge, mortgage or transfer his partnership interest shall be subject to the same conditions governing the sale, assignment, pledge, mortgage or transfer of the capital stock of a corporation, as in subparagraph (f) of this paragraph (except that all endorsements shall be printed on units of participation, not stock certificates).

(h) If the FRANCHISEE is or becomes a corporation, FRANCHISEE shall disclose to FRANCHISOR the names and addresses of all officers and directors of the corporation and shall, whenever there is any change, immediately notify FRANCHISOR of the name and address of any new officer and/or director, and upon the change of any officer and/or director, FRANCHISEE agrees to execute a new agreement with FRANCHISOR, consistent with the provisions of subparagraph (e)(iv) of this paragraph.

22.   ASSIGNMENT BY FRANCHISOR.   This Franchise Agreement and all rights hereunder may be assigned and transferred by FRANCHISOR and shall inure to the benefit of FRANCHISOR'S successors and assigns.

23.   COVENANT NOT TO COMPETE.  As long as this Agreement shall be in effect, and for a period of two (2) years thereafter, the FRANCHISEE shall not, directly or indirectly, engage or be financially interested in, or associated with, or invest in, the ownership or operation of any shop, center, or business located within a radius of twenty-five (25) miles from the licensed premises or any other MR. TRANSMISSION SERVICE CENTER, which shop, center or business specializes in sale, service, and/or repair of transmissions or related services.  If any part of this restriction is found by a court of law to be unreasonable in time and/or distance, the restriction may be reduced in time and/or distance by an appropriate order of the court to that deemed reasonable.   This restriction shall include, but is not limited to, such action as cessation of operation as a MR. TRANSMISSION SERVICE CENTER in the licensed premises, and FRANCHISEE understands and agrees hereby that in such event, FRANCHISEE may not, directly or indirectly, engage or be financially interested in, or associated with, or invest in, the ownership or operation of a transmission repair or service facility from the premises licensed hereunder during the term stated herein.

In addition as long as this agreement shall be in effect, the FRANCHISEE shall not, directly or indirectly, engage or be financially interested in, or associated with, or invest in, the ownership or operation of any shop, center or business specializing in sale, service and/or repair of transmissions or related services unless that shop, center or business is an approved franchise of FRANCHISOR.

24.   TERMINATION BY FRANCHISOR.

(a) Upon the happening of any of the following events, this Agreement shall, at the sole discretion of FRANCHISOR, immediately terminate upon receipt by FRANCHISEE of written notice of termination:

(1) Any breach or failure by FRANCHISEE to perform any terms or conditions of this Franchise Agreement (except the nonpayment of any monies due) including exhibits, schedules and appendices, or failure by the FRANCHISEE to comply with rules, regulations, or directives promulgated by FRANCHISOR if such default shall continue for thirty (30) days (unless a shorter period is provided for elsewhere in this Franchise Agreement) after FRANCHISOR gives written notice of such default to FRANCHISEE, or, if the default cannot reasonably be corrected within said thirty (30) day period (or such shorter period as may be provided elsewhere in this Franchise Agreement), then within such additional time as may be required, assuming FRANCHISEE proceeds with reasonable diligence (unless state law requires a longer period); provided, however, that default in the payment of any sums due FRANCHISOR shall never be deemed to require any longer period of cure;

19

(2) Notwithstanding anything contained in subparagraph (a)(1) above to the contrary, upon receipt for any reason by FRANCHISEE of the third notice of default from FRANCHISOR in any consecutive twelve (12) month period, regardless of whether or not prior defaults were timely cured;

(3) Notwithstanding anything in subparagraph (a)(1) above to the contrary, if FRANCHISEE'S default under the terms of this Agreement is the nonpayment of any sum due FRANCHISOR, FRANCHISOR shall notify FRANCHISEE in writing of said default in payment and FRANCHISEE shall have ten (10) days after receipt of such notice to fully pay all amounts owing to FRANCHISOR. In the event payment is not made within said ten (10) day period, then FRANCHISOR at its option may terminate this Agreement and this Agreement shall immediately terminate on receipt by FRANCHISEE of the notice of termination by FRANCHISOR (unless state law requires a longer period);

(4) If the location specified in paragraph 1 of this Agreement is an exact location, failure by FRANCHISEE to commence operations within 120 days from the date of execution by FRANCHISEE hereof; or if the location specified in paragraph 1 is a marketing area rather than an exact location, failure to obtain an approved location for the Service Center within the marketing area and to commence operations, all within one year from the date of execution by FRANCHISEE, unless such period is extended by FRANCHISOR in writing;

(5) In the event that FRANCHISEE makes a general assignment or trust mortgage for the benefit of creditors or if the FRANCHISEE shall commit or suffer default under any lease, mortgage, contract or conditional sale, or security instrument, or a petition be filed by or against the FRANCHISEE initiating proceedings under any provisions of the Federal Bankruptcy Code, or if a receiver or similar officer shall be appointed by a court of competent jurisdiction to take charge of all or any part of the FRANCHISEE'S property, or if the FRANCHISEE shall fail to perform or observe any of the provisions required to be performed or observed by the FRANCHISEE under any lease or sublease of the FRANCHISEE'S premises; provided, however, that should any provision of the Federal Bankruptcy Code prohibit the enforcement of this provision, FRANCHISEE shall remain in default hereunder and no additional notice of default hereunder shall be required if and when such prohibition of enforcement shall be removed for any reason. It is further understood and agreed that nothing contained herein shall be construed as a release of any rights of FRANCHISOR under the Federal Bankruptcy Code, and notice is hereby given that FRANCHISOR does not consent to any extension of time for acts required thereunder to be performed by FRANCHISEE, all of which must be performed in strict compliance with the Code;

(6) In the event that FRANCHISEE commits any acts of fraud or misrepresentation or conducts his business in a manner likely to impair FRANCHISOR'S reputation, goodwill, and trade name. Unless required by state law, no notice shall be required under this paragraph;

(7) If the FRANCHISEE ceases to operate as a MR. TRANSMISSION SERVICE CENTER or closes his MR. TRANSMISSION SERVICE CENTER for any reason whatsoever and fails to recommence operation as a MR. TRANSMISSION SERVICE CENTER or reopen within six (6) days from the date of such closing;

(8) In the event that FRANCHISEE is in default under any lease or sublease of the FRANCHISEE's premises;

(9) If the FRANCHISEE attempts to sell, sells, or transfers or assigns any of his rights under this Agreement without approval of FRANCHISOR as provided in paragraph 21 of this Agreement;

20

(10) If the FRANCHISEE fails to procure and/or maintain any insurance coverages required by the terms of this Agreement;

(11) If FRANCHISEE fails to attend any training course or meeting required by FRANCHISOR;

(12) If FRANCHISEE fails to discharge any employee immediately upon notification by FRANCHISOR that such employee has been convicted of any felony, or that such employee has been convicted of fraud, embezzlement, larceny or other acts of moral turpitude, or upon notification that such employee has been discharged by FRANCHISOR or any other licensee of FRANCHISOR because of conduct by the employee involving fraud, embezzlement, larceny, or other acts of moral turpitude;

(13) If FRANCHISEE fails to honor or pay for Service Center Warranties, or if FRANCHISEE'S warranty fund is not replenished within ten (10) days of demand by FRANCHISOR;

(14) If FRANCHISEE voluntarily abandons the franchise business, for more than five days.

(15) FRANCHISEE threatens a material breach, or breaches and fails to cure within any permitted cure period, any default of any other agreement between FRANCHISEE and FRANCHISOR or its subsidiaries and affiliates.

(b) In addition to FRANCHISOR'S right to terminate and not in lieu thereof, FRANCHISOR may enter into FRANCHISEE'S Service Center and exercise complete authority with respect to the operation thereof until such time as FRANCHISOR shall determine that the default of FRANCHISEE has been cured and that FRANCHISEE is complying with the requirements of this Agreement. FRANCHISEE specifically agrees that a designated representative of FRANCHISOR may take over control and operate FRANCHISEE'S Service Center and that FRANCHISEE shall reimburse FRANCHISOR for the full compensation paid to such representative including the cost of all fringe benefits plus any and all expenses reasonably incurred by such representative so long as he shall be necessary, and in any event until the default has been cured and FRANCHISEE is complying with the terms of this Agreement. In connection with this right, FRANCHISOR may obtain a temporary restraining order as a matter of course from any court of competent jurisdiction enjoining and restraining FRANCHISEE from any interference with the right of FRANCHISOR to enter upon the licensed premises and exercise complete control and authority with respect to the operation of the Service Center.

(c) At FRANCHISOR's option, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, said arbitration to be conducted at the offices of the American Arbitration Association located in Chicago, Illinois, or at FRANCHISOR's option at another location, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

25. <u>PROCEDURES AFTER TERMINATION OR EXPIRATION</u>.

(a) Upon the expiration or termination of this Agreement for any cause, the FRANCHISEE shall immediately cease operations of any transmission repair or similar business at the location licensed under this Agreement and shall immediately discontinue the use of FRANCHISOR'S trade names, trademarks, or service marks, and all goods and materials, including, but not limited to, signs, structures, fixtures, equipment, literature of any kind, including, but not limited to, all forms of advertising and stationery containing or bearing FRANCHISOR'S trade names, trademarks, or service marks, or any distinctive color schemes or patterns, symbols, designs, or emblems suggestive of FRANCHISOR or anything in any way connecting

FRANCHISOR and FRANCHISEE; and so far as the FRANCHISEE may lawfully do so, shall make or cause to be made such removals of or changes in signs, buildings and structures as the FRANCHISOR shall reasonably direct so as to eliminate the name MR. TRANSMISSION from the FRANCHISEE'S premises, and to effectively distinguish the premises from its former appearance and from any other MR. TRANSMISSION SERVICE CENTER.

If the FRANCHISEE shall, upon request, fail or omit to make or cause such changes to be made, then without prejudice to FRANCHISOR'S other rights and remedies, the FRANCHISOR shall have the right to enter upon FRANCHISEE'S premises without being guilty of trespass or any other tort, and to make or cause to be made such changes at the FRANCHISEE'S expense. FRANCHISEE hereby appoints FRANCHISOR its attorney-in-fact for the purpose of taking any and all steps and executing any documents necessary to assign to FRANCHISOR upon expiration or termination of this Agreement each telephone number maintained by FRANCHISEE as a MR. TRANSMISSION franchisee. FRANCHISEE shall upon execution of this Agreement immediately execute and deliver any and all documents required to assign each telephone number maintained by it as a MR. TRANSMISSION franchisee to FRANCHISOR, and shall not, in any way, use or attempt to use any such telephone number(s), including, but not limited to, having such calls forwarded or "ring over" to any other number.

FRANCHISEE shall, at its expense and upon request of FRANCHISOR, also remove and deliver to the FRANCHISOR any material which has been loaned by FRANCHISOR to FRANCHISEE, as well as all consigned inventory which may be in FRANCHISEE'S possession. FRANCHISEE, upon request of FRANCHISOR, shall sell all of its inventory on hand to FRANCHISOR at the depreciated value of said inventory on FRANCHISEE'S books, less freight and handling cost.

(b) In no event shall termination or expiration of this Agreement affect, modify or discharge any claims, rights, causes of action or remedies, which FRANCHISOR may have against FRANCHISEE, whether under this Agreement or otherwise, for any reason whatsoever, whether such claims or rights arise before or after expiration or termination of this Agreement. No act of FRANCHISOR taken pursuant to any rights under the terms of this Franchise Agreement, any other agreement, or at law or sounding in equity shall be deemed as a release of FRANCHISEE or consent to any action of FRANCHISEE, nor shall any such act be deemed a novation of this Agreement.

(c) Upon termination or expiration of this Agreement, FRANCHISOR shall have the right to credit all monies of FRANCHISEE being held under deposit or otherwise, to any debts which the FRANCHISEE owes FRANCHISOR or its subsidiaries or divisions, FRANCHISEE'S advertising agent, FRANCHISEE'S insurance carrier, the MR. TRANSMISSION CREATIVE MARKETING FUND or any local advertising group or pool of which FRANCHISEE is a member. FRANCHISEE shall remain liable for all monies owed pursuant to this Franchise Agreement prior to and after any authorized or unauthorized transfer or attempt to transfer all or any part of FRANCHISEE'S rights and interest hereunder, or the cessation of operation as a MR. TRANSMISSION SERVICE CENTER by FRANCHISEE.

(d) Without limiting any of provisions listed above, upon expiration or termination of this Agreement, the FRANCHISEE shall execute such documents and take such action as FRANCHISOR shall deem reasonably necessary or desirable to demonstrate the fact that FRANCHISEE has ceased using the trademarks, trade names, service marks and other distinctive commercial symbols, color schemes, patterns or emblems suggestive of a MR. TRANSMISSION SERVICE CENTER and otherwise has terminated its rights hereunder.

(e) The termination of this Agreement shall not affect, modify or discharge any claim, rights, or causes of action which MR. TRANSMISSION may have against FRANCHISEE, under this Agreement or otherwise, whether such claims or rights arise before or after termination, and FRANCHISEE agrees hereby that in addition to any other damages to which FRANCHISOR may

22

be entitled, FRANCHISOR may collect a sum equal to the then present value of all future royalty payments which would have been due hereunder for the remainder of the term, which sum shall be computed by FRANCHISOR and based upon the average monthly gross sales (as the term "gross sales" is defined elsewhere in this Agreement) of FRANCHISEE, during the term of this Agreement.

26.  ATTORNEY'S FEES.  FRANCHISEE shall pay FRANCHISOR all reasonable costs and expenses, including, but not limited to, attorney's fees and court costs, incurred by FRANCHISOR in connection with any legal proceeding involving the enforcement of any provision of this Agreement. In the event FRANCHISEE files a lawsuit against FRANCHISOR, the prevailing party shall be is entitled to collect its reasonable attorneys' fees and costs from the losing party.

27.  EQUITABLE RELIEF.  The parties hereto agree and stipulate that the restraints upon the FRANCHISEE as described throughout this Agreement, including, but not limited to, those provisions within the paragraph entitled "COVENANT NOT TO COMPETE" are reasonable with regard to the limitations; necessary for the protection of the FRANCHISOR and its business; and that such restraints will not be unduly burdensome upon the FRANCHISEE. In addition to all the remedies at law available to FRANCHISOR in the event of any breach of this Agreement by the FRANCHISEE, the FRANCHISEE agrees that a violation of any of the covenants, terms or provisions hereof to be performed by FRANCHISEE pursuant to this Agreement will cause irreparable harm to the FRANCHISOR and that the actual amount of damages will be impossible to ascertain.  FRANCHISEE agrees that because of the impossibility of determining FRANCHISOR'S total damages in the event of such breach, FRANCHISOR shall be entitled as a matter of course to a temporary restraining order, temporary injunction, and/or a permanent injunction from any court of competent jurisdiction without prior notice thereof to FRANCHISEE, which right of notice, if any, is expressly waived with full knowledge and consent of FRANCHISEE, enjoining and restraining the further violation of any provision of this Agreement, prohibiting FRANCHISEE from any interference with the assertion of any rights of FRANCHISOR, and/or granting possession and control of the center licensed hereunder to FRANCHISOR. Nothing contained herein shall be construed as in any way limiting the rights of the FRANCHISOR to enforce this Agreement or to avail itself of any remedies available to it in law or in equity or otherwise, or as a waiver of any rights to recover damages from FRANCHISEE for any violation.  In the event a bond is required to be posted by the FRANCHISOR in order to obtain injunctive relief hereunder, FRANCHISEE agrees and stipulates that the bond in an amount not to exceed Five Thousand Dollars ($5,000.00) shall in all instances be adequate.

28.  FAILURE TO EXERCISE RIGHTS.  No failure of FRANCHISOR to exercise any power or rights given to it hereunder or to insist upon strict compliance with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of FRANCHISOR'S right to demand exact compliance with the terms hereof.  Waiver by FRANCHISOR of any particular default by FRANCHISEE shall not affect or impair the FRANCHISOR'S rights in respect to any subsequent default of the same or a different nature; nor shall any delay or omission of FRANCHISOR to exercise any rights arising from a default affect or impair the FRANCHISOR'S rights as to said default or any subsequent default.

29.  LEASE.  If FRANCHISEE leases or subleases the property on which the franchise will be operated, any such sublease or lease must be attached hereto as Exhibit "A," and FRANCHISEE must provide FRANCHISOR with a copy of such lease prior to the commencement of operation of the MR. TRANSMISSION SERVICE CENTER licensed hereunder. FRANCHISEE further agrees to include the following provisions in any such lease or sublease:

In the event of any breach by FRANCHISEE of any of the provisions contained herein, and in the further event that this lease shall be terminated by Lessor, or if Lessee shall surrender possession of the premises, or be expelled or removed by Lessor for any

reason, or should Lessee be more than thirty (30) days late in the payment of any rental or the performance of any other obligations (whether monetary or otherwise) under the terms of this Lease, Lessor shall give written notice thereof by registered mail to MORAN INDUSTRIES, INC., MR. TRANSMISSION division, 4444 West 147th Street, Midlothian, Illinois 60445, and MORAN INDUSTRIES, INC. shall have the exclusive option within ten (10) days of receipt of said notice to assume in writing with Lessor all of the obligations of Lessee hereunder (including, but not limited to, the obligation of any rental then past due). In the event of such assumption, MORAN INDUSTRIES, INC. shall acquire all of the right, title, and interest of Lessee in and about said premises.

In addition, should MORAN INDUSTRIES, INC. terminate the Franchise Agreement for the operation of the MR. TRANSMISSION SERVICE CENTER on these premises, MORAN INDUSTRIES, INC. will give notice thereof to Lessor, and the same shall be considered by Lessor and Lessee as a breach of this Lease on the part of Lessee. This notice shall also include a statement of MORAN INDUSTRIES, INC.'S intent to assume Lessee's obligations hereunder. Upon the receipt of such notice, Lessor shall immediately assign all of the right, title, and interest of Lessee in and about said premises to MORAN INDUSTRIES, INC. under the same terms and conditions as contained in the Lease.

Lessor and Lessee understand and agree that the premises leased hereby shall be operated solely as a licensed MR. TRANSMISSION SERVICE CENTER unless such requirement is waived in writing by MORAN INDUSTRIES, INC.

Failure to provide such lease or sublease prior to the beginning of operation of the MR. TRANSMISSION SERVICE CENTER licensed hereunder and/or failure to include the above provision in any third-party lease shall constitute an item of default hereunder and shall entitle FRANCHISOR to enforce any and all rights and remedies available to it, including, but not limited to, the right to injunctive relief granting possession and control of the premises to FRANCHISOR.

30. <u>SECURITY INTEREST</u>. FRANCHISEE hereby grants to FRANCHISOR a security interest in any and all personal property, equipment, inventory and fixtures owned by FRANCHISEE and used or usable in connection with the operation of the franchise. This security interest shall be security for any and all royalties, damages, expenses or other sums owed to FRANCHISOR hereunder and for any other amounts owed by FRANCHISEE to FRANCHISOR. FRANCHISEE agrees to execute any documents, including but not limited to, a UCC-1 (or replacements therefor or extension thereof) reasonably believed by FRANCHISOR to be necessary to perfect said security interest prior to the opening of the MR. TRANSMISSION SERVICE CENTER licensed hereunder, and hereby appoints FRANCHISOR as its attorney-in-fact for the purpose of executing such documents should FRANCHISEE fail so to do.

31. <u>COMPLIANCE WITH LAWS</u>. FRANCHISEE agrees to conduct its business in strict compliance with all applicable laws, ordinances, regulations, and other requirements of any federal, state, county, municipal or other governmental authority and will obtain at its own expense all permits, licenses, and other consents for the operation of its business. FRANCHISOR shall immediately upon receipt deliver to FRANCHISEE a copy of any notice or other instrument which alleges a violation of any municipal, state, federal, or any other governmental law, ordinance, rule, regulation, or order of any governmental agency or authority. Further, FRANCHISEE agrees hereby to give notice to FRANCHISOR of any customer complaints made to any consumer agency, including, but not limited to, the Better Business Bureau, State or Federal Agencies, or other such entities, and further agrees to promptly respond to and answer any such complaints, with a copy of such answer to be provided to FRANCHISOR immediately. Should FRANCHISOR be advised by any such agency of the investigation of FRANCHISEE'S business for any reason whatsoever, FRANCHISEE shall fully cooperate in any request for cooperation in such investigation and shall pay any and all expenses incurred by

FRANCHISOR therein, including, but not limited to, investigation fees, fines, penalties, court costs, attorney's fees and interest.

32.   SEVERABILITY.   In the event any of the terms, conditions or clauses of this Agreement shall be determined by a court of competent jurisdiction to be illegal or unenforceable, or be declared by such court to be invalid, then only those terms, conditions, or clauses as so determined by the court shall be affected, and all other terms, conditions and clauses hereof shall remain fully valid and enforceable according to law.

Further, in the event any state or other governmental authority has enacted or promulgated, or subsequently enacts or promulgates, any legislation or regulation which affects, alters or controls the terms and substance of this Agreement, such shall automatically become a part of this Agreement and any portions hereof in conflict therewith shall be amended to conform with such legislation or regulation.

33.   NOTICE.   All notices required hereunder shall be deemed properly given if one party shall mail the same, postage prepaid, to the other by registered or certified mail, Federal Express, UPS, hand delivery or courier service (a) if to the FRANCHISEE, to the address of the MR. TRANSMISSION SERVICE CENTER licensed hereunder and/or his last known address; (b) if to FRANCHISOR, to the principal address of its home office, marked to the attention of the President.  In the event any notice sent by FRANCHISOR shall be returned for any reason, then it shall be deemed that FRANCHISEE has received proper notice under the terms of this Franchise Agreement, and FRANCHISOR may proceed to enforce its rights hereunder at law or in equity.

34.   APPLICABLE LAW.   The parties have finalized this Agreement in the City of Midlothian, County of Cook, State of Illinois, and agree that this contract and their actions hereunder shall be governed by and construed in accordance with the laws of the State of Illinois.  The parties further agree that any proceedings which arise out of or are connected in any way with this Agreement and/or operation of the MR. TRANSMISSION franchise licensed hereunder shall be submitted to the Unites States District Court for the Northern District of Illinois or any court of record of Cook County, Illinois.

35.   IMPROVEMENTS TO METHOD OF OPERATION.   FRANCHISOR expressly reserves the right to revise, amend and change, from time to time, the method of operation of MR. TRANSMISSION SERVICE CENTERS, or any part thereof.   Any and all such revisions, amendments, changes and improvements developed by FRANCHISOR, FRANCHISEE, or other Franchisees, shall be and become the sole and absolute property of the FRANCHISOR, and FRANCHISOR shall have the sole and exclusive rights to copyright, patent, register and protect such improvements in FRANCHISOR'S own name, and FRANCHISEE agrees to abide by any such changes.

36.   PRONOUNS AND DEFINITION OF TERMS.   All terms and words used in this agreement regardless of the number and gender in which they are used shall be deemed and construed to include any other number, and any other gender, as the context or sense of this agreement or any provision hereof may require, as if such words had been fully and properly written in the appropriate number and gender.  In the event that the "Franchisee" consists of two or more individuals or in the event that the Franchisee is a corporation, then such stockholders or individuals shall be jointly and severally liable, and references to the "Franchisee" in this Agreement shall include all such individuals and stockholders.

37.   CAPTIONS.   The paragraph captions as to contents of a particular paragraph herein are inserted only for convenience, and are no way to be construed as part of this Franchise Agreement, or as a limitation of the scope of the particular paragraph to which they refer.

38.   COMPUTERIZED CUSTOMER SERVICE SYSTEM.   FRANCHISEE understands and agrees that FRANCHISOR distributes and maintains Trans Plus Management Software in

conjunction with the Intranet which FRANCHISOR requires to be in operation in the licensed MR. TRANSMISSION SERVICE CENTER. FRANCHISEE agrees hereby to purchase such system from FRANCHISOR for use in its Service Center. FRANCHISEE agrees to pay any monthly or annual maintenance fee relating to use of FRANCHISOR's Trans Plus Management Software. FRANCHISEE agrees to submit reports via the Intranet and must acquire access to do so.

FRANCHISEE further agrees to attend any training school required by FRANCHISOR in connection with the operation of Trans Plus Management Software, at FRANCHISEE'S sole cost and expense.

In addition to the reports required in the preceding paragraphs FRANCHISEE agrees to furnish FRANCHISOR on a weekly basis, the following reports, including but not limited to (i) Daily/Weekly Business report, (ii) Weekly Business report, (iii) Cash Received report, (iv) Center Summary report, (v) Completed/Not Delivered report, and (vi) Center Activity report via the Intranet.

FRANCHISEE further agrees hereby that FRANCHISOR may, without any further approval being required, poll FRANCHISEE'S computer system and obtain any and all information contained therein, by any necessary method, including but not limited to, direct telephone connection, at any time deemed necessary by FRANCHISOR, whether on a routine basis or under special circumstances.

    39.   ENTIRE AGREEMENT. THIS DOCUMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES CONCERNING THE SUBJECT MATTER HEREOF, AND NO REPRESENTATIONS, INDUCEMENTS, PROMISES, OR AGREEMENTS, ORAL OR OTHERWISE, BETWEEN THE PARTIES WITH REFERENCE THERETO AND NOT EMBODIED IN THIS AGREEMENT SHALL BE OF ANY FORCE AND EFFECT EXCEPT FOR OR OTHER THAN THOSE CONTAINED IN THE UFOC. ANY AGREEMENTS MADE HEREINAFTER SHALL BE INEFFECTIVE TO CHANGE, MODIFY, ADD TO OR DISCHARGE IN WHOLE OR IN PART, THE OBLIGATIONS AND DUTIES UNDER THIS AGREEMENT, UNLESS SUCH AGREEMENT IS IN WRITING AND SIGNED BY FRANCHISEE AND BY AN OFFICER OF FRANCHISOR.

ATTEST:

FRANCHISOR

Barbara Moran, President & CEO
Moran Industries, Inc.

ATTEST:

FRANCHISEE

Mark Baker

ADDRESS OF FRANCHISEE:

**3137 Lisa Court, Tallahassee, Florida 32312**

If FRANCHISEE is a partnership or a corporation, this Agreement and all obligations, promises and covenants of FRANCHISEE must be guaranteed individually and personally.

Rev. 10/01/07

.

GUARANTY

On this 6th day of **October 2008** in consideration of the benefits the undersigned derives from **Mark Baker** ("FRANCHISEE") entering into a Franchise Agreement with Moran Industries, Inc., and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned guarantor(s) hereby guarantees the payment of all fees and costs and the performance by FRANCHISEE or FRANCHISEE's successors or assigns of all covenants and agreements of the above Franchise Agreement. Guarantor shall be directly and primarily liable, jointly and severally, with FRANCHISEE for all covenants and agreements contained within the Franchise Agreement.

Guarantor absolutely and unconditionally covenants and agrees that in the event that FRANCHISEE is unable to, or does not, pay, perform or satisfy FRANCHISEE's obligations in a full and timely manner, for any reason, including, without limitation, the liquidation, dissolution, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment of, or other similar proceedings affecting the status, composition, identity, existence, assets or obligations of FRANCHISEE or the disaffirmance or termination of any of FRANCHISEE's obligations in or as a result of any such proceedings, Guarantor shall pay, perform or satisfy FRANCHISEE's liabilities and that no such occurrence shall in any way reduce or affect Guarantor's obligations hereunder. Upon the occurrence of a default in the prompt payment, timely performance and satisfaction in full of FRANCHISEE's obligations, all of the obligations of the Guarantor shall, at the election of FRANCHISOR, become immediately due and payable. FRANCHISOR need not exhaust its remedies against FRANCHISEE or exercise any of the other remedies available to FRANCHISOR, prior to, concurrently with or after proceeding against Guarantor to collect the full amount of Guarantor's obligations hereunder. The term "FRANCHISEE's obligations" shall mean the payment of all amounts due and the performance and observance of all covenants, conditions and obligations contained in the Franchise Agreement; and all renewals, extensions, amendments, modifications and replacements of any of payments, performance and observance of all covenants, conditions and obligations contained in the Franchise Agreement, and all other indebtedness or obligations of FRANCHISEE to FRANCHISOR, of every kind or nature.

Guarantor hereby expressly waives:

A. Notice of acceptance of this Guarantee, notice of any default under the Franchise Agreement, notice of any matter concerning the financial conditions of FRANCHISEE or notice of the taking of any action or the exercise of any remedy by FRANCHISOR under the Franchise Agreement;

B. Presentment, demand, notice of dishonor, protest and notice of protest, notice of any and all defaults and all other notices whatsoever; and it being the intention of Guarantor to, and Guarantor does hereby, waive all defenses, including those given to sureties or guarantors at law or in equity, other than the actual payment and performance of FRANCHISEE's obligations.

_____
Mark Baker, Individually

27

## EXHIBIT A TO FRANCHISE AGREEMENT

**LEASE OR SUBLEASE**

(Franchisee's lease agreement or sublease agreement for the licensed premises, if any, should be inserted in this portion.)

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MORAN INDUSTRIES, INC.** ) | |
| **and MEINEKE CAR CARE** ) | |
| **CENTERS, INC.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Case No. 10-CV-7653** |
| **v.** ) | **Hon. Judge Hibbler** |
| ) | |
| **MARK E. BAKER,** ) | |
| ) | |
| **Defendant.** ) | |

## DECLARATION OF TED P. PEARCE

1.       My name is Ted P. Pearce.  I am an individual over the age of eighteen (18) years. I am Vice President and General Counsel of Driven Brands, Inc. ("Driven Brands").  Driven Brands is a holding company that was organized in 2005, and it is the parent company of Meineke Car Care Centers, Inc. ("Meineke").  I have served as General Counsel for Meineke since 1982. I was appointed as a vice president of Meineke in 1984.  Since 2005, I also have served as a vice president of Driven Brands and its General Counsel.

2.       I have personal knowledge of the facts set forth in this declaration and would be willing and able to testify thereto if and when called upon to do so.  I submit this declaration in support of Meineke's opposition to defendant Mark E. Baker's motion to dismiss for lack of personal jurisdiction or to transfer.

3.       A true and correct copy of the franchise agreement between Meineke and defendant is attached to this declaration as Exhibit 1 ("Meineke Franchise Agreement").

1

4.      While Meineke and its witnesses are located in North Carolina, and the Meineke Franchise Agreement allows for Meineke to sue in North Carolina, Meineke chose to sue in the State of Illinois along with Moran Industries, Inc. ("Moran"), as is provided for in Moran's Franchise Agreement with Mr. Baker.

5.      Meineke's decision to join Moran and sue in Illinois has the effect of avoiding a multiplicity of suits against defendant (with Moran filing in Illinois and Meineke filing in North Carolina) and creating efficiencies, not only for the plaintiffs, but also for defendant and the courts. Since there are issues of fact and law common to Meineke's claims against defendant and Moran's claims against him, common evidence need only be gathered and presented once in a single venue.

6.      In this case, Meineke anticipates that no fewer than three (3) Meineke employees will likely be called to testify should this case proceed to trial. Those three witnesses are located in Charlotte, North Carolina and are identified in paragraphs seven through nine below.

7.      Keenan Moran is Meineke's President and is located in Charlotte, North Carolina. Mr. Moran will testify to the corporate structure of Meineke and the Meineke system. Mr. Moran also had interaction with defendant during the time that defendant was a franchisee and has personal knowledge of defendant's interactions with Meineke and his repudiation of the Meineke Franchise Agreement.

8.      David Schaefers is Meineke's Vice President of Franchise Development and is located in Charlotte, North Carolina. Mr. Schaefers will testify to the franchise sale to defendant, of which he has personal knowledge. He also will testify as to the process necessary

2

to replace a franchisee in a territory previously operated by an authorized Meineke franchisee whose franchise has since been terminated.

9.      Michael Carlet is Meineke's Vice President and Chief Financial Officer and is located in Charlotte, North Carolina. Mr. Carlet has personal knowledge of, and will testify as to, the amounts owed to Meineke at the time of the termination of defendant's franchise, and the amount of future royalties that defendant would owe as a result of his anticipatory repudiation of the Meineke Franchise Agreement.

10.     All of the tangible evidence that Meineke will offer at trial, which consists of business records, franchise files, correspondence, and similar materials, are maintained at Meineke's headquarters in Charlotte, North Carolina.

11.     I declare under penalty of perjury that the foregoing is true and correct. Executed on March 2, 2011.


TED P. PEARCE

3

# EXHIBIT 1

# MEINEKE®
# CAR CARE CENTERS, INC.
# FRANCHISE AND TRADEMARK AGREEMENT

<u>Mark Baker</u>
DEALER

4071
CENTER NUMBER

TABLE OF CONTENTS

Page

ARTICLE 1:  INTRODUCTION AND DEFINITIONS ................................................................ 1
   1.1   Meineke Car Care Centers ................................................................................. 1
   1.2   Acknowledgments ............................................................................................. 1
   1.3   Definitions ....................................................................................................... 1

ARTICLE 2:  GRANT OF RIGHTS ........................................................................................ 3
   2.1   Grant of Franchise/Reservation of Rights ........................................................ 3
   2.2   Selection of Location for New Center .............................................................. 3
   2.3   Your Territorial Protection ............................................................................... 4
   2.4   Your Right to Associate with Other Meineke Dealers ...................................... 5
   2.5   Consultation with the Dealer Association Advisory Council ............................ 5
   2.6   Relocation of Center ........................................................................................ 6

ARTICLE 3:  FEES ............................................................................................................... 6
   3.1   Initial Franchise Fee ........................................................................................ 6
   3.2   Royalty Fees .................................................................................................... 6
   3.3   Royalty Fee Administration ............................................................................. 7
   3.4   Contributions to Meineke Advertising Fund .................................................... 8
   3.5   Interest On Late Payments ............................................................................... 8
   3.6   Method of Payment .......................................................................................... 8
   3.7   Application of Payments .................................................................................. 8

ARTICLE 4:  DEVELOPMENT OF YOUR CENTER .............................................................. 9
   4.1   Purchase or Lease of Premises ......................................................................... 9
   4.2   Development and Opening of Your Center ...................................................... 10
   4.3   Equipment, Fixtures and Signs ...................................................................... 10
   4.4   Ownership of Telephone Listings ................................................................... 10

ARTICLE 5:  TRAINING AND GUIDANCE ......................................................................... 10
   5.1   Training Programs .......................................................................................... 10
   5.2   On-Going Guidance ....................................................................................... 11
   5.3   Periodic Visits ............................................................................................... 11
   5.4   Operations Manual ........................................................................................ 11

ARTICLE 6:  YOUR ORGANIZATION AND MANAGEMENT ............................................. 12
   6.1   Disclosure of Ownership Interests ................................................................. 12
   6.2   Management of Center .................................................................................... 12

ARTICLE 7:  OPERATING STANDARDS ............................................................................ 12
   7.1   Authorized Products and Services .................................................................. 12
   7.2   Parts and Supplies .......................................................................................... 13
   7.3   Maintenance and Repair of Equipment ........................................................... 14
   7.4   Condition of Center/Center Upgrades ............................................................ 14
   7.5   Specifications and Standards .......................................................................... 14
   7.6   Changes to Specifications and Standards/Days and Hours of Operation ......... 15
   7.7   Compliance With Laws ................................................................................... 15
   7.8   Personnel ....................................................................................................... 15

| | | |
|---|---|---|
| 7.9 | Insurance | 16 |
| 7.10 | Conformity to the Discount Price Programs | 16 |
| 7.11 | Customer Warranties | 16 |
| 7.12 | Customer Complaints | 17 |
| **ARTICLE 8:** | **MARKETING AND ADVERTISING** | 17 |
| 8.1 | Marketing and Advertising Programs | 17 |
| 8.2 | Meineke Advertising Fund | 18 |
| 8.3 | Allocation Between Local Advertising and Yellow Pages | 20 |
| 8.4 | Local Advertising | 20 |
| 8.5 | Dealer Web Site | 20 |
| 8.6 | Approval of Advertising Content | 21 |
| **ARTICLE 9:** | **REPORTS AND INSPECTIONS** | 21 |
| 9.1 | Records | 21 |
| 9.2 | Computer System | 21 |
| 9.3 | Periodic Reports | 22 |
| 9.4 | Use of Customer Information | 22 |
| 9.5 | Inspections | 22 |
| 9.6 | Audits | 22 |
| **ARTICLE 10:** | **TRADEMARKS** | 23 |
| 10.1 | Ownership of the Marks | 23 |
| 10.2 | Use of the Marks | 23 |
| 10.3 | Discontinuance of Use of Marks | 23 |
| 10.4 | Notification of Infringements and Claims | 24 |
| 10.5 | Indemnification of Dealer | 24 |
| **ARTICLE 11:** | **RESTRICTIVE COVENANTS** | 24 |
| 11.1 | Confidential Information | 24 |
| 11.2 | Dealer's In-Term Covenants | 25 |
| 11.3 | Information Exchange | 25 |
| 11.4 | Dealer's Post-Term Covenants | 25 |
| 11.5 | Meineke's Non-Competition Covenant | 26 |
| 11.6 | Competition by Meineke's Affiliates | 26 |
| 11.7 | Meineke's Management Commitment | 28 |
| **ARTICLE 12:** | **TRANSFER OF AGREEMENT** | 28 |
| 12.1 | Transfer by You Subject to Our Approval | 28 |
| 12.2 | Conditions for Approval | 28 |
| 12.3 | Transfer to a Corporation | 30 |
| 12.4 | Special Transfers | 30 |
| 12.5 | Death or Disability of Dealer | 30 |
| 12.6 | Your Right to Offer Your Franchise to Us | 30 |
| 12.7 | Our Right of First Refusal | 31 |
| 12.8 | Transfer by Us | 32 |
| **ARTICLE 13:** | **TERMINATION OF AGREEMENT** | 32 |
| 13.1 | Termination Upon Notice | 32 |
| 13.2 | Termination After Opportunity to Cure | 34 |

ii

ARTICLE 14:  RENEWAL RIGHTS .................................................................................................... 34

ARTICLE 15:  EFFECT OF TERMINATION OR EXPIRATION ........................................................ 35
    15.1    Payment of Amounts Owed to Us ................................................................. 35
    15.2    Discontinue Use of Marks and Confidential Information ............................. 35
    15.3    Customers .................................................................................................... 36
    15.4    Possession of Premises ................................................................................ 37
    15.5    Continuing Obligations ................................................................................ 37

ARTICLE 16:  RELATIONSHIP OF THE PARTIES ............................................................................ 37
    16.1    Independent Contractors .............................................................................. 37
    16.2    Indemnification ............................................................................................ 38
    16.3    Taxes ............................................................................................................ 38

ARTICLE 17:  MISCELLANEOUS .................................................................................................... 39
    17.1    Governing Law ............................................................................................. 39
    17.2    Arbitration ................................................................................................... 39
    17.3    Preliminary Injunctive Relief ....................................................................... 40
    17.4    Multi-Plaintiff and Class Action Claims ...................................................... 40
    17.5    Venue ........................................................................................................... 40
    17.6    Costs and Attorneys' Fees ........................................................................... 40
    17.7    Limitations on Legal Claims ........................................................................ 40
    17.8    Severability and Substitution of Provisions ................................................. 40
    17.9    Waiver of Obligations .................................................................................. 41
    17.10   Exercise of Rights ........................................................................................ 41
    17.11   Construction ................................................................................................ 41
    17.12   Modification ................................................................................................. 42
    17.13   Policy Regarding Meineke Chain Expansion ............................................... 42
    17.14   Notices and Payments .................................................................................. 43
    17.15   Ombudsman .................................................................................................. 43

### MEINEKE®
### FRANCHISE AND TRADEMARK AGREEMENT

**THIS AGREEMENT** between **MEINEKE CAR CARE CENTERS, INC.** ("Franchisor" or "we"), a North Carolina corporation, with its principal place of business located at 128 South Tryon, Charlotte, North Carolina 28202 and Mark Baker ("Dealer" or "you"), a(n) Individual, whose principal address is 3237 Lisa Ct., Tallahassee, FL 32312, is made and entered into as of the date appearing below our signature line at the end of this Agreement (the "Agreement Date").

## ARTICLE 1:
## INTRODUCTION AND DEFINITIONS

### 1.1    Meineke Car Care Centers

We operate, and grant others ("Meineke Dealers") the right to operate, automotive maintenance and repair businesses known as "Meineke Car Care Centers." As a result of our investment of time, skill, effort and money, we have developed comprehensive business methods and systems, that we may improve or otherwise change from time to time, for operating Meineke Car Care Centers.

### 1.2    Acknowledgments

You and we acknowledge our shared commitment to the common goals of enhancing customer goodwill toward the Marks, to strengthening the business of Meineke Car Care Centers and to expanding the chain of Meineke Car Care Centers. You and we further acknowledge that the success of achieving these common goals is dependent on us and Meineke Dealers working together in a spirit of mutual respect and cooperation. In accordance with that spirit, we have developed this form of franchise agreement with the advice and counsel of the Dealer Association Advisory Council.

The provisions of this Agreement are based on the guiding principles that: (a) we should respect your interest in the going-concern value of your business; and (b) you should respect our ownership of the System, including the Marks, trade secrets, confidential information and the associated goodwill, and our rights to determine the nature and quality of the products and services sold under the Marks, to control the manner in which the Marks are used, to enforce System standards and to manage the System. You understand the terms of this Agreement and accept them as being reasonably necessary for us to maintain the uniformity of our high quality standards at all Meineke Car Care Centers and to protect the goodwill of the Marks and the integrity of the System.

### 1.3    Definitions

The terms listed below have the meanings which follow them or have the meanings which are set out in the referenced Section and include the plural as well as the singular. Other terms are defined elsewhere in this Agreement in the context in which they arise.

(1)    "Affiliate" - Any person or entity that directly or indirectly owns or controls the referenced party, that is directly or indirectly owned or controlled by the referenced party, or that is under common control with the referenced party.

(2)    "Agreement Date" - See Preamble.

(3)     "Annual Administrative Expense" - See Section 8.2.

(4)     "Authorized Products and Services" - See Section 7.1.

(5)     "CPI" - The index number in the table relating to "Consumer Price Index - United States City Average, All Items, for Urban Wage Earners and Clerical Workers" as presently published in the "Monthly Labor Review" of the Bureau of Labor Statistics for the United States Department of Labor (the "Bureau"). In the event the Bureau ceases publishing the Consumer Price Index or materially changes the methods of its computation or other features of it, we may substitute comparable statistics on the purchasing power of the consumer dollar published by the Bureau, another governmental agency or a responsible financial periodical or recognized authority to be chosen by us.

(6)     "Competitive Business" - See Section 11.2.

(7)     "Confidential Information" - See Section 11.1.

(8)     "Core Authorized Products and Services" - See Section 7.1.

(9)     "DAAC" or "Dealer Association Advisory Council" - See Section 2.5.

(10)    "Dealer" or "you" - See Preamble.

(11)    "Franchisor" or "we" - See Preamble.

(12)    "Gross Revenues" - See Section 3.3.

(13)    "Immediate Family" - Spouse, parents, brothers, sisters and children, whether natural or adopted.

(14)    "MAF" - See Section 3.4.

(15)    "Market Area" - The MSA, PMSA, NECMA, county, parish or other corresponding geographical area used by the U.S. Census Bureau and as described in Schedule A, attached hereto and incorporated herein by reference.

(16)    "Marks" - Our current and future trademarks, service marks and trade dress, including the mark Meineke®, that we authorize Meineke Dealers to use.

(17)    "Meineke Dealers" - See Section 1.1.

(18)    "Meineke Car Care Centers," "Meineke Centers" or "Centers" - Automotive maintenance and repair businesses that we operate, or that we grant others the right to operate, and which offer and sell the Authorized Products and Services using the Marks and the System.

(19)    "Operating Partner" - See Section 6.2.

(20)    "Operations Manual" - See Section 5.4.

(21)    "Opening Date" - See Section 4.2.

(22)    "Owner" - See Section 6.1.

2

(23)    "Preferred Supplier" - A supplier of equipment, parts, supplies or other products who we have approved and whose equipment, parts, supplies or products we use in training programs and the Operations Manual to demonstrate and teach techniques in performing services associated with Authorized Products and Services.

(24)    "Premises" - The location of your Center identified in <u>Schedule B</u>, attached hereto and incorporated herein by reference.

(25)    "Protected Area" - See <u>Section 2.3</u>.

(26)    "System" - The business methods, systems, designs and arrangements for developing and operating Meineke Car Care Centers that include the Marks; the Confidential Information; standards and specifications for equipment; service standards; training and assistance; advertising and promotional programs; and certain operations and business standards and policies.

(27)    "Term" - See <u>Section 2.1</u>.

(28)    "Transfer the Franchise" - See <u>Section 12.1</u>.

(29)    "Your Center" - See <u>Section 2.1</u>.

**ARTICLE 2:**
**GRANT OF RIGHTS**

**2.1    Grant of Franchise/Reservation of Rights**

Subject to the terms and conditions of this Agreement, we grant you the right, and you assume the obligation, to operate a Meineke Center ("your Center") at the Premises and to use the System solely in connection therewith, for a term expiring on the expiration date set forth in <u>Schedule A</u> or otherwise expiring on the 15th anniversary of the Opening Date (the "Term"). You may not conduct the business of your Center or use the System anywhere other than the Premises without our consent.

Except as otherwise expressly provided in this Agreement, we and our Affiliates reserve all of our respective rights and discretion with respect to the Marks, the System and Meineke Centers anywhere in the world and the right to engage in any business whatsoever, including: (a) the right to operate, and grant to others the right to operate, Meineke Centers at such locations and on such terms and conditions as we deem appropriate; and (b) the right to acquire, merge or consolidate with, be acquired by, operate and expand businesses.

**2.2    Selection of Location for New Center**

If this Agreement is for a new Center, you agree to propose a location for your Center in the Market Area within 270 days after the Agreement Date. Your proposed location must conform to our site selection guidelines and requirements and is subject to our approval. You agree to submit to us all information about the proposed location that we request, including a complete site analysis report. We have no obligation to consider a proposed location until we receive all requested information. You agree not to execute any lease or purchase agreement for, nor commit to any other binding obligation to purchase, occupy or improve, any proposed location until we have approved the location in accordance with our standard procedures. In approving or disapproving any proposed location, we will consider the factors we deem relevant, including general location, neighborhood and the distance to any other Meineke Center operating in the Market Area. We will have no liability whatsoever to you or anyone else for disapproving a proposed location. Upon

3

approval of a proposed location, the location will be identified in <u>Schedule B</u> and <u>Schedule B</u> will be signed by both parties and attached to this Agreement. Once <u>Schedule B</u> has been completed and signed, the location identified in <u>Schedule B</u> will be deemed the "Premises."

If you and we are unable to mutually agree on a location for your Center within 270 days after the Agreement Date, either party may terminate this Agreement, effective upon notice. We will refund, without interest, the initial franchise fee you have paid hereunder (less our costs and expenses relating to processing your application, including franchise sales commissions, and evaluating proposed locations, which costs and expenses will not be less than $10,000), provided you and your Owners sign a general release in form and substance satisfactory to us.

Neither our site selection guidelines and requirements, our approval of the Premises, nor any information we may impart to you about the Premises, constitutes a warranty or representation of any kind, express or implied, that your Center will be profitable or successful. Our approval of the Premises merely signifies that we authorize you to operate a Meineke Center at that site. You are solely responsible for the selection of an appropriate site for your Center.

### 2.3    Your Territorial Protection

Once the Premises have been identified in accordance with <u>Section 2.2</u>, we will not during the Term operate, nor grant others the right to operate, (a) a Meineke Center within a radius of 2 miles from the Premises (the "Protected Area"), (b) a Meineke Center outside of the Protected Area but within a radius of 3 miles from the Premises without offering you a right of first refusal, as described in this <u>Section 2.3</u>, or (c) more than 1 Meineke Center for every 50,000 motor vehicles (i.e., automobiles and light trucks that are licensed to operate on public highways) registered in the Market Area at the time each Center is opened.

If, during the Term, we want to operate, or to grant someone else the right to operate, a Meineke Center outside the Protected Area, but at a proposed location within a 3-mile radius from the Premises, we will first offer a franchise to you on our then-standard terms and conditions for new Meineke Car Care Centers, provided that you are Option Eligible (as defined below). If you do not accept our offer within 30 days, we will be entitled to operate, and to grant to someone else the right to operate, a Meineke Center at the proposed location. Notwithstanding anything to the contrary contained in this <u>Section 2.3</u>, if there is more than one then-existing Meineke Center located within a 3-mile radius from the proposed location of the new Meineke Center, then you will be entitled to the right of first refusal contained in this <u>Section 2.3</u> only if (a) your Center is closest to the proposed location of the new Meineke Center, or (b) the owners of all Meineke Car Care Centers that are closer to the proposed location of the new Meineke Center fail to accept any similar right of first refusal contained in their franchise agreements.

For purposes of this <u>Section 2.3</u>, you will be "Option Eligible" if: (1) you are not then in arrears in any payment to us or to any of our Affiliates for 30 days or more and we have not delivered to you a notice of default during the preceding 12 months; and (2) you have no outstanding customer warranty matters or customer complaints which are not resolved within 30 days after we notify you of them. You acknowledge and agree that the foregoing "Option Eligible" standard does not encompass our normal requirements and criteria for issuing a new franchise, approving a transferee or renewing a franchise and, by agreeing to limit our criteria under this <u>Section 2.3</u>, we are not limiting our requirements or criteria for any other types of franchise sales or transactions or acknowledging that being Option Eligible means you are in compliance with this Agreement.

Your rights and our obligations in this <u>Section 2.3</u> do not apply to any Meineke Center that is open or under development, or as to which the location has been approved, as of the date we notify you of our approval of the Premises.

4

### 2.4    Your Right to Associate with Other Meineke Dealers

We agree not to prohibit or restrict you from lawfully associating with other Meineke Dealers, nor from forming, joining or participating in the lawful activities of any independent association of Meineke Dealers. Notwithstanding the foregoing, our exercise and enforcement of rights under this Agreement or under applicable law will not, by itself, constitute a breach of this Section 2.4. You are not required to be a member or participate in the activities of any independent association of Meineke Dealers.

### 2.5    Consultation with the Dealer Association Advisory Council

We agree to consult with DAAC (or, as applicable, the Advertising Committee) on a periodic basis with respect to the matters specified in Sections 3.3 (Royalty Fee Administration), Section 7.1 (Authorized Products and Services), Section 7.2 (Parts and Supplies), Section 7.8 (Insurance), Section 7.10 (Customer Warranties), Section 8.2 (Meineke Advertising Fund), Section 17.12 (Policy Regarding Meineke Chain Expansion) and Section 17.14 (Ombudsman) and other matters relating to our relationship with Meineke Dealers as to which we may, at our sole discretion, agree to consult with DAAC from time to time. You agree that we may consult with and consider the advice and counsel of DAAC, but that we are not bound by its views.

Provided that Meineke Dealers Association, Inc. (d/b/a "The New Meineke Dealers Association, Inc." and f/k/a "Association of Muffler Dealers, Inc.") ("MDA"), a Delaware non-profit corporation, complies with its obligations under the Meineke/Dealer Association Cooperation Agreement dated on or about May 1, 2000 to amend its organizational documents before July 31, 2000 in accordance with the terms of that agreement, the "Dealer Association Advisory Council" or "DAAC" shall be a representative committee of Meineke Dealers (or officers or directors of Meineke Dealers operating in corporate form) duly elected from time to time by the members of MDA through democratic processes and reflecting reasonable geographical representation, so long as MDA represents the owners of more than 50% of all franchised Meineke Car Care Centers in the United States of America. In the event that MDA does not fulfill its obligations under the above-referenced agreement, or the owners of 50% or less of all franchised Meineke Car Care Centers in the United States of America are members of MDA, and another association of Meineke Dealers which represents the owners of more than 50% of all franchised Meineke Car Care Centers in the United States of America and whose governing documents meet our reasonable requirements from time to time for ensuring democratic processes and representation of the interests of all Meineke Dealers, including appropriate electoral regions and districts, then the DAAC shall consist of a committee of duly elected representatives of such other association.

We may from time to time require that MDA or any other independent association of Meineke Dealers intending to qualify for a DAAC demonstrate to our reasonable satisfaction that it qualifies to establish a DAAC, and we shall have no obligation to recognize any purported DAAC of any association, including MDA, that has failed or refused to so demonstrate its qualifications.

If, at any time, no association of Meineke Dealers exists or qualifies to establish a DAAC, we may, but are not obligated to, establish an elected or appointed DAAC, and if we determine not to do so, we will have no obligation, notwithstanding anything to the contrary contained in this Agreement, to seek the advice and counsel (or consent under Section 17.13 or otherwise) of any DAAC (or, as applicable, Advertising Committee), unless and until an association of Meineke Dealers qualifies to establish a DAAC.

### 2.6    Relocation of Center

If your lease or sublease for the Premises terminates prior to its expiration for reasons other than a default thereunder by you or expires without you being able to obtain a renewal of the lease or sublease, then

you may relocate your Center in accordance with this Section 2.6, subject to our approval. Any such relocation shall be at your sole expense. The relocation of your Center is subject to all of the provisions of Section 2.2, Section 2.3, Section 3.3, Section 4.1, Section 4.2, Section 4.3 and Section 4.4 as if you were establishing a new Center, provided, however: (a) your rights under Section 2.3 terminate effective immediately upon closing of the old Premises and become operative again only when the new Premises are approved by us; (b) your Center at the new Premises must open within 12 months after the date of closing of the old Premises; (c) your initial franchise fee is not refundable; and (d) you agree to reimburse us for all of our costs and expense incurred in connection with your relocation.

**ARTICLE 3:**
**FEES**

### 3.1     Initial Franchise Fee

If your Center is a new Meineke Center, you agree to pay us an initial franchise fee of $30,000 (less any creditable deposit), payable on the Agreement Date. The initial franchise fee is fully earned by us on the Agreement Date and, except as otherwise provided in Section 2.2 and Section 4.1, is non-refundable.

### 3.2     Royalty Fees

You agree to pay us, on or before Wednesday of each week, royalty fees at the percentages set forth below for the identified categories of Authorized Products and Services derived from the sale of such products or services during the immediately preceding week (i.e., Sunday through Saturday period):

| Authorized Product or Service | Royalty rate as a percentage of Gross Revenues |
|---|---|
| wiper blades | 7% |
| exhaust systems | 7% |
| brakes | 5% |
| CV boots and shafts | 5% |
| Universal joints | 5% |
| belts | 5% |
| cooling system | 5% |
| shocks and struts | 5% |
| tune up and fuel injection cleaning | 5% |
| air conditioning | 5% |
| head lamps | 5% |
| lift supports | 5% |
| trailer hitches | 5% |
| bearings and seals | 5% |
| front end parts | 5% |
| power steering | 5% |
| rack & pinion | 5% |
| merchandise including chemicals, clothing, and other | 5% |
| wheel alignment | 4% |
| wheel balancing | 4% |
| tire rotation | 4% |
| transmission fluid change | 4% |
| tires | 3% |
| state inspection | 3% |

6

MCC 9/2008

| | |
|---|---|
| motor mount | 3% |
| oil change | 3% |

The authorized products and services within each of the foregoing categories include installation, repair and maintenance and all parts relating thereto and the sale of any such parts, and our determination with respect to any item which may fall within one or more categories shall be final and binding. The phrase "exhaust systems" includes mufflers, pipes, clamps, catalytic converters, flex hoses, resonators and other parts customarily considered components of the exhaust system.

### 3.3    Royalty Fee Administration

Notwithstanding the provisions of Section 3.2, royalty fees payable pursuant thereto and MAF Contributions payable pursuant to Section 3.4 on work performed for commercial customers who do not pay for those services at the time they are performed, i.e., trade accounts, shall be paid by the earlier of: (a) 7 days after the date of payment from the customer; or (b) 90 days after the services are performed. If you can demonstrate, within one year after the services have been performed for a particular trade account, that such account is uncollectible, you may assign such account to us and we will credit you for the amount of royalty and MAF Contribution that you have paid on such account.

Notwithstanding anything to the contrary contained in Section 3.2: (a) the royalty fee will be 7% of all revenues derived from products sold and services rendered at or in connection with your Center that are not Authorized Products and Services; (b) the royalty fee will be 7% of all Gross Revenues, if you fail to provide us required reports and information using computer systems in accordance with Section 9.2; (c) the royalty fee will be 7% of all unreported Gross Revenues, including those uncovered by an audit conducted pursuant to Section 9.6; and (d) we have the right to establish the amount of the royalty fee for any new products or services that become part of the Authorized Products and Services after the Agreement Date (provided that if and when batteries become part of Authorized Products and Services, the royalty rate will be 5% of Gross Revenues derived therefrom). We agree to consult with DAAC on the amount of the royalty fee for any such new products or services and to consider, among other things, the potential profitability of such new products and services in determining the amount of the royalty fee.

"Gross Revenues" are all the revenues derived from or in connection with the operation of your Center, whether from sales for cash or credit, and irrespective of their collection, including charges for Authorized Products and Services and applicable proceeds from any business interruption insurance for your Center, but excluding: (a) sales taxes, use taxes, gross receipts taxes, and other similar taxes added to the sale price, collected from the customer and remitted to the appropriate tax authorities; (b) credit card fees on credit card sales; and (c) check guaranty fees. "Gross Revenues" also include revenues derived from any products or services sold and/or performed from or in connection with your Center that are not Authorized Products and Services, without such inclusion in this definition or the related collection of royalty fees constituting an acknowledgment or admission by us that such products or services are Authorized Products and Services or constituting in any manner a waiver of our right to assert that any such sale breaches this Agreement or otherwise violates our rights.

### 3.4    Contributions to Meineke Advertising Fund

You agree to contribute 8% of your Gross Revenues to the Meineke Advertising Fund ("MAF"), provided however, if your Center is a new Center, you agree to pay the greater of 8% of your Gross Revenues or $250 for each of the first 12 weeks that your Center is open. You acknowledge and agree that we may enforce your obligation to contribute to the MAF.

7

Notwithstanding the foregoing: (a) we may from time to time reduce the percentage amount of your contributions to the MAF on Gross Revenues from the sale of any products and services that are not Core Authorized Products and Services and determine the manner in which such reduced percentage amounts are allocated under Section 8.2; and (b) the percentage amount of your contributions to the MAF on Gross Revenues derived from the sale of tires shall be 1.5%, of which .5% will be allocated to Creative and 1% will be allocated to National Advertising in accordance with Section 8.2.

Your contributions to the MAF are due and payable weekly together with the royalty fees due under Section 3.2. Meineke Car Care Centers owned by us and any of our Affiliates will contribute to the advertising programs funded by the MAF on the same basis as you are required to hereunder. Without waiving any rights or constituting any election of remedies, we have the right to notify DAAC or other regionally elected Dealer representatives of any delinquencies in your payment of contributions to the MAF.

### 3.5    Interest On Late Payments

All amounts which you owe us or any of our Affiliates, including MAF contributions, will bear interest from and after ten (10) days after their due date at the highest contract rate of interest permitted by law, not to exceed 3% above the prime rate announced from time to time by The Chase Manhattan Bank or any other national bank we select. In addition, we have the right to assess service charges for any checks that are returned for insufficient funds and late charges if permitted by applicable law. Notwithstanding the imposition of interest or charges, your failure to pay all amounts, when due, constitutes grounds for termination of this Agreement as provided in Article 13.

### 3.6    Method of Payment

All initial franchise fees, royalty fees, MAF contributions and any other payments hereunder shall be paid using those methods of payment we may require from time to time, including electronic debit/credit transfer of funds, provided we may not require any payment mode that would allow us to draw from your account without your consent. You agree to sign such documents, pay such bank fees and do such things as we deem necessary to facilitate electronic transfers of funds or other methods of payment, provided that so long as we require you to send us hard copies of invoices for work performed pursuant to Section 9.3, we will pay for bank transfer fees, if we require electronic transfer of funds. No restrictive endorsement on any check or in any letter or other communication accompanying any payment will bind us, and our acceptance of any such payment will not constitute an accord and satisfaction.

### 3.7    Application of Payments

We may apply any of your payments to us to any of your past due indebtedness for royalty fees, MAF contributions, purchases of products or supplies or any other past due indebtedness to us or any of our Affiliates, notwithstanding any contrary designation by you, provided that any payments that are designated as MAF contributions will be applied first to any currently due or past due MAF contributions. You agree that all such payments will be made as and when due without any setoff, deduction or prior demand therefor.

### ARTICLE 4:
### DEVELOPMENT OF YOUR CENTER

### 4.1    Purchase or Lease of Premises

If your Center is a new Meineke Center, you agree to lease, sublease or purchase the Premises within 1 year after the Agreement Date. We have the right to approve the terms of any lease, sublease or purchase contract for the Premises, which approval will not be unreasonably withheld. You agree to deliver

8

a copy of such lease, sublease or purchase contract to us for our approval before you sign it. You agree that any lease or sublease for the Premises shall, in form and substance satisfactory to us: (a) provide for notice to us of your default under the lease or sublease and an opportunity for us to cure such default; (b) require the lessor or sublessor to disclose to us, on our request, sales and other information furnished by you; (c) give us the right on any termination or expiration of this Agreement to assume the lease or sublease or to enter into a further sublease for a period of not less than 12 months and not more than 18 months (the "Interim Sublease"), without the lessor's or sublessor's consent; (d) give us the right to enter the Premises to make any modifications to your Center to protect our rights to the Marks; (e) provide that the lessor and/or sublessor relinquish to us, on any such termination or expiration of this Agreement, any lien or other ownership interest, whether by operation of law or otherwise, in and to any tangible property that embodies any of the Marks; (f) give us the right to assign the lease or sublease to a successor Meineke Dealer, in which event the Interim Sublease (if any) shall terminate and be of no further force or effect; and (g) include an acknowledgment by the lessor and/or sublessor that we have no liability or obligation whatsoever under the lease or sublease until and unless we assume the lease or sublease on termination or expiration of this Agreement or enter into the Interim Sublease.

You may not execute a lease, sublease or purchase contract for the Premises or any modification, amendment or assignment thereof before we have approved it. Our approval of the lease, sublease or purchase contract does not constitute a warranty or representation of any kind, express or implied, as to its fairness or suitability or as to your ability to comply with its terms. We do not, by virtue of approving the lease, sublease or purchase contact, assume any liability or responsibility to you or to any third parties. You agree to deliver a copy of the fully signed lease, sublease or purchase contract to us within 5 days after its execution.

If for any reason you fail to lease or purchase the Premises within 1 year after the Agreement Date, we may terminate this Agreement, effective upon delivery of notice thereof. In the event of such termination, we will refund, without interest, the initial franchise fee you have paid hereunder (less our costs and expenses relating to processing your application, including franchise sales commissions, evaluating proposed locations for your Center and assisting in developing your Center, which costs and expenses will not be less than $10,000), provided you and your Owners sign a general release and any other instruments we require in order to rescind all transactions between you and us, all in form and substance satisfactory to us.

## 4.2    Development and Opening of Your Center

You are solely responsible for developing and operating your Center and for all associated expenses. If your Center is a new Meineke Center, we will furnish you prototype plans for a Meineke Center. You may modify the prototype plans only to the extent necessary to comply with all applicable laws, regulations, ordinances, building codes and permit requirements (including the Americans with Disabilities Act and the Occupation Safety and Health Act) and any lease requirements and restrictions. You agree to submit such plans and specifications to us for our approval before starting to develop the Premises. All development must be in accordance with the plans and specifications we have approved and must comply with all applicable laws, ordinances and local rules and regulations. We may periodically inspect the Premises during its development. Your Center may not be opened for business until we notify you that all our requirements for opening have been met. The date of our formal notification to you that such requirements have been met shall be deemed the "Opening Date" for purposes of this Agreement. You agree to open your Center within 18 months after the Agreement Date. However, if a failure to open your Center within such 18-month period is due to reasons beyond your control (such as acts of God, unavoidable delays in obtaining zoning permits or unavoidable construction delays), we agree to grant a reasonable extension of time for you to open your Center.

9

### 4.3 Equipment, Fixtures and Signs

You agree that all signs that you purchase or lease for your Center shall be of the types, brands and models that meet our standards and specifications. You agree that all fixtures and equipment that you purchase or lease for your Center shall be of the types, brands and models that we reasonably determine meet industry standards as to quality, performance and safety. You may purchase or lease such equipment, fixtures and signs from any suppliers.

### 4.4 Ownership of Telephone Listings

We will arrange to have telephone service connected for your Center. We will obtain, in our name, the telephone numbers for your Center, which you will have the right to use during the Term. You agree to pay all telephone company charges for such telephone numbers and to reimburse us if we have to pay any such charges. You agree not to place any restrictive codes on the telephone numbers for your Center without our consent. You agree not to terminate any such telephone numbers during the Term or do anything else that may directly or indirectly impede our ability to transfer or use those numbers upon any termination or expiration (without renewal) of this Agreement.

All telephone numbers and directory listings for your Center are our property, and we have the right to transfer, terminate or amend such telephone numbers and directory listings only on termination or expiration (without renewal) of this Agreement. If we take any action pursuant to this Section 4.4, the telephone company and all listing agencies may accept this Agreement as conclusive evidence of our exclusive rights to such telephone numbers and directory listings and as conclusive evidence of our authority to direct their amendment, termination or transfer, without any liability to you.

In addition, you agree to sign such release and transfer documents as we may require to authorize us to obtain the telephone numbers of your Center upon any termination or expiration (without renewal) of this Agreement. If, during the Term, the telephone numbers for your Center should be transferred to someone other than us, you will cooperate with us to ensure that they are returned to us.

## ARTICLE 5:
## TRAINING AND GUIDANCE

### 5.1 Training Programs

If you (or, if applicable, your Operating Partner) have not previously attended and successfully completed our initial training program, then prior to opening or operating your Center, you (or your Operating Partner) must attend and successfully complete an initial training program on the operation of a Meineke Center at such time(s) and place(s) as we designate. If you have paid in full the initial franchise fee in accordance with Section 3.1 and you (or your Operating Partner) attend the initial training program prior to the opening of your Center, then: (a) we will not charge you any separate fees for the training program; and (b) we will pay for the reasonable cost of travel and lodging for not more than 2 persons (who have either signed this agreement or guaranteed this agreement if you are a corporation) in connection with attending the initial training program. At any time during the Term, you (or your Operating Partner) may attend, subject to availability, the initial training program for retraining. We will not charge you a fee for such retraining.

In connection with Core Products and Services added after the Agreement Date, we will make available, if reasonably appropriate, training to you (or your Operating Partner) with respect to general aspects of such Core Products or Services, such training to be made available at such time(s) and place(s) as we may determine. We will not charge any fees for training for additional Core Products and Services.

10

On your request, we will endeavor to provide special training on various aspects of operating a Meineke Center for which you will be required to pay the training fees and charges we may establish from time to time. If we determine that there are significant deficiencies in the operations of your Center, we may require you (or your Operating Partner) and your managers and key employees to attend and successfully complete periodic or additional training programs for which we may charge reasonable training fees.

Except as otherwise provided in this Section 5.1, you will be responsible for all expenses you incur in connection with attending all training programs, including compensation, travel, lodging and meals.

### 5.2    On-Going Guidance

We will furnish you on-going guidance with respect to the System, including improvements and changes to it. Such guidance, at our discretion, will be furnished in the form of the Operations Manual, bulletins (such as our Pipebender™ weekly newsletter) and other written or electronic communications, consultations by telephone or in person at our offices or at your Center, or by any other means of communications. You acknowledge and agree that various means of communication (e.g., electronic communication) may require you to incur expenses for communication technology, including hardware, software and access fees.

### 5.3    Periodic Visits

We will conduct inspections of your Center to evaluate your Center's operations and compliance with the System when and as frequently as we deem appropriate.

### 5.4    Operations Manual

We will loan you one copy of the Operations Manual during the Term. "Operations Manual" means our confidential operations manual, as amended from time to time, that may consist of one or more written manuals (including training manuals), containing our mandatory and suggested standards, specifications and operating procedures relating to the development and operation of Meineke Car Care Centers and other information relating to your obligations under this Agreement. "Operations Manual" also includes alternative or supplemental means of communicating such information by other media which specifically reference that they are to be considered to be part of the Operations Manual, including bulletins, e-mails, videotapes, audio tapes, compact discs, computer diskettes and CD Roms. You agree to keep your copy of the Operations Manual current. If there is a dispute relating to the contents of the Operations Manual, our master copy will be controlling. The Operations Manual contains Confidential Information, and you agree not to copy any part of it.

### ARTICLE 6:
### YOUR ORGANIZATION AND MANAGEMENT

### 6.1    Disclosure of Ownership Interests

You and each Owner (as defined below) represent, warrant and agree that Schedule C, attached hereto and incorporated herein by reference, is current, complete and accurate. You agree to promptly update Schedule C so that Schedule C (as so revised and signed by you) is at all times current, complete and accurate. Each person who is or becomes an Owner must execute an Owner's Personal Guaranty, in the form of Schedule D, attached hereto and incorporated herein by reference, undertaking to be bound

jointly and severally by the terms of this Agreement. Each Owner must be an individual acting in his personal capacity, unless we waive this requirement.

The term "Owner" is defined as a person or entity that has a 10% or more direct or indirect legal or beneficial ownership interest in you, if you are a business corporation, partnership, limited liability company or other legal entity.

### 6.2 Management of Center

We may require you (or your Operating Partner, as defined below) to actively participate in, and exert your best efforts to, the management of your Center and other Meineke Car Care Centers you own. You agree that your Center at all times shall be managed by you (or your Operating Partner) or a manager who has satisfactorily completed our training program.

If you are, or at any time during the Term become, a business corporation, partnership, limited liability company or other legal entity, you agree to designate as the "Operating Partner" an individual approved by us who: (a) owns and controls not less than 10% of your equity and voting rights; (b) has completed our training program to our satisfaction; and (c) has the power and authority to bind you in all dealings with us, unless you designate in writing another Owner reasonably acceptable to us who has the power and authority to so bind you.

## ARTICLE 7:
## OPERATING STANDARDS

### 7.1 Authorized Products and Services

You agree that your Center will offer for sale only those automotive maintenance and repair products and services we authorize Meineke Car Care Centers to offer and sell to the public from time to time pursuant to the Operations Manual ("Authorized Products and Services"). You agree to offer for sale, and to exert your best efforts to aggressively market and sell, all Core Authorized Products and Services. "Core Authorized Products and Services" shall mean repair and replacement of exhaust system components, brake system components, shocks and struts, and any other Authorized Products and Services that we designate from time to time to be products or services central to the operation of Meineke Car Care Centers. All other Authorized Products and Services (i.e., those which are not Core Authorized Products and Services) shall be optional, and you are not required to offer them for sale at your Center.

We have the right to add or delete Authorized Products and Services (including those identified in Section 3.2), and to conditionally approve Authorized Products and Services. We agree to consult with DAAC with respect to decisions to add or delete Authorized Products and Services. You acknowledge and agree that additional Authorized Products and Services may require you to incur additional costs for equipment, inventory, additional personnel, personnel training and leasehold improvements.

We have the right to add Core Authorized Products and Services once the Gross Revenues of such product or service category reaches 10% or more of system-wide sales (i.e., the aggregate Gross Revenues of all Meineke Car Care Centers located in the U.S.) for one year. We have the right to delete Core Authorized Products and Services once the Gross Revenues of such product or service category reaches less than 10% of system-wide sales for one year, provided we agree not to delete any products or services that are designated as Core Authorized Products and Services as of August 1, 1999.

12

Your Center may not be used for any purpose other than the operation of a Meineke Center in compliance with this Agreement. You agree that your Center will offer courteous and efficient service in accordance with our standards.

## 7.2 Parts and Supplies

You acknowledge that the reputation and goodwill of Meineke Car Care Centers is based at least in part on the sale of high quality products and services. Therefore, you agree that your Center will use only parts, uniforms, forms, labels, and other inventory and supplies that conform to our specifications and standards as to quality, performance, and safety and/or are purchased from suppliers (which may include us and/or our Affiliates) we approve. For exhaust system parts, standards meeting the most stringent noise regulations of all the states in the United States of America, which the parties acknowledge currently is California, shall be deemed approved. All other parts that meet the original equipment manufacturer's standards shall be deemed approved, unless we reasonably determine otherwise. If we lower standards for any part, those standards will apply to all suppliers of the particular part.

We (or a designated supplier) will be the only supplier of customer receipts, which will be sold to you at reasonable prices. We and our Affiliates may be suppliers of any other items, including equipment, signs, parts, uniforms, forms and labels. If we require you to purchase any such other items exclusively from us, we agree to sell such items at our cost; otherwise, any such other items may be sold at a profit.

We agree to subject any Preferred Supplier arrangement to a periodic competitive bidding process, the timing of which we will determine with the advice of DAAC. From time to time, we may, with the advice of DAAC, modify our specifications and standards and the list of approved suppliers. After notice of such modification, you may not reorder any parts, uniforms, forms, labels or other inventory and supplies that do not meet our then-current specifications and standards or reorder any such items from any supplier who is no longer approved. At the request of DAAC, we will make available to members of DAAC relevant information in order to verify the financial arrangements we may have with approved third-party suppliers, provided we shall have received reasonable assurances in writing that such information will be treated confidentially and will not be misused.

If you propose to order on a regular basis any parts, uniforms, forms, labels and other inventory and supplies from any supplier who is not then approved by us, you must first submit to us sufficient information, specifications and samples concerning the supplier so that we can decide whether the supplier meets our approved supplier criteria. If we do not disapprove such supplier within 30 days after we have received all requested information, then such supplier shall be deemed approved. If the part offered by a supplier for which you seek approval has not been tested by an independent certified laboratory, we have the right to charge reasonable fees to cover our costs of evaluating such supplier. We may prescribe procedures for the submission of requests for approval and impose obligations on suppliers that we may require to be incorporated in written agreements.

We agree not to solicit or accept any rebates from any approved supplier of equipment, signs, parts or other supplies based on the amount of your purchases from such supplier, but we may solicit and accept rebates based on the amount of purchases by us and our Affiliates. We may solicit and accept other benefits from suppliers, such as promotional allowances, provided we use them solely for the benefit of the chain of Meineke Car Care Centers, such as defraying the cost of training programs, dealer conventions or other meetings. Otherwise, you and we mutually agree not to solicit or accept any benefits from any Preferred Supplier that such supplier does not offer on a comparable basis to all owners of Meineke Car Care Centers. Notwithstanding anything to the contrary contained herein, we may solicit and accept royalty fees and other payments from suppliers for authorization to use the Marks, provided we do not require you to purchase any such items exclusively from such suppliers.

13

### 7.3 Maintenance and Repair of Equipment

You agree to use, operate and maintain all equipment and fixtures in a careful and proper manner in accordance with all applicable laws and regulations, all manufacturers' guidelines and our standards and operating procedures. You agree to undertake all required inspections and, to the extent required by applicable law, post appropriate certificates of inspection or other evidence of governmental approval. You agree to maintain and/or install all safety features as originally installed and as required by applicable safety codes and regulations and to not alter any safety features. You agree to periodically repair and, if reasonably necessary, replace any worn-out or obsolete equipment or fixtures.

### 7.4 Condition of Center/Center Upgrades

You agree to maintain the condition and appearance of your Center so that it is clean and attractive. If at any time the general state of repair, appearance or cleanliness of your Center, or its fixtures, equipment, furnishings or signs, does not meet our standards, we may notify you of the action you must take to correct such deficiency. If, within 10 days after receiving such notice, you fail or refuse to initiate and continue with due diligence a bona fide program to complete such required repair or maintenance, we have the right (in addition to our rights under <u>Article 13</u>), but not the obligation, to enter the Premises and perform such repair or maintenance on your behalf and at your expense. You must promptly reimburse us for the expenses we incur in performing such repair or maintenance.

You agree to periodically upgrade and/or remodel your Center as we may reasonably require, including replacing and/or upgrading exterior and interior signs and decor, provided no such upgrading or remodeling during the Term will require any increase in the square footage of the Premises. We agree that substantial upgrades or remodeling shall not be required more than once every 7½ years during the Term or involve a capital cost of more than $7,500 per occurrence during the Term. You may not make any alterations to your Center, nor any replacements, relocations or alterations of fixtures, equipment or signs that do not meet our then current standards and specifications.

### 7.5 Specifications and Standards

You acknowledge that each and every aspect of the operation of your Center is important to us and is subject to our specifications and standards. You agree to comply with all mandatory specifications, standards and operating procedures and other obligations that are contained in the Operations Manual relating to the development and operation of a Meineke Center, including: (a) all aspects (other than prices) of Authorized Products and Services offered by your Center and the manner in which they are promoted and sold; (b) sales procedures and customer warranties and services; (c) advertising and promotional programs; (d) appearance and dress of employees; (e) safety, appearance, cleanliness and standards of service and operation of your Center; (f) days and hours of operation; and (g) accounting and recordkeeping systems and forms. Mandatory specifications, standards and operating procedures and other obligations set forth in the Operations Manual constitute provisions of this Agreement.

### 7.6 Changes to Specifications and Standards/Days and Hours of Operation

We may modify the Operations Manual to reflect changes in standards, specifications and operating procedures and other obligations, provided no addition or modification may alter your rights, and fundamental status, under this Agreement. We agree to consult with DAAC with respect to any material changes to mandatory standards in the Operations Manual. If DAAC recommends that we not make any material change to required days and hours of operation for Meineke Car Care Centers, we agree not to make such change at any time before January 1, 2004 and not to make such change thereafter, unless: (a) at the time we propose such change, all Meineke Car Care Centers located in the U.S. owned by us and our

14

Affiliates operate during such days and hours (except to the extent prohibited by applicable law) and at least 33.3% of all Meineke Car Care Centers in the U.S. (other than those owned by us or any of our Affiliates) operate during such days and hours; and (b) we give at least 6 months' prior notice to any such change.

### 7.7    Compliance With Laws

You agree to maintain in force in your name all required licenses, permits and certificates relating to your Center. You agree to operate your Center in full compliance with all applicable laws, ordinances and regulations, including the Occupational Safety and Health Act and the Americans with Disabilities Act and to take reasonably prompt action to cure any deficiencies. You agree to notify us in writing within 5 days after the commencement of any legal or administrative action, the issuance of any order of any court, agency or other governmental instrumentality, or the delivery of any notice of violation or alleged violation of any law, ordinance or regulation that may adversely affect the operation of your Center or your financial condition. You agree to adhere to our standards of honesty, integrity, fair dealing and ethical conduct in all dealings with your customers.

### 7.8    Personnel

You agree that your Center at all times will be staffed by a sufficient number of competent and properly trained employees. You are responsible for hiring all employees of your Center and are exclusively responsible for the terms of their employment, including their compensation and training. You are solely responsible for all employment decisions for your Center, including those related to hiring, firing, remuneration, personnel policies, benefits, record keeping, supervision and discipline, and regardless of whether you received advice from us on these subjects (unless such advice from us is a mandatory standard set forth in the Operations Manual).

You may not recruit or hire any person who is then (or was within the immediately preceding 30 days) employed by any Meineke Center operated by us, our Affiliates or another Meineke Dealer, without obtaining the employer's consent, which consent may be withheld for any or no reason. We agree not to recruit or hire any person who is then (or was within the immediately preceding 30 days) employed by you at your Center without obtaining your consent, which consent may be withheld for any or no reason.

At least one employee of your Center must obtain (within a reasonable period of time, not to exceed 1 year after the Agreement Date or Opening Date, if your Center is a new Meineke Center) and maintain certification by Automotive Service Excellence ("ASE") (or any successor or similar organization we designate) for each of the areas of service comprising Authorized Products and Services performed at your Center for which certification is provided. In the event of changes in personnel at your Center in functions that require ASE certification, you will have a reasonable period of time, not to exceed 1 year, to obtain appropriate certification of any replacement personnel. If in the future ASE certification is offered on Authorized Products and Services that is not offered as of the Agreement Date, or if in the future you perform Authorized Products or Services for which ASE certification is offered, you agree to obtain such certification within a reasonable period of time, not to exceed 1 year.

### 7.9    Insurance

You agree to maintain in force: (a) comprehensive, commercial, general, product, garage keeper and automobile liability insurance; (b) general casualty insurance, including fire and extended coverage, vandalism and malicious mischief insurance, for the replacement value of your Center and its contents; and (c) such other insurance policies, such as business interruption insurance, as we may reasonably determine from time to time. All insurance policies shall be issued by carriers with at least an A- rating with A.M. Best (or a similar rating by a comparable rating service acceptable to us), shall contain such types and minimum

15

amounts of coverage, exclusions and maximum deductibles as we reasonably determine from time to time, shall name us and our Affiliates as additional insureds, shall provide for 30 days' prior written notice to us of any material modification, cancellation or expiration of such policy and shall include such other provisions as we may require. We agree to consult with DAAC on any material changes in the types and minimum amounts of coverage, exclusions and maximum deductibles.

At our request, you shall furnish us with such evidence of insurance coverage and payment of premiums as we require. If you fail or refuse to maintain any required insurance coverage, or to furnish satisfactory evidence thereof, we, at our option and in addition to our other rights and remedies hereunder, may obtain such insurance coverage on your behalf. If we do so, you agree to fully cooperate with us in our effort to obtain such insurance policies and agree to pay us any costs and premiums we incur. Your obligation to maintain insurance coverage is not diminished in any manner by reason of any separate insurance we may choose to maintain, nor does it relieve you of your obligations under Section 16.02. Our approval of the insurance you obtain shall not constitute a representation or warranty as to the adequacy of the limits of coverage of such insurance.

### 7.10    Conformity to the Discount Price Program

You agree to conform to the discount price program that is the foundation of the marketing concept of Meineke Car Care Centers, i.e., services performed at prices measurably less than those charged by authorized new car dealers. You acknowledge that the foregoing pricing commitment is necessary to maintain the marketing concept of Meineke Car Care Centers and does not, in any manner, mandate or attempt to mandate the retail prices you charge customers. You agree not to enter into any agreement, understanding or arrangement, or engage in any concerted practice, with other Meineke Dealers or others relating to the prices at which Authorized Products and Services are offered or sold by you or any other Meineke Center.

### 7.11    Customer Warranties

You recognize the importance of standardization of customer warranties offered by Meineke Car Care Centers and agree to deliver warranties to your customers with respect to Authorized Products or Services on terms and conditions we determine from time to time and using such product and service warranty forms as we may furnish to you. We agree, unless prohibited by applicable law, that all Meineke Car Care Centers owned by us and our Affiliates will offer and perform all such customer warranties. You agree, unless prohibited by applicable law, to offer and perform all such customer warranties at your Center. You will have sole responsibility for all such warranties that you issue and for performing any other authorized warranties you issue to customers. We agree to consult with DAAC if we propose to require a new warranty, or change an existing warranty requirement, on terms that are materially more favorable to consumers than are generally granted by major competitors in the automotive maintenance and repair industry.

You agree to comply with all policies and procedures on warranty programs set forth in the Operations Manual, including performing warranty service on customer warranties issued by other Meineke Car Care Centers and keeping records with respect to your reimbursement claims. You agree that all warranty services are performed by you as an independent contractor and not as our agent.

We agree to establish and maintain a national customer warranty program containing such policies and procedures as we deem appropriate from time to time. You authorize us to charge you for warranty services performed by another Meineke Center on customer warranties issued by you, and to credit you for warranty services you perform on customer warranties issued by another Meineke Center, in such amounts as we may determine to be appropriate from time to time for the national customer warranty program. You

16

agree to pay us any net debit balances, and we agree to pay you any net credit balances, with respect to the national customer warranty program at such times and on such conditions as we determine from time to time.

WE MAKE NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY OR SUITABILITY OF ANY PRODUCTS SOLD OR SERVICES PERFORMED BY YOU. You have no authority to make any kind of warranty or representation to others on our behalf. You agree not to make or give to any customer any warranty or representation as to the quality or fitness for use for any purpose, either express or implied, with respect to any Authorized Products or Services, unless we have approved the warranty or representation.

Your obligations and liabilities under this Section 7.11 shall survive any termination or expiration of this Agreement.

### 7.12    Customer Complaints

You agree to promptly address all customer complaints in accordance with the procedures contained in the Operations Manual. If you are unable or unwilling to resolve a customer complaint within 30 days and it becomes necessary for us to reimburse a customer in settlement of his or her complaint about work performed at your Center, you agree to promptly reimburse us for amounts expended on account of any such complaint. Your obligations and liabilities under this Section 7.12 shall survive any termination or expiration of this Agreement.

### ARTICLE 8:
### MARKETING AND ADVERTISING

### 8.1    Marketing and Advertising Programs

Recognizing the value of advertising, and the importance of the standardization of advertising to enhancing the goodwill associated with the Marks, to promoting the sale of Authorized Products and Services and to developing and maintaining a favorable public image of Meineke Car Care Centers, you agree that we have the right to determine, conduct and administer all national, regional, local and other marketing, advertising, promotions, market research and other related activities for Meineke Car Care Centers as may be instituted from time to time, including advertising and marketing funded by the MAF, and the right to direct all such advertising and marketing with sole authority and discretion (exercised in accordance with the terms, and subject to the conditions, contained in this Article 8) over all aspects thereof, including concepts, materials, media, nature, type, scope, frequency, place, form, copy, layout and content.

### 8.2    Meineke Advertising Fund

We agree to administer the MAF for the creation, development and implementation of marketing, advertising and related programs and materials to enhance the goodwill associated with the Marks, to promote the sale of any or all Authorized Products and Services and to develop and maintain a favorable public image of Meineke Car Care Centers. We will have sole discretion over all aspects of the materials and programs funded by MAF, including concepts, materials, media, nature, type, scope, frequency, place, form, copy, layout and context, provided we will periodically (not more frequently than once every 6 months) seek the advice of the Advertising Committee (as defined below) with respect to the creative concepts and media used for programs funded by the MAF. The "Advertising Committee" will consist of a committee of not more than 7 Meineke Dealers appointed from time to time by DAAC.

17

MCC 9/2008

We may use funds from the MAF to pay for all costs and expenses associated with such programs and materials, including the costs of preparing, producing and distributing marketing, advertising and related programs and materials, employing advertising agencies and media buying agencies, supporting market research activities, administering the MAF and all other related costs and expenses. Although the MAF is intended to enhance the goodwill associated with the Marks, to promote the sale of any or all Authorized Products and Services and to develop and maintain a favorable public image of Meineke Car Care Centers for the benefit of all Meineke Car Care Centers, we cannot assure you that any particular Meineke Center, or that Meineke Centers in any particular local market area, will benefit directly or pro-rata from any marketing, advertising or related program.

Your contributions to the MAF will be held and disbursed by a national bank or trust company or other financial institution ("MAF Trustee") we appoint from time to time, with the advice of DAAC, with the MAF Trustee being obligated to receive, hold and disburse funds in the MAF in accordance with an agreement that: (a) is consistent with the parties' rights and obligations hereunder; (b) includes reasonable provisions regarding limitations on the scope of MAF Trustee's fiduciary duties to Meineke Dealers and us; and (c) is mutually acceptable to the MAF Trustee and us. We agree to remit promptly all of your MAF contributions to the MAF Trustee and to periodically monitor the performance of the MAF Trustee under its trust agreement. We may direct the MAF Trustee to make payments directly to third parties or to make such payments to us for remittance to such third parties. All fees, compensation, charges and expenses of the MAF Trustee ("MAF Trustee Fees") shall be paid from MAF, and we will have no liability or responsibility for paying MAF Trustee Fees.

We agree to allocate your contributions to the MAF as follows: (a) an amount not more than 0.5% of your Gross Revenues will be used for Creative (as defined below); (b) an amount not more than 3%, of your Gross Revenues will be used for National Advertising (as defined below); and (c) an amount not less than 4.5% of your Gross Revenues will be used for Yellow Pages Advertising (as defined below) and Local Advertising (as defined below). The following chart illustrates the foregoing allocation:

### Allocation of your 8% of Gross Revenues Contribution to the MAF

Creative - Not more than .5%
National Advertising - Not more than 3%
Yellow Pages Advertising and Local Advertising - Not less than 4.5%

You agree that we may, with the advice of the Advertising Committee, from time to time change the foregoing allocations of your contributions to MAF among Creative, National Advertising and Yellow Pages Advertising and Local Advertising in order to enhance the effectiveness of advertising and promotional efforts.

The term "Creative" includes the costs associated with creating, developing and distributing national or general advertising, marketing, promotions, public relations and market research programs and related activities, including costs relating to preparing television, radio, newspaper, point-of-sales and other media programs and materials (such as Web Sites for the Internet) and all related fees, charges and commissions, including fees charged by national spokespersons and commissions charged for creative works. In addition, up to 30% of your contributions to Creative may be used from time to time to offset any deficits in media placement costs incurred as part of the Local Advertising portion of the MAF in any local market area on such terms and conditions as we may determine from time to time. As part of the Creative portion of the

18

MAF, we may furnish you with marketing, advertising and promotional materials at cost, plus any related administrative, shipping, handling and storage charges. The term "National Advertising" includes all costs associated with placing and purchasing national media advertising (e.g., national television, print media and electronic media) and related activities and associated fees and commissions, including commissions charged by media buying companies. The term "Yellow Pages Advertising" includes all costs associated with placing and purchasing advertising in classified advertising directories (i.e., yellow pages) through various media, including print and electronic media, and related activities and associated fees and commissions, including commissions charged by media buying companies. The term "Local Advertising" includes all costs associated with regional and local advertising and promotional programs and related activities and associated fees and commissions, including commissions charged by advertising agencies and media buying companies. To the extent any costs can be allocated to more than one of the above categories or to the extent that any costs appropriately charged to the MAF do not fall within a particular category, we may, in our sole discretion, allocate such costs to one or more of such categories.

We agree to maintain an adequately staffed advertising department to perform the services we customarily provide in administering the advertising and other programs funded by the MAF. We are entitled to be paid each year from the MAF for such services in an amount equal to 2.75% of all contributions by all Meineke Car Care Centers to the MAF ("the Annual Administrative Expense") provided the Annual Administrative Expense shall be 4.1% of all contributions by all Meineke Car Care Centers to the MAF through December 31, 2002. We may pay ourselves the Annual Administrative Expense in advance in quarterly installments each year. We will allocate the Annual Administrative Expense, MAF Trustee Fees and the costs relating to the annual audit of the revenues and expenses of the MAF proportionately to the Creative, National Advertising, Yellow Pages Advertising and Local Advertising portions of the MAF, notwithstanding anything to the contrary contained in this Agreement.

The MAF will be accounted for separately from our other funds and will not, except for the Annual Administrative Expense, be used to defray any of our or any Affiliate's general operating expenses. Except for the Annual Administrative Expense and the repayment of any advances or loans we may make to the MAF, neither we nor any of our Affiliates will be entitled to derive any income from the MAF, including commissions, rebates or discounts for media purchases from the MAF. Any advertising agency commissions and discounts granted to us or any of our Affiliates for media purchases from the MAF will be contributed to the MAF or netted against the invoice for such purchases.

All disbursements from the MAF shall be made first from income and then from contributions. We may compromise any claim for past due contributions to the MAF from any Meineke Dealer, provided any compromise of contributions to the MAF shall be proportionate to any contemporaneous compromise of other amounts such Dealer owes us and our Affiliates, and we have the right to charge a proportionate amount of the collection costs against contributions we recover. In any fiscal year, we may spend amounts that are more or less than the aggregate contributions of all Meineke Car Care Centers to the MAF in that year, and we may fund any deficits with contributions from future years. The MAF may borrow from us (on commercially reasonable terms and rates) or other lenders to cover deficits or cause the MAF to invest any surplus for future use. We will cause to be prepared an annual audit of the revenues and expenses incurred by the MAF and will furnish you a copy upon your written request. The costs of such audits shall be charged against the MAF. On request, the Advertising Committee may periodically review the books and records of the MAF.

Except as otherwise expressly provided in this Section 8.2, we assume no direct or indirect liability or obligation with respect to the maintenance, direction or administration of the MAF. We do not act as trustee or in any other fiduciary capacity with respect to the MAF.

**8.3     Allocation Between Local Advertising and Yellow Pages**

19

The 4.5% allocation of your MAF contributions (as well as those of other Meineke Car Care Centers in your Market Area) that are designated to be used for Yellow Pages and Local Advertising shall be allocated between Yellow Pages and Local Advertising on an annual basis by the owners of all of the Meineke Car Care Centers located in your Market Area in accordance with the provisions of this <u>Section 8.3</u>, provided however that under no circumstances will less than 2.5% be allocated to Yellow Pages without our prior consent. The allocation shall be determined annually by a majority vote (on a one-vote-per-Center basis) of all owners of Meineke Car Care Centers in the Market Area (including us and our Affiliates, as to any Meineke Car Care Centers owned in the Market Area) who shall vote on such allocation. If no vote shall take place, then the allocation shall be determined by us.

The parties acknowledge that the foregoing allocation is based on projected revenues for the following year in the Market Area and that the actual amounts expended will deviate from the projected percentage allocation.

### 8.4    Local Advertising

In addition to your 8% of Gross Revenues contributions to MAF, we strongly recommend that you spend 2% of your Gross Revenues on local advertising, but you are not required to do so and your failure to do so does not constitute a breach of this Agreement.

### 8.5    Dealer Web Site

You may maintain a World Wide Web site in connection with your Center with our prior approval. You agree to submit to us for prior approval, true and correct printouts of all Web site pages, materials and content you propose to use on your Web site associated with your Center. You agree to provide all hyperlinks or other links that we may reasonably require. All modifications to your Web site are subject to our prior approval. You may not post on your Web site any material (including text, video clips, photographs, images and sound bites) in which any third party has any direct or indirect ownership interest. You agree to obtain our prior written approval for any Internet domain name and/or home page address.

### 8.6    Approval of Advertising Content

You agree to submit to us, for our prior approval, samples of all advertising and promotional materials not prepared by us and which vary from our standard advertising and promotional materials. You may not use any advertising or promotional materials that we have not approved or that we have disapproved. All of your advertising and promotion shall comply with all applicable laws, shall be completely factual and shall conform to the highest standards of ethical advertising. You agree to refrain from any business or advertising practice which may be injurious to our business, to the business of other Meineke Car Care Centers or to the goodwill associated with the Marks.

## ARTICLE 9:
## REPORTS AND INSPECTIONS

### 9.1    Records

You agree to prepare and maintain for 5 years complete and accurate books, records (including invoices and records relating to your Gross Revenues) and accounts (using our standard chart of accounts specified in the Operations Manual) for your Center, copies of your sales tax returns, bank statements, and such portions of your state and federal income tax returns as relate to your Center. All such books and records shall be kept at the Premises, unless we otherwise approve. Alternatively, you may keep such books and records at the premises of the accountant who maintains your financial records and/or prepares your tax

20

returns, provided you notify us in advance and such accountant agrees to give us unrestricted access to such books and records. You agree to cause such accountant to fully cooperate with us in connection with any review or audit of such books and records.

You may not commingle any of your funds derived from the operation of your Center with any other funds. If you commingle any of the funds derived from the operation of your Center with other funds, such as your personal funds, then, in addition to our other rights hereunder and under applicable law, we will have the right to review and photocopy all of the records and accounts relating to such other funds, including your personal records and accounts.

### 9.2    Computer System

We may require you to purchase or lease, at your expense, such computer hardware and software, required dedicated telephone and power lines, modems, printers, and other computer-related accessories or peripheral equipment as we may specify from time to time for management information functions, such as recording and reporting Gross Revenues. You may use any computer hardware you consider to be appropriate, provided it meets our specifications and provided further that it functions properly with the computer software we require. You agree not to use any point of sale software in the operation of your Center that we have not approved. We agree not to unreasonably withhold approval of a request to use alternative software, provided the software meets all of our requirements and specifications, which we will make available on reasonable request.

You agree to provide such assistance as may be required to connect your computer system with our computer system or the computer system of a third party data collection service we designate. You agree to transmit electronically to us such data from your computer system as we, in our sole discretion, deem desirable, with the cost of such telephonic transmission to be borne by you if we mandate electronic submission of such data and we no longer require you to furnish hard copy of such data pursuant to Section 9.3.

You agree, at your expense, to keep your computer systems in good condition and to promptly install such additions, changes, modifications, substitutions or replacements to software, telephone and power lines, and other data transmission facilities as we direct to ensure full operational efficiency and optimum communication capability between and among computer systems. In view of the contemplated interconnection of computer systems and the necessity that such systems be compatible with each other, you agree to use computer software that complies with our specifications.

### 9.3    Periodic Reports

You agree to furnish us: (a) no later than Wednesday of each week, a report of Gross Revenues for the immediately preceding week, along with copies of invoices for work performed; (b) no later than the 15th day of each month during the first 3 months of the operation of your Center, an income statement and statement of cash flow for your Center for the preceding month and for the year-to-date and a balance sheet as of the end of such month; (c) within 120 days after the end of each calendar year, a year-end balance sheet and income statement and statement of cash flow of your Center for such year, reflecting all year-end adjustments and accruals, provided we will not unreasonably withhold our consent to a request for an extension of time to provide such statements; and (d) such other information as we may require from time to time, including reports on marketing activities, customer warranty work, cost of goods sold and labor costs, sales and your income tax statements (provided, however, that if you are an individual, only the parts of income tax statements that disclose information about your Center need be furnished). You agree that the information in each such report and financial statement shall be complete and accurate.

21

### 9.4 Use of Customer Information

We have the right to use or disclose information from all reports, statements and electronic data transmissions from you in such manner as we deem reasonably appropriate, provided we will not identify you by name unless required to do so by law or in connection with any legal proceeding, and provided further that, during the Term, we agree not to (a) use the identity of customers of your Center for soliciting Authorized Products and Services by Meineke Car Care Centers owned by us or any of our Affiliates, (b) sell, or authorize any Affiliate of ours to sell, such information to any third party, or (c) disclose such information to any Affiliate that offers or sells any of the Core Products and Services under trademarks or service marks that are not the Marks.

### 9.5 Inspections

We and our agents have the right at any time during business hours and without prior notice to: (a) inspect your Center; (b) observe, photograph, audio-tape and/or video tape the operations of your Center; and (c) interview personnel and customers of your Center, provided we will not interfere unduly with the operation of your Center. You agree to cooperate fully with such activities.

### 9.6 Audits

We have the right at any time during business hours to inspect, photocopy and audit the books, records, bank statements, tax returns and documents relating to the development, ownership, lease, occupancy or operation of your Center for the sole purpose of determining your compliance with the provisions of this Agreement. We agree to provide you reasonable prior notice (which in no event shall be more than 30 days) of any such audit unless we have justification for not providing prior notice, in which case no prior notice need be given. You must cooperate fully with our representatives and independent accountants conducting such audits. If any audit discloses an understatement of Gross Revenues, we agree to provide you with a copy of the audit report, and you agree to pay us, within 7 days after receipt of the audit report, the royalties and MAF payments due on the amount of such understatement, plus interest (as provided in Section 3.5) from the date originally due until the date of payment. Our acceptance of any such payment does not constitute a waiver of any rights, including our rights under Article 13, an estoppel or an election of remedies. If you dispute the findings of the audit, you may, at your expense, invoke the Ombudsman procedures of Section 17.15 hereof, without affecting the rights and obligations of the parties hereto.

In addition, you agree to pay us the costs of any audits performed as a result of: (a) your failure to submit statements of Gross Revenues; (b) your failure to maintain books and records or computer systems as required by Section 9.1 and Section 9.2; (c) your reporting Gross Revenues for any period of twelve consecutive months that are more than 5% percent below your actual Gross Revenues for such period, as determined by any such audit; or (d) your failure to produce all of your books and records as required by us or our authorized agents within 15 days after we request any such items. Such audit costs include the fees and costs of any independent accountants and per diem fees and travel and related costs of our employees.

### ARTICLE 10:
### TRADEMARKS

### 10.1 Ownership of the Marks

You acknowledge that the Marks are valid and that we own the Marks. Your right to use the Marks is derived solely from this Agreement and is limited to conducting business pursuant to and in compliance with this Agreement. Your unauthorized use of any of the Marks constitutes a breach of this Agreement and

22

an infringement of our rights to the Marks. This Agreement does not confer on you any goodwill or other interests in the Marks. Your use of the Marks and any goodwill established thereby inures to our exclusive benefit. All provisions of this Agreement applicable to the Marks apply to any additional or substitute trademarks, service marks and trade dress we authorize you to use. You may not at any time during or after the Term contest, or assist any other person in contesting, the validity or ownership of any of the Marks.

### 10.2    Use of the Marks

You agree to use the Marks as the sole identification of your Center, provided you identify yourself as the independent owner in the manner we prescribe. You agree to use the Marks as we prescribe in connection with the sale of Authorized Products and Services. You may not use any Mark (or any abbreviation, modification or colorable imitation) as part of any corporate or legal business name or in any other manner (including as an electronic media identifier, such as websites, web pages or domain names) not expressly authorized by us in writing.

### 10.3    Discontinuance of Use of Marks

If we determine it is advisable at any time for us and/or you to modify or discontinue use of any Mark and/or use one or more additional or substitute trademarks, service marks or trade dress; you agree to comply with our directions within a reasonable time after notice. We will have no liability or obligation to you whatsoever with respect to any such required modification or discontinuance of any Mark, or the promotion of a substitute trademark, service mark or trade dress, that is a result of our determination of a risk of conflicting rights with others.

### 10.4    Notification of Infringements and Claims

You agree to notify us immediately of any apparent infringement of or challenge to your use of any Mark, or any claim by another person of any rights in any Mark. You may not communicate with any person, other than us, our counsel and your counsel, in connection with any such infringement, challenge or claim. We will have sole discretion to take such action as we deem appropriate and will have the right to control exclusively any litigation or U.S. Patent and Trademark Office proceeding arising out of any such infringement, challenge or claim or otherwise relating to any Mark. You must sign any and all documents, render such assistance and do such things as may be advisable in the opinion of our counsel to protect our interests in any litigation or U.S. Patent and Trademark Office proceeding or otherwise to protect our interests in the Marks.

### 10.5    Indemnification of Dealer

We agree to indemnify you against, and to reimburse you for, all damages for which you are held liable in any action for trademark infringement arising out of your authorized use of any Mark pursuant to and in compliance with this Agreement and, except as provided herein, for all costs you reasonably incur in defending any such claim brought against you, provided you have timely notified us of such claim and provided further that you and your Owners are in compliance with this Agreement and all other agreements entered into with us or any of our Affiliates. We, at our sole discretion, are entitled to prosecute, defend and/or settle any such action arising out of your use of any Mark, and if we undertake to prosecute, defend and/or settle any such matter, we have no obligation to indemnify or reimburse you for any fees or disbursements of any legal counsel retained by you.

### ARTICLE 11:
### RESTRICTIVE COVENANTS

23

### 11.1 Confidential Information

We own proprietary and confidential information ("Confidential Information") relating to the development and operation of Meineke Car Care Centers, including: (1) technical information and expertise relating to Authorized Products and Services and the equipment used in connection therewith; (2) site selection criteria for Meineke Car Care Centers; (3) sales, marketing and advertising programs and techniques for Meineke Car Care Centers; (4) knowledge of operating results and financial performance of Meineke Car Care Centers, other than your Center and other Meineke Car Care Centers that you own; (5) comprehensive methods of operating Meineke Car Care Centers, including pricing information and inventory mix; and (6) computer software programs.

We agree to disclose relevant parts of the Confidential Information to you solely for your use in the operation of your Center. The Confidential Information is proprietary and includes trade secrets. During the Term and thereafter: (a) you may not use the Confidential Information in any other business or capacity (and you acknowledge that such use is an unfair method of competition); (b) you agree to maintain the confidentiality of the Confidential Information; (c) you may not make unauthorized copies of any portion of the Confidential Information disclosed in written, electronic or other form; and (d) you agree to implement all reasonable procedures we prescribe from time to time to prevent unauthorized use or disclosure of the Confidential Information, including the use of nondisclosure agreements with your officers, directors, and managers and the delivery of such agreements to us. Your restrictions on disclosure and use of Confidential Information do not apply to information or techniques which are or become generally known in the automotive service industry (other than through your own disclosure), provided you obtain our prior written consent to such disclosure or use. We agree to consent to such disclosure or use if we believe such information is in the public domain.

### 11.2 Dealer's In-Term Covenants

During the Term, neither you nor any of your Owners may:

(a) directly or indirectly (such as through corporations or other entities owned or controlled by you or your Owners) own any legal or beneficial interest in, manage, operate or consult with: (1) any Competitive Business located anywhere; or (2) any entity located anywhere which grants franchises, licenses or other rights to others to operate any Competitive Business; or

(b) divert or attempt to divert any business or customer of any Meineke Center to any competitor or do anything injurious or prejudicial to the goodwill associated with the Marks or the System.

The term "Competitive Business" is defined as any enterprise (other than a Meineke Center operated under a franchise agreement with us) that offers or sells any of the Core Authorized Products and Services. Notwithstanding anything to the contrary contained in this Agreement, you are not restricted from: (a) owning shares of a class of securities of a Competitive Business that are listed on a stock exchange or traded on the over-the-counter market and that represent less than 5% of that class of securities; or (b) owning and operating an enterprise (i) that offers and sells products and services which we consider to be Core Authorized Products and Services, other than repair and replacement of exhaust system components, brake system components and ride system components, (ii) that you own and operate prior to the date that such product or service is designated as an Authorized Product or Service (even if such designation is on a test basis), and (iii) that you fully disclose to us in writing before the date such product or service is designated an Authorized Product or Service.

### 11.3 Information Exchange

24

The value of the System is maximized by our evaluating and, if we deem appropriate, incorporating into the System innovations suggested by Meineke Dealers. If such innovations from other Meineke Dealers are incorporated in the System, you will be entitled to use them as part of the System. You agree to a reciprocal obligation and to disclose to us all ideas, concepts, methods, techniques and products relating to the development, marketing and/or operation of a Meineke Center that you conceive or develop, other than patentable inventions. If we adopt any of them as part of the System, you agree to grant us a perpetual, royalty-free, world-wide license to incorporate same into the System and to use, and sublicense the use, of same in connection with Meineke Car Care Centers. You agree to execute documents and do such other things as we may reasonably request for you to secure intellectual property rights in such ideas, concepts, methods, techniques or products.

### 11.4    Dealer's Post-Term Covenants

For a period of 1 year, starting on the effective date of termination or expiration (without you exercising your rights pursuant to, and in accordance with, Article 14) of this Agreement, neither you nor any of your Owners may directly or indirectly (such as through corporations or other entities owned or controlled by you or your Owners) own a legal or beneficial interest in, manage, operate or consult with: (a) any Competitive Business located at the Premises; (b) any Competitive Business located within a radius of 6 miles of your Center; (c) any Competitive Business located within a radius of 6 miles of any Meineke Center in operation on the effective date of termination or expiration; or (d) any entity which grants franchises, licenses or other rights to others to operate any Competitive Business.

You and each of your Owners acknowledge that we have a protectible legal interest in the System and that these non-competition covenants contained in Section 11.2 and Section 11.4 are necessary elements to their protection and are an integral part of this Agreement.

### 11.5    Meineke's Non-Competition Covenant

If we or any subsidiary of ours (and specifically excluding all other Affiliates of ours) acquires a business, then to the extent any retail outlet of such business at the time of the acquisition is located in the Protected Area and 15% or more of such outlet's revenues during the 12 months prior to the acquisition are derived from Core Authorized Products and Services, we agree to exert reasonable efforts to sell such outlet, or to discontinue any franchise or other licensing arrangement with such outlet, within 12 months after the acquisition ("Divestiture Period"). If, despite such efforts, we are unable to effect such sale or discontinuance within the Divestiture Period, we will not be in breach of this Agreement as a result of such failure, but you may, at your election, invoke "Meineke's Encroachment Insurance Policy" referenced in Section 17.13 with respect to any adverse impact caused by such outlet or exercise your right to sell the assets of your Center to us in accordance with Section 11.6.

### 11.6    Competition By Meineke's Affiliates

If: (a) you have the right to sell your Center to us pursuant to Section 11.5; or

(b)(i) any of our Affiliates (including any subsidiary of ours) acquires a business, and such business, after the acquisition and while it is an Affiliate of ours, opens a new retail outlet (and specifically excluding any existing retail outlets) in your Protected Area; and (ii) 15% or more of such new outlet's revenues during the 12 months after its opening ("1-Year Opening Period") are derived from the sale of Core Authorized Products and Services; or

(c) any of our Affiliates (including any subsidiary of ours) acquires a business with an existing retail outlet located in your Protected Area, and such retail outlet, prior to the acquisition, did not derive 15% or

25

more of its revenues from the sale of Core Authorized Products and Services in your Protected Area during the 12 months prior to its acquisition but during the 12 months after its acquisition ("1-Year Opening Period") it derives 15% or more of its revenues from the sale of Core Authorized Products and Services in your Protected Territory;

then you have the option ("Put Option") exercisable by giving us written notice ("Put Option Notice") 120 days after the expiration of the Divestiture Period or the 1-Year Opening Period, as applicable, to sell to us at Fair Market Value (as determined below) all of the tangible assets of your Center that you own ("the Purchased Assets" for purposes of this Section 11.6), including signs, equipment, inventories of saleable parts, products, materials and supplies, and to assign to us the lease for the Premises of your Center and any equipment lease for equipment used to perform Authorized Products and Services at your Center. If you exercise your Put Option and you or any of your Affiliates or Owners directly or indirectly own the land and/or building of your Center, you agree to lease, or cause such Affiliate or Owner to lease, such land and/or building to us or our designee at reasonable and customary rental rates and other terms prevailing in the community where your Center is located.

Upon delivery of the Put Option Notice, you agree (a) to continue to operate your Center in the ordinary course of business in accordance with the terms of this Agreement, and (b) not to sell or remove any of the Purchased Assets from the Premises (other than the sale of inventory in the ordinary course of business), and (c) to give us, our designated agents and the Appraiser (as defined below) full access to your Center and all of your books and records at any time during customary business hours in order to conduct inventories and determine the purchase price for the Purchased Assets. Upon delivery of the Put Option Notice and pending the closing of the purchase, we may require that the operation of your Center be subject to the supervision and control of one or more managers appointed by us.

The Fair Market Value shall be determined by consultation between you and us to establish the amount which an arm's length purchaser would be willing to pay for the Purchased Assets, assuming that the Purchased Assets would be used for the operation of a Meineke Center at the Premises under a valid franchise agreement reflecting the then-current (or if we are not offering franchises at that time, then the most recent) standard terms upon which we offer franchises for Meineke Car Care Centers. The Fair Market Value may reflect the going concern value of the operation of your Center at the Premises, but under no circumstances will any value be attributed to any goodwill associated with any Mark. If you and we are unable to agree on the Fair Market Value of the Purchased Assets within 30 days after the Put Option Notice, then Fair Market Value will be determined by a mutually agreeable member of a nationally recognized accounting firm (other than a firm which conducts audits of our or your financial statements) who has experience in the valuation of retail businesses (the "Appraiser"). The Appraiser will make his or her determination and submit a written report ("Appraisal Report") to you and us as soon as practicable, but in no event more than 60 days after his or her appointment. Each party may submit in writing to the Appraiser its judgment of Fair Market Value (together with its reasons therefor). The Appraiser's fees and costs shall be borne equally by the parties hereto.

Within 10 days after delivery of the Appraisal Report or the date we mutually agree to the Purchase Price, whichever is applicable, we, you and your Owners will enter into a purchase agreement in form and substance reasonably satisfactory to us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as we deem reasonably necessary to fully protect our interests, including representations, warranties and other closing documents and post-closing indemnifications and covenants as we reasonably require, including: (a) instruments transferring good and merchantable title to the Purchased Assets, free and clear of all liens, encumbrances, and liabilities, to us or our designee, with all sales and other transfer taxes paid by you; (b) a mutual termination of this Agreement, with you and your Owners continuing to be bound by all post-term covenants and obligations contained herein; and (c) an assignment of all leases of tangible assets and real

26

property used in the operation of your Center, including land, building and/or equipment (or if an assignment is prohibited, a sublease to us or our designee for the full remaining term and on the same terms and conditions as your lease, including renewal and/or purchase options). In addition, if you or any of your Owners or Affiliates directly or indirectly own the land and/or building of your Center, you agree to lease, or to cause such Owner or Affiliate to lease, such land and/or building to us or our designee at reasonable and customary rental rates and other terms prevailing in the community where your Center is located. Any dispute concerning the rental rates and terms of such lease shall be resolved by the Appraiser.

The consummation of the purchase of the Purchased Assets ("closing" for purposes of this Section 11.6) shall occur at such place, time and date we designate in the purchase agreement, but not later than 90 days after the date the Appraisal Report is delivered or the date we and you have mutually agreed to the Purchase Price, whichever is applicable. In accordance with the terms and conditions of the purchase agreement: (a) fifty percent (50%) of the purchase price for the Purchased Assets will be paid in cash at the closing; (b) twenty-five percent (25%) of the purchase price (plus accrued and unpaid interest on the unpaid balance, at the Prime Rate, as defined below, from and after the closing date) shall be payable on the first anniversary of the closing date; and (c) the remaining twenty-five percent (25%) of the purchase price (plus accrued and unpaid interest on the unpaid balance, at the Prime Rate, from and after the closing date) shall be payable on the second anniversary of the closing date. The "Prime Rate" for purposes of this Section 11.6 shall be the published prime rate as of the date of the closing of The Chase Manhattan Bank or any other national bank we select.

If you cannot deliver clear title to all of the Purchased Assets, or if there are other unresolved issues, the closing of the sale may, at our option, be accomplished through an escrow on such terms and conditions as we deem reasonably appropriate, including the making of payments, to be deducted from the purchase price, directly to third parties in order to obtain clear title to all of the Purchased Assets. Further, you and we shall comply with any applicable Bulk Sales provisions of the Uniform Commercial Code as enacted in the state where your Center is located and all applicable state and local sales and income tax notification and/or escrow procedures. We have the right to set off against and reduce the Purchase Price by any and all amounts owed by you or any of your Owners or Affiliates to us or any of our Affiliates.

**11.7    Meineke's Management Commitment**

We agree not to authorize our executive officers who perform line management functions (specifically excluding any such officers who are also members of our Board of Directors, except for any Chief Operating Officer or Vice President of Marketing) to be employed by or to have management responsibility for an Affiliate of ours that is a Competitor. For the avoidance of doubt, the foregoing restriction shall not apply to our executive officers who perform staff functions, such as a General Counsel or Chief Financial Officer. For purposes of this Section 11.7, a "Competitor" shall mean a business enterprise that: (a) does not use any of the Marks; and (b) has annual revenues from the sale of Core Authorized Products and Services that exceed 15% of its total annual revenues.

### ARTICLE 12:
### TRANSFER OF AGREEMENT

#### 12.1    Transfer by You Subject to Our Approval

You and/or your Owners may Transfer the Franchise (as defined below) subject to our approval and subject to your complying with all of the applicable provisions of this ARTICLE 12. You agree to submit to us all information we require in order to determine whether to approve a proposed Transfer of the Franchise, and we agree to notify you of our approval or disapproval within a reasonable period of time, not to exceed

27

10 business days, after we have received all requested information relating to the proposed Transfer of the Franchise.

The term "Transfer the Franchise" or "Transfer of the Franchise" means the voluntary or involuntary, direct or indirect, sale, assignment, transfer, pledge, grant of a security interest in, or other disposition of this Agreement, any right or obligation under this Agreement, or any form of ownership interest in Dealer or the assets, revenues or income of your Center, including: (1) any issuance or redemption of a legal or beneficial ownership interest in the capital stock of Dealer; (2) any merger or consolidation of Dealer, whether or not Dealer is the surviving corporation; (3) any transfer as a result of a divorce, insolvency or dissolution proceeding or otherwise by operation of law; (4) any transfer on the death of Dealer or any Owner of Dealer by will, declaration of trust or under the laws of intestate succession; or (5) any foreclosure of your Center or your transfer, surrender or loss of possession, control or management of your Center. A marketing list, customer list or potential customer list may be transferred only to a transferee to whom your rights and obligations under this Agreement are simultaneously being transferred in accordance with the terms hereof.

## 12.2    Conditions for Approval

If we have not exercised our rights under <u>Section 12.6</u> or <u>Section 12.7</u>, we will not unreasonably withhold our approval of a Transfer of the Franchise that meets all of the reasonable restrictions, requirements and conditions that we may impose on the transfer, the transferor(s) and/or the transferee(s), including the following:

(a)    you and your Owners and Affiliates must be in compliance with the provisions of this Agreement and all other agreements with us or any of our Affiliates that relate to your Center;

(b)    the transferee (or its owners) must meet our then-applicable standards for Meineke Dealers, and if the transferee is an existing Meineke Dealer, such transferee must be in compliance with its agreements with us and our Affiliates for at least 6 months prior to the proposed date of transfer;

(c)    the transferee (or its Operating Partner) must complete our initial training program to our satisfaction;

(d)    your Center must be open and operating, unless we otherwise agree in writing;

(e)    the transferee (and its owners) must execute, at your option, (i) an assignment and assumption agreement in form and substance satisfactory to us, pursuant to which the transferee (and its owners) assume your obligations hereunder and you will remain responsible for future performance of the obligations under this Agreement for the longer of a period of time of one (1) year after the effective date of the transfer or the period of time during which the transferee or any of its Affiliates has any financial obligations to you or any of your Affiliates in connection with the transfer; or (ii) our then current standard form of franchise agreement and related documents offered to new Meineke Dealers in the state in which your Center is located (which may provide for different royalties, advertising contributions and expenditures, term and other rights and obligations than those provided in this Agreement) in conjunction with you and us mutually terminating this Agreement;

(f)    you or the transferee must pay us a standard transfer fee of $2,500, which fee may be increased to reflect any increase in the CPI as of the date of transfer over the CPI as of January 1, 1998;

(g)    the transferee must execute an agreement, in form and substance satisfactory to us, to remodel your Center, add or replace fixtures, furnishings, equipment and signs and otherwise modify your

28

Center so it meets the specifications and standards then applicable for new Meineke Car Care Centers, provided the transferee shall not be required to replace equipment or increase the square footage of the Premises if the transferee executes an assignment and assumption agreement pursuant to Section 12.2(e)(i) hereof;

(h)     you and your Owners and Affiliates must, except to the extent limited or prohibited by applicable law, execute a mutual general release, in form and substance satisfactory to us, of any and all claims against us and our Affiliates, stockholders, officers, directors, employees, agents, successors and assigns (unless such claims have been filed in accordance with this Agreement and are then pending and not finally resolved or are filed in accordance with this Agreement within 12 months after the effective date of transfer), and an affidavit stating that you have not offered any unauthorized warranties to customers of your Center;

(i)     the terms of the proposed Transfer of the Franchise must not, in our reasonable judgment, place an unreasonable financial or operational burden on the transferee;

(j)     any financing you (or any of your Owners or Affiliates) offer the transferee must be subordinate to any current or future obligations of the transferee to us;

(k)     you and your Owners must execute a noncompetition covenant, in form and substance satisfactory to us, in favor of us and the transferee, agreeing that, for a period of not less than 1 year, starting on the effective date of the transfer, you and your Owners will not directly or indirectly own any legal or beneficial interest in, manage, operate or consult with: (1) any Competitive Business that is located within a 6-mile radius of your Center; (2) any Competitive Business that is located within a 6-mile radius of any other Meineke Center in operation as of the effective date of such transfer; or (3) any entity which grants franchises, licenses or other interests to others to operate any Competitive Business; and

(l)     you and your Owners must execute such other documents and do such other things as we may reasonably require to protect our interests under this Agreement.

### 12.3    Transfer To A Corporation

Notwithstanding Section 12.1 and Section 12.2, on 30 days' prior notice to us, you (if you are an individual or partnership) may transfer this Agreement, in conjunction with a transfer of all of the assets of your Center, by an agreement in form and substance satisfactory to us, to a corporation or limited liability company of which you own and control all of the equity and voting power of all issued and outstanding capital stock. No such assignment will relieve you or your Owners of your obligations hereunder, and you and your Owners will remain jointly and severally liable for all obligations hereunder.

### 12.4    Special Transfers

Neither Section 12.2(b) nor Section 12.2(d) shall apply to any Transfer of the Franchise among any of your then current Owners disclosed in Schedule C. Section 12.6 shall not apply to a Transfer of the Franchise to a member of the Immediate Family of Dealer (if an individual) or to a member of the Immediate Family of a then current Owner of Dealer (if a corporation, limited liability company or partnership).

### 12.5    Death or Disability of Dealer

Upon your death or permanent disability, or the death or permanent disability of your Operating Partner, the executor, administrator or other personal representative of such person must transfer his interest in this Agreement or his interest in Dealer to a third party approved by us in accordance with all of the

29

applicable provisions of Article 12 within a reasonable period of time, not to exceed 12 months from the date of death or permanent disability.

### 12.6 Your Right to Offer Your Franchise to Us

If you or any of your Owners desires to Transfer the Franchise for legal consideration before obtaining an offer from a buyer, you may send us an offer in writing ("Offer Notice") containing the exact terms and conditions on which you desire to Transfer the Franchise and including (a) financial statements of your Center (including balance sheets and income statements) for the last 3 fiscal years and the year-to-date; (b) federal income tax returns and all applicable schedules for your Center for the last 3 fiscal years; and (c) a complete and accurate copy of your then current lease for the Premises of your Center. Upon receipt of the Offer Notice we will have the option, exercisable by notice ("Response Notice") delivered to you within 15 business days thereafter, to indicate our intention to accept your offer to sell such interest in this Agreement, your Center or in Dealer for the price and terms contained in the Offer Notice. We have the right to investigate and analyze the business, assets and liabilities and all other matters we deem necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms described in the Offer Notice. We may conduct such investigation and analysis in any manner we deem reasonably appropriate, and you and your Owners agree to provide us with all information we request and to cooperate fully with us in connection therewith.

If we deliver a Response Notice, we and you and/or your Owners will enter into a purchase agreement reasonably satisfactory to both you and us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as is reasonably necessary to protect each party's interests. The closing shall occur not more than 90 days after the date of the Response Notice, unless the closing is delayed for reasons beyond our reasonable control.

If we do not deliver a Response Notice, as provided above, you and/or your Owners may solicit offers to Transfer the Franchise from other parties at the exact same price and on the exact same terms as presented in the Offer Notice for a period of time expiring 365 days after the Offer Notice is delivered to us. You must immediately deliver to us a complete and accurate copy of any offer that you receive within such 365-day period from any such third party that you and/or your Owners are willing to accept ("Third Party Offer").

If the terms of the Third Party Offer are the same as those contained in the Offer Notice, then you or your Owners may accept such offer and complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in Section 12.1 and Section 12.2, provided that if the sale to such offeror is not completed within 90 days after delivery of such Third Party Offer to us, or if there is any change in the terms of the offer, you must promptly notify us and we will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the 30-day period following your notification of the expiration of the 90-day period or the change to the terms of the offer.

### 12.7 Our Right of First Refusal

If the terms of the Third Party Offer pursuant to Section 12.6 are different in any material respect (including price and/or payment terms) from those contained in the Offer Notice pursuant to Section 12.6, we will have the option, exercisable by notice delivered to you within 15 business days from the date of delivery to us of a complete and accurate copy of the Third Party Offer, to purchase such interest in this Agreement, your Center or in Dealer for the price and on the terms and conditions contained in such Third Party Offer.

30

In addition, if you or any of your Owners desire to transfer the Franchise for legal consideration to a prospective buyer without first giving us an Offer Notice pursuant to Section 12.6, you or such Owner must obtain a bona fide, executed written offer and earnest money deposit in the amount of at least 5% of the offering price from a responsible and full disclosed purchaser and must deliver immediately to us a complete and accurate copy of such offer ("Right of First Refusal Offer"), including: (a) financial statements of your Center (including balance sheets and income statements) for the last 3 fiscal years and the year-to-date; (b) federal income tax returns and all applicable schedules for your Center for the last 3 fiscal years; and (c) a complete and accurate copy of your then-current lease for the Premises of your Center. If the offeror proposes to buy any other property or rights from you or any of your Owners or Affiliates (other than rights under other franchise agreements for Meineke Car Care Centers) as part of the bona fide offer, the proposal for such property or rights must be set forth in a separate, contemporaneous offer that is disclosed to us, and the price and terms of purchase offered to you or your Owners for the Transfer of the Franchise must reflect the bona fide price offered therefor and may not reflect any value for any other property or rights. We have the option, exercisable by notice delivered to you or your Owners within 15 business days from the date of delivery of the Right of First Refusal Offer, to purchase such interest for the price and on the terms and conditions contained in such offer. We have the right to investigate and analyze the business, assets and liabilities and all other matters we deem necessary or desirable in order to make an informed investment decision with respect to the fairness of the terms of our right of first refusal. We may conduct such investigation and analysis in any manner we deem reasonably appropriate and you and your Owners must cooperate fully with us in connection therewith.

If we exercise our option to purchase pursuant to the terms of the Third Party Offer or the Right of First Refusal Offer, as provided in this Section 12.7, we and you and/or your Owners will enter into a purchase agreement reasonably satisfactory to you and us, containing such agreements, representations, warranties, covenants, indemnities and customer warranty reserve funds, and requiring such documents at closing, as are reasonably necessary to protect each party's interests. The closing shall occur not more than 90 days after the date of our response to the Third Party Offer or Right of First Refusal Offer, as applicable, unless the closing is delayed for reasons beyond our reasonable control. In the event the consideration, terms and/or conditions offered by a third party are such that we may not reasonably be able to furnish the same consideration, terms and/or conditions, then we may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, we at our own expense may designate an independent appraiser and the appraiser's determination shall be binding.

If we do not exercise our option to purchase pursuant to the terms of the Third Party Offer or the Right of First Refusal Offer, as provided in this Section 12.7, you or your Owners may complete the sale to such offeror pursuant to and on the exact terms of such offer, subject to our approval of the transfer as provided in Section 12.1 and Section 12.2, provided that if the sale to such offeror is not completed within 90 days after delivery of such offer to us, or if there is any change in the terms of the offer, you must promptly notify us and we will have an additional option to purchase (on the terms of the revised offer, if any, and otherwise as set forth herein) during the 30-day period following your notification of the expiration of the 90-day period or the change to the terms of the offer.

### 12.8   Transfer by Us

We have the right to transfer or assign all or any part of our rights or obligations under this Agreement to any person or legal entity. If the assignee expressly assumes and agrees to perform all of our obligations under this Agreement accruing after the date of assignment, then the assignee will become solely responsible for all of our obligations under this Agreement from and after one (1) year after the effective date of assignment. In addition, and without limiting the foregoing, we may sell our assets; may sell our securities in a public offering or in a private placement; may merge with or acquire other corporations, or be

31

acquired by another corporation; and may undertake any refinancing, recapitalization, leveraged buy-out, or other economic or financial restructuring.

## ARTICLE 13:
## TERMINATION OF AGREEMENT

### 13.1   Termination Upon Notice

In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if:

(a)      you become insolvent by reason of your inability to pay your debts as they mature;

(b)      you are adjudicated bankrupt or insolvent;

(c)      you file a petition in bankruptcy, reorganization or similar proceedings under the bankruptcy laws of the United States or have such a petition filed against you which is not discharged within 30 days;

(d)      a receiver or other custodian, permanent or temporary, is appointed for your business, assets or property (other than in connection with your death and for reasons other than financial concerns or irregularities);

(e)      you request the appointment of a receiver or make a general assignment for the benefit of creditors;

(f)      final judgment against you in the amount of $25,000 or more remains unsatisfied of record for 30 days or longer (unless and until such judgment is appealed in accordance with applicable law and is affirmed);

(g)      your bank accounts, property or accounts receivable relating to your Center are attached and such attachment is not lifted within 30 days;

(h)      execution is levied against any property or assets used in connection with your Center;

(i)      you voluntarily dissolve or liquidate or have a petition filed for dissolution and such petition is not dismissed within 30 days; or

(j)      you fail to have your Center open for business for any 6 consecutive days after you open your Center (other than in connection with a relocation pursuant to Section 2.6 or due to force majeure);

(k)      you fail to open your Center and start business, as provided in Section 4.2 or fail to operate your Center as a Meineke Center;

(l)      you or any of your Owners or Affiliates make any material misstatement or omission in an application for a Meineke Center franchise or in any other information provided to us, including reports of Gross Revenues;

32

(m)     you suffer cancellation or termination of the lease or sublease for your Center as a result of a default thereunder;

(n)     you or any of your Owners or Affiliates are convicted of, or plead no contest to, a felony or other crime or offense that we reasonably believe may adversely affect the goodwill associated with the Marks;

(o)     you or any of your Owners or Affiliates make an unauthorized Transfer of the Franchise;

(p)     you or any of your Owners or Affiliates make any unauthorized use or disclosure of any Confidential Information or use, duplicate or disclose any portion of the Operations Manual in violation of this Agreement;

(q)     you or any of your Owners or Affiliates fail, on 3 or more separate occasions within any period of 12 consecutive months, to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with this Agreement (including the Operations Manual), which failures are brought to your attention by delivery of formal notices of default, regardless whether such defaults are timely cured; or

(r)     you or any of your Owners or Affiliates fail, on 7 or more separate occasions during the Term, to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with this Agreement (including the Operations Manual), which failures are brought to your attention by delivery of notices of default, regardless whether such defaults are timely cured, provided however, any notice of default which you timely cure to our satisfaction shall be disregarded for purposes of determining the foregoing number of defaults if you are not thereafter sent any further notices of default in any successive 12-month period (provided no such 12-month period can be used to disregard more than one notice of default).

**13.2    Termination After Opportunity to Cure**

In addition to our right to terminate pursuant to other provisions of this Agreement and under applicable law, we have the right to terminate this Agreement, effective upon delivery of notice of termination to you, if you or any of your Owners or Affiliates:

(a)     offer or sell any products or services from your Center that are not Authorized Products and Services and fail to discontinue such practice within 30 days after a formal notice of default is delivered to you; or

(b)     fail to make payment of any amount due us or any of our Affiliates, when due, or otherwise fail to comply with any provision of this Agreement (including the Operations Manual) not otherwise mentioned in <u>Section 13.1</u> or this <u>Section 13.2</u>, and do not correct such failure within 30 days after a formal notice of default is delivered to you.

**ARTICLE 14:**
**RENEWAL RIGHTS**

You have the right, subject to the conditions contained in this <u>Article 14</u>, to acquire a successor franchise for your Center on the terms and conditions of our then-current form of franchise agreement, if upon expiration of the Term: (a) you and your Owners and Affiliates are in compliance with this Agreement and all other agreements with us or any of our Affiliates, and you and your Owners have been in substantial

33

compliance with this Agreement throughout the Term; and (b) you maintain the right to possession of the Premises for the term of the successor franchise agreement and enter into an agreement with us whereby you agree within a specified time period, starting on the date of signing of a successor franchise agreement, to remodel your Center, add or replace fixtures, furnishings, equipment and signs and otherwise upgrade your Center to the specifications and standards then applicable for new Meineke Car Care Centers (provided we will not require any increase in square footage of your Center that would be impractical or uneconomical as a result of property lines, zoning restrictions or unreasonable cost of demolition and reconstruction).

You agree to give us notice of your desire to acquire a successor franchise at least 180 days prior to the expiration of the Term in order to provide us sufficient time to conduct a renewal inspection of your Center and complete the renewal process. We agree to give you notice, not later than 60 days after receipt of your notice, of our decision whether you have the right to acquire a successor franchise pursuant to this Article 14. Notwithstanding that our notice may state that you have the right to acquire a successor franchise for your Center and that you and we may have executed a successor franchise agreement, your right to a successor franchise will be subject to your continued compliance with all the provisions of this Agreement up to the date of its expiration. If you so request in writing, we will give you the estimated costs or range of costs for upgrading your Center to the specifications and standards for new Meineke Car Care Centers and you will have two weeks following receipt of this information to evaluate it and notify us as to whether you will exercise your right to a successor franchise.

If you have the right to acquire a successor franchise, and state you intent to exercise that right, all in accordance with this Article 14, then: (a) we and you (and your Owners) will execute a Successor Franchise Agreement (as defined below); (b) you will be obligated to pay a successor franchise fee of $2,500, which fee may be increased to reflect any increase in the CPI as of the end of the Term over the CPI as of January 1, 1998; and (c) you and your Owners will be obligated to execute release agreements, in form and substance satisfactory to us, releasing us and our Affiliates, stockholders, officers, directors, employees, agents, successors and assigns from any and all claims relating to this Agreement, unless such claims have been filed in accordance with this Agreement and are then pending and not finally resolved, or are filed in accordance with this Agreement within 12 months after execution of the successor franchise agreement. Failure by you (and your Owners) to sign such agreements and releases, or to pay the successor franchise fee, within 30 days after such documents are delivered to you will be deemed an election by you not to acquire a successor franchise for your Center. Your right to a successor franchise will be subject to your ability to obtain a lease for the location in form and substance satisfactory to us.

The term "Successor Franchise Agreement" shall mean our then-current form of franchise agreement, which may contain provisions materially different from those contained herein, except: (i) that we agree not to materially change the provisions of Section 2.3, Section 3.2, Section 3.4 or Section 17.13; and (ii) at your option, the term of the successor franchise may be for 15 years (in which case the Unilateral Right to Independence Rider, attached hereto, shall be executed by both parties), 8 years or 5 years (in which case the Unilateral Right to Independence Rider shall not be executed and instead, at your option, the Reciprocal Right to Independence Rider, attached hereto, may be executed by both parties). The term "Successor Franchise Agreement" shall also include all ancillary agreements (including personal guarantees by your Owners and a remodeling agreement in form and substance satisfactory to us) which we then customarily use in granting successor franchises for the operation of Meineke Car Care Centers. The parties hereto explicitly acknowledge and agree that the Unilateral Right to Independence and Reciprocal Right to Independence Riders are not part of this Agreement and are attached hereto solely for purposes of establishing such rights in connection with any successor franchise agreement.

## ARTICLE 15:
## EFFECT OF TERMINATION OR EXPIRATION

34

**15.1    Payment of Amounts Owed to Us**

You agree to pay us and our Affiliates immediately upon termination or expiration (without grant of a successor franchise) of this Agreement, all royalties, MAF payments, amounts owed for purchases from us or our Affiliates, interest due on any of the foregoing and all other amounts owed to us or our Affiliates which are then unpaid.

**15.2    Discontinue Use of Marks and Confidential Information**

Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, you will:

(a)  not directly or indirectly at any time or in any manner use any Mark, any colorable imitation of any Mark or any other indicia of a Meineke Center;

(b)  take such action as may be required to cancel all fictitious or assumed name registrations relating to your use of any Mark;

(c)  notify the telephone company and all telephone directory publishers of the termination or expiration of any rights you may have to use any telephone number and any regular, classified or other telephone directory listings associated with any Mark and to authorize transfer of the number to us or at our direction. You must immediately execute such instruments and take such steps as we deem necessary or appropriate to transfer and assign each such telephone number. You irrevocably appoint our then-President as your duly authorized agent and attorney-in-fact to execute all instruments and take all steps to transfer and assign each such telephone number;

(d)  if we do not exercise our right to take possession of the Premises of your Center pursuant to Section 15.4, promptly remove from the Premises, and discontinue using for any purpose, all signs, fixtures, posters, decor items, advertising materials, forms and other materials and supplies which display any of the Marks or any distinctive features, images, or designs associated with Meineke Car Care Centers and, at your expense, make such alterations as may be necessary to distinguish the Premises so clearly from its former appearance as a Meineke Center as to prevent any possibility of confusion by the public;

(e)  on our request, promptly sell to us (free and clear of any and all liens, encumbrances, liabilities and restrictions) all of your inventory of parts and supplies at a mutually agreeable reasonable price. We will have the right to set off against and reduce the purchase price by any and all amounts you or any of your Owners owe us or any of our Affiliates. If we do not purchase all of your inventory of parts and supplies which contain any of the Marks, you will promptly remove all such labels and markings from any such remaining inventory;

(f)  immediately cease to use all Confidential Information and return to us all copies of the Operations Manual and any other confidential materials which we have loaned to you;

(g)  immediately cease to use all computer software incorporating any of the Marks or any of our Confidential Information;

(h)  comply with the post-term covenants as provided in Section 11.4; and

(i)  within 30 days after the effective date of termination or expiration, furnish us evidence satisfactory to us of your compliance with the foregoing obligations.

35

### 15.3  Customers

Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, we have the unrestricted right, without paying you any legal consideration, to offer and sell, and to permit other Meineke Dealers to offer and sell, any products or services, to any and all customers of your Center. We have the right to use information from your computer system or related reports submitted to us for such purposes, notwithstanding anything to the contrary contained in this Agreement.

36

**15.4    Possession of Premises**

(a)    Upon any termination or expiration (without the grant of a successor franchise) of this Agreement, we may require you:

(i) to promptly assign to us the lease or sublease for the Premises of your Center (or, at our option, sublease to us the Premises of your Center as an Interim Sublease in accordance with Section 4.1 and otherwise on the same terms and conditions as your lease) and promptly grant us possession to the Premises of your Center; or

(ii) if this Agreement is for a new Center and you or one of your Affiliates or Owners owns the Premises, to promptly enter into a lease with us on commercially reasonable terms for an initial term of 18 months, with 2 additional 18-month options to renew.

(b)    You will not be obligated to lease or sublease to us the Premises of your Center if you have notified us at least 18 months prior to expiration of the Term that you do not intend to exercise your right to a successor franchise under Article 14, and that neither you nor any Affiliate or Owner of yours intends to own, operate, manage, lease, lend funds to or otherwise assist a Competitive Business at the Premises after expiration of the Term, and you and your Affiliates and Owners in fact do not engage in any such activities with respect to the Premises for one year after expiration of the Term.

(c)    For the avoidance of doubt, if this Agreement is for a Meineke Center that operated as a Meineke Center prior to the date hereof, and you or one of your Affiliates owns the Premises as of the Effective Date, then you will not be obligated to lease the Premises to us in accordance with the terms of this Agreement upon termination or expiration of this Agreement, provided that neither you nor any Affiliate or Owner of yours owns, operates, manages, leases, lends funds to or otherwise assists a Competitive Business at the Premises for a 1 year term after the termination or expiration.

**15.5    Continuing Obligations**

All obligations under this Agreement which expressly or by their nature survive the expiration or termination of this Agreement will continue in full force and effect until they are satisfied in full or by their nature expire.

**ARTICLE 16:**
**RELATIONSHIP OF THE PARTIES**

**16.1    Independent Contractors**

You and we are independent contractors. Neither this Agreement, the nature of the relationship of the parties nor the dealings of the parties pursuant to this Agreement will create, directly or indirectly, any fiduciary or similar relationship between the parties hereto.

Nothing contained in this Agreement, or arising from the conduct of the parties hereunder, is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose whatsoever. You agree to conspicuously identify yourself in all dealings with customers, lessors, contractors, suppliers, public officials, employees and others as the owner of your Center and agree to place such other notices of independent ownership at your Center and on forms, business cards, stationery, advertising and other materials as we may require from time to time.

37

You may not make any express or implied agreements, warranties, guarantees or representations or incur any debt in our name or on our behalf or represent that the relationship of the parties hereto is anything other than that of independent contractors. We will not be obligated by or have any liability under any agreements made by you with any third party or for any representations made by you to any third party. We will not be obligated for any damages to any person or property arising directly or indirectly out of the operation of your business hereunder.

### 16.2    Indemnification

You agree to indemnify us, our Affiliates and our respective directors, officers, employees, shareholders, agents, successors and assigns (collectively "indemnitees"), and to hold the indemnitees harmless to the fullest extent permitted by law, from any and all losses and expenses (as defined below) incurred in connection with any litigation or other form of adjudicatory procedure, claim, demand, investigation, or formal or informal inquiry (regardless of whether it is reduced to judgment) or any settlement thereof which arises directly or indirectly from, or as a result of, a claim of a third party in connection with the selection, development, ownership, operation or closing of your Center (collectively "event"), and regardless of whether it resulted from any strict or vicarious liability imposed by law on the indemnitees, provided, however, that this indemnity will not apply to any liability arising from a breach of this Agreement by the indemnitees or the gross negligence or willful acts of indemnitees (except to the extent that joint liability is involved, in which event the indemnification provided herein will extend to any finding of comparative or contributory negligence attributable to Dealer). The term "losses and expenses" includes compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against claims; settlement amounts; judgments; compensation for damages to our reputation and goodwill; and all other costs associated with any of the foregoing losses and expenses. You agree to give us prompt notice of any event of which you are aware for which indemnification is required, and, at your expense and risk, we may elect to assume (but under no circumstance obligated to undertake) the defense and/or settlement thereof, provided that we will seek your advice and counsel. Our assumption of the defense does not modify your indemnification obligation. We may, in our reasonable discretion, take such actions as we deem necessary and appropriate to investigate, defend, or settle any event or take other remedial or corrective actions with respect thereof as may be, in our reasonable discretion, necessary for the protection of the indemnitees or Meineke Car Care Centers generally. This Section 16.2 will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### 16.3    Taxes

You agree to promptly pay to us an amount equal to all taxes levied or assessed, including unemployment taxes, sales taxes, use taxes, withholding taxes, excise taxes, personal property taxes, intangible property taxes, gross receipt taxes, taxes on royalties, any similar taxes or levies, imposed upon or required to be collected or paid by us by reason of the furnishing of products, intangible property (including trademarks) or services to you. In the event of a bona fide dispute as to your liability for taxes, you may contest your liability in accordance with applicable law.

38

## ARTICLE 17:
## MISCELLANEOUS

### 17.1    Governing Law

Except as otherwise provided in Section 17.2 with respect to the United States Arbitration Act (9 U.S.C. § 1, et seq.), this Agreement and all issues arising from or relating to this Agreement will be governed by and construed under the laws of the State of North Carolina, provided the foregoing does not constitute a waiver of your rights under any applicable franchise registration and disclosure or franchise relationship law of another state. Otherwise, in the event of any conflict of law, North Carolina law will prevail, without regard to the application of North Carolina conflict of law principles.

### 17.2    Arbitration

Subject to Section 17.3 and Section 17.4, all controversies, disputes, or claims between the parties, including their respective Affiliates, owners, officers, directors, agents, and employees, arising from or relating to this Agreement shall on demand of either party be submitted for arbitration to the American Arbitration Association ("AAA"). The arbitration shall be governed exclusively by the United States Arbitration Act (9 U.S.C. § 1, et seq.), without reference to any state arbitration statutes. The parties agree that, in connection with any such arbitration proceeding, each shall submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedures) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed in such proceeding shall be barred. The arbitration proceedings shall be conducted in the city where we then have our principal place of business in accordance with the then-current commercial arbitration rules of the AAA, except the parties shall be entitled to limited discovery at the discretion of the arbitrator(s) who may, but are not required to, allow depositions. The parties acknowledge that the arbitrators' subpoena power is not subject to geographic limitations. The parties agree to be bound by the provisions of any limitation on the period of time by which claims must be brought under North Carolina law or any applicable federal law.

The arbitration proceedings may, at the discretion of the arbitrator(s), also include claims under other Meineke Franchise and Trademark Agreements that also provide for mandatory arbitration on substantially similar terms as those contained in this Section 17.2, provided that the parties to all such agreements are identical to the parties to this Agreement (or their successors and assigns in accordance with their respective provisions) or are Affiliates of such parties. Otherwise, the arbitration proceedings shall be conducted on an individual basis and not on a multi-plaintiff, consolidated or class-wide basis.

The arbitrator(s) shall have the right to award the relief which he or she deems proper, consistent with the terms of this Agreement, including compensatory damages (with interest on unpaid amounts from date due), specific performance, injunctive relief, legal fees and costs. The award and decision of the arbitrator(s) shall be conclusive and binding on all parties, and judgment upon the award may be entered in any court of competent jurisdiction. Any right to contest the validity or enforceability of the award shall be governed exclusively by the United States Arbitration Act. The provisions of this Section 17.2 shall continue in full force and effect subsequent to and notwithstanding expiration or termination of this Agreement.

### 17.3    Preliminary Injunctive Relief

39

Either party hereto may obtain in any court of competent jurisdiction temporary restraining orders and preliminary injunctions in accordance with applicable law, provided in all instances the party seeking such relief simultaneously files a demand for arbitration of such claim in accordance with Section 17.2 and the final merits of such claim are determined in the arbitration proceedings, notwithstanding that the court may, if appropriate under applicable law, consider the likelihood of a party prevailing on the merits in determining whether to issue preliminary relief. The parties agree that any violation of Article 10, Article 11, Section 12.2(k), Section 15.2 or Section 15.4 would result in irreparable harm for which no adequate remedy at law may be available. The provisions of this Section 17.3 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### 17.4    Multi-Plaintiff and Class Action Claims

Subject to and in accordance with applicable law, you may institute a multi-plaintiff claim (involving more than one plaintiff that is not one of your Owners or Affiliates) or a class action claim in a court of competent jurisdiction against us for the sole purpose of seeking: (a) preliminary and permanent injunctive relief or specific performance as a result of a breach of this Agreement; (b) restitution to the MAF as a result of a breach of Article 8 hereof; or (c) restitution as a result of a breach of our obligation under Section 7.2 not to take rebates, benefits and promotional allowances from suppliers, other than in accordance with the terms of Section 7.2. You agree that multi-plaintiff or class action claims may not be instituted for any claims or purposes other than those listed above in this Section 17.4. You further agree that any such action shall be brought exclusively in the jurisdiction where we then have our principal place of business, notwithstanding the provisions of Section 17.5. The provisions of this Section 17.4 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

### 17.5    Venue

Any judicial proceeding we may bring against you or any of your Owners in accordance with the terms of this Agreement may be brought in the jurisdiction where we then have our principal place of business and, if brought in that jurisdiction, may not be transferred to another jurisdiction on the basis that the other jurisdiction is more convenient for the parties and witnesses. Any judicial proceeding you may bring against us in accordance with the terms of this Agreement may be brought in the jurisdiction where your Center is located and, if brought in that jurisdiction, may not be transferred to another jurisdiction on the basis that the other jurisdiction is more convenient to the parties and witnesses.

### 17.6    Costs and Attorneys' Fees

The party who prevails in any arbitration or judicial proceeding will be awarded its costs and expenses incurred in connection with such proceedings, including reasonable attorneys' fees.

### 17.7    Limitations on Legal Claims

Except with respect to any of your obligations herein regarding the Confidential Information and the Marks, we and you (and your Owners) each agrees, to the fullest extent permitted by law, not to assert any right to or claim for any punitive, exemplary or special damages against the other directly or indirectly arising from or relating to this Agreement.

### 17.8    Severability and Substitution of Provisions

40

Every part of this Agreement will be considered severable. If for any reason any part of this Agreement is held to be invalid, that determination will not impair the other parts of this Agreement. If any covenant which restricts competitive activity is deemed unenforceable by virtue of its scope in terms of geographical area, type of business activity prohibited and/or length of time, but could be rendered enforceable by reducing any part or all of it, you and we agree that it will be enforced to the fullest extent permissible under applicable law and public policy.

If any applicable law requires a greater prior notice of termination of or refusal to renew this Agreement than is required hereunder, a different standard of "good cause" to terminate or not renew this Agreement, or the taking of some other action not required hereunder, then the prior notice, "good cause" standard and/or other action required by such law will be substituted for the comparable provisions hereof. However, the foregoing shall not be deemed a waiver of our right to contest the validity, enforceability or application of any such law. If any provision of this Agreement or any specification, standard or operating procedure prescribed by us is invalid or unenforceable under applicable law, we have the right, in our sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to make it valid and enforceable.

### 17.9   Waiver of Obligations

We and you may by written instrument unilaterally waive or reduce any obligation of the other under this Agreement. You and we will not be deemed to have waived any right reserved by this Agreement by virtue of any custom or practice of the parties at variance with it; any failure, refusal or neglect by you or us to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder; any waiver, forbearance, delay, failure or omission by us to exercise any right, whether of the same, similar or different nature, with respect to other Meineke Centers or dealers; or the acceptance by us of any payments due from you after any breach of this Agreement.

### 17.10   Exercise of Rights

Except as otherwise expressly provided herein, the rights of the parties hereto are cumulative and no exercise or enforcement by either party of any right or remedy hereunder will preclude the exercise or enforcement of any other right or remedy which such party is entitled to enforce by law.

### 17.11   Construction

The language of this Agreement will be construed according to its fair meaning and not strictly against or for any party. The introduction, personal guarantees, Schedules and addenda (if any) to this Agreement, as well as the Operations Manual, are a part of this Agreement and constitute the entire agreement of the parties with respect to the subject matters hereof and supersede all prior oral or written agreements, commitments or understandings with respect to the matters provided for herein. If there is an inconsistency between the terms of this Agreement and the Operations Manual, the terms of this Agreement will prevail. Except as otherwise expressly provided herein, there are no other oral or written agreements, understandings, representations or statements relating to the subject matter of this Agreement, other than our franchise disclosure document, that either party may or does rely on or that will have any force or effect. This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest. Nothing in this Agreement will be deemed to confer any rights or remedies on any person or legal entity not a party hereto (including any independent association of Meineke Dealers or DAAC), other than successors and assigns of any party to this Agreement whose interests are assigned in accordance with its terms.

41

The headings of articles and sections are for convenience only and do not limit or construe their contents. The word "including" will be construed to include the words "without limitation." The term "Dealer" or "you" is applicable to one or more persons, a corporation, limited liability company or a partnership and its owners, as the case may be. If two or more persons are at any time Dealer hereunder, whether as partners, joint venturers or otherwise, their obligations and liabilities to us will be joint and several. The parties hereto acknowledge and agree that the franchise relationship contemplated by this Agreement, as well as other similar agreements with other Meineke Dealers, confers on us discretion to make decisions and to take certain actions and that we will exercise our business judgment honestly in doing so.

Whenever this Agreement requires the approval or consent of either party, the other party must make written request therefor, and such approval or consent must be obtained in writing. This Agreement may be executed in multiple copies, each of which will be deemed an original. Time is of the essence in this Agreement.

### 17.12 Modification

This Agreement may not be amended except: (a) as noted below; (b) by written agreement signed by both parties; and (c) as otherwise provided herein with respect to the Operations Manual.

This Agreement may be amended at any time whenever we and a super-majority (as hereinafter defined) of Meineke Dealers agree to any such amendment. We agree to provide you, at least ninety (90) days prior to the date such amendment is to be effective, a copy of the proposed amendment, together with a brief statement explaining the reasons therefor. A "super-majority" of Meineke Dealers shall consist of the owners of at least seventy-five percent (75%) of all franchised Meineke Car Care Centers in the United States of America. Whenever a super-majority of Meineke Dealers approve an amendment in the manner provided for herein, such amendment shall be binding on all Meineke Dealers, including you, to the same extent and in the same manner as if the amendment was unanimously approved by all Meineke Dealers, and regardless whether you may or may not desire to be bound by the amendment. By signing this Agreement, you appoint any of our officers as your attorney in fact with irrevocable power and authority to execute any such amendment so approved.

### 17.13 Policy Regarding Meineke Chain Expansion

We have developed certain policies to determine the potential loss of sales incurred by existing Meineke Car Care Centers as a result of the addition of new Meineke Car Care Centers in a local market area. These policies are embodied in a written document entitled "Meineke's Encroachment Insurance Policy" ("the Policy"), which is not part of this Agreement and which we may change from time to time. We agree to seek the advice of DAAC with respect to any material changes to the Policy and not to make any material changes to the Policy before January 1, 2006 without the consent of DAAC.

You may invoke the procedures set forth in the Policy at your option. However, if you choose not to invoke the Policy and instead you pursue legal action against us in connection with the opening of new Meineke Car Care Centers in the vicinity of your Center, your legal rights with respect to our actions in opening new Meineke Car Care Centers will be limited solely and exclusively to those contained in Section 2.3, and we shall have no liability whatsoever with respect to the opening or operation of additional Meineke Car Care Centers, provided we do not breach our express obligations under Section 2.3. You acknowledge and agree that, if you institute any legal action relating directly or indirectly to the opening of additional Meineke Car Care Centers, the Policy does not confer on you any legal rights whatsoever (whether as a matter of contract, any implied covenant of good faith and fair dealing or

42

otherwise), and that the Policy, and our practices and communications thereunder, are not relevant or material to the issues in such proceedings and therefore are inadmissible as evidence in such proceedings.

### 17.14 Notices and Payments

All notices, requests and reports permitted or required to be delivered by this Agreement will be deemed delivered: (a) at the time delivered by hand to the recipient party (or to an officer, director or partner of the recipient party); (b) on the same day of the transmission by facsimile, telegraph or other reasonably reliable electronic communication system; (c) one business day after being placed in the hands of a commercial courier service for guaranteed overnight delivery; or (d) five business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the party to be notified at its most current principal business address of which the notifying party has been notified in writing. All payments and reports required by this Agreement must be sent to us at the address identified in this Agreement unless and until a different address has been designated by written notice.

### 17.15 Ombudsman

We agree to appoint, with the advice of DAAC, a neutral person with experience in resolving franchise disputes ("Ombudsman") who will be available to you in attempting to resolve any disputes, in accordance with the provisions set forth below, in the event (a) we exercise our rights under Section 13; or (b) a dispute arises as to the findings of an audit conducted pursuant to Section 9.6.

If we have delivered to you a formal notice of default or a notice of termination, then you have the right to seek the assistance of the Ombudsman within 10 days thereafter, if you believe we are not entitled to terminate this Agreement. We agree to consider the views of the Ombudsman, but are not bound by his or her views. If the matter for which you seek the Ombudsman to assist you involves termination for reasons that include monetary defaults, then you agree to pay for the fees and costs of the Ombudsman, except that if the Ombudsman notifies us that he or she believes that you are not in default of your monetary obligations or that our notice of termination is defective, we agree to reimburse you for such fees and costs. Otherwise, in all other circumstances, you and we agree to share equally the fees and costs of the Ombudsman.

If: (a) we have delivered to you a formal notice of default or notice of termination as a result of one or more non-monetary defaults (regardless whether we also assert monetary defaults); and (b) the Ombudsman notifies us that he or she believes that we have no right to terminate this Agreement on any basis set forth in the default letter; then, we agree that we will not invoke our rights under Section 15.2(c) or Section 15.2(d) without obtaining an order or declaration from a court or arbitrator that we may invoke such rights.

The exercise of your right to seek the assistance of the Ombudsman hereunder shall not negate our right to terminate this Agreement and, except as otherwise explicitly provided in this Section 17.15, to enforce your post-termination obligations hereunder or under applicable law.

You and we agree that all information received by the Ombudsman while serving in that capacity shall be kept confidential. Accordingly, the parties agree not to serve the Ombudsman with any subpoena or discovery request (or otherwise compel the Ombudsman's attendance or testimony) in connection with any legal or administrative action between the parties. Each party agrees to maintain the confidentiality of all communications it receives relating to the Ombudsman, and not to use it for any purpose other than resolution of the dispute in the Ombudsman process. Nothing contained in this Section 17.15, nor our participation in the Ombudsman process, shall constitute a waiver of our right to terminate this Agreement at any time in accordance with its terms or in accordance with applicable law.

43

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the Agreement Date.

**DEALER**

MEINEKE CAR CARE CENTERS, INC.
a North Carolina corporation

a_____

By:_____          By:_____
Print Name:_____                Ted P. Pearce
Title: _____                Vice President and General Counsel

Attest: _____

If individuals:

_____
Mark Baker

Date: ___5/14/09___, 200___          Date: ___June 26___, 200_9_

Per Dave Schaefers
email 4:31 P.M
response to Conditions 5/13/09
Open

## SCHEDULE A - MARKET AREA

### MEINEKE®
### FRANCHISE AND TRADEMARK AGREEMENT
### WITH

Mark Baker

Dated June 26, 2009

The expiration date of the agreement is: _____

The "Market Area" is:

MSA Market Area: ~~Flagstaff, AZ - UT~~ *Open Per Dave Schaefer email 5/13/09 4:31 P.M*

DMA Advertising Market Area: ~~Phoenix AZ~~ *response to conditions*

**DEALER**

_____
a _____

By: _____
Print Name: _____
Title: _____

If individuals:

Mark Baker *Per Dave Schaefer email response to conditions 5/13/09 4:31 pm open*

Date: *5/13/09* , 200__

MEINEKE CAR CARE CENTERS, INC.
a North Carolina corporation

By: _____
    Ted P. Pearce
    Vice President and General Counsel

Attest: _____

Date: June 26 , 200 9

## SCHEDULE B - PREMISES

**MEINEKE®**
**FRANCHISE AND TRADEMARK AGREEMENT**
**WITH**

Mark Baker

Dated ___June 26, 2009___

The "Premises" of your Center shall be as follows:_____

_____

**DEALER**                                              MEINEKE CAR CARE CENTERS, INC.
_____                       a North Carolina corporation
a_____

By:_____                       By:_____
Print Name:_____                           Ted P. Pearce
Title: _____                           Vice President and General Counsel

                                                        Attest: _____

If individuals:

_____
Mark Baker *Per Dale Schacht's email 4:31,*
*response to conditions 5/13/09 ©Open 5/13/09*
Date:_____5/14/09_____, 200___        Date: _____June 26_____, 200 9

## SCHEDULE C - DISCLOSURE OF OWNERSHIP INTERESTS

### MEINEKE®
### FRANCHISE AND TRADEMARK AGREEMENT
### WITH

Mark Baker

Dated ___June 26, 2009___

1.   Operating Partner. The name and home address of the Operating Partner is as follows: Mark Baker, 3237 Lisa Ct., Tallahassee, FL 32312.

2.   Form of Entity of Dealer.

(a) Corporation or Limited Liability Company. Dealer was incorporated on _____, under the laws of the State of _____. It has not conducted business under any name other than its corporate name. The following is a list of all of Dealer's directors and officers as of _____.

| Name of Each Director/Officer | Position(s) Held |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

(b) Partnership. Dealer is a [general] [limited] partnership formed on _____, under the laws of the State of _____. It has not conducted business under any name other than its partnership name. The following is a list of all of Dealer's general partners as of _____.

Name of General Partner

_____

_____

_____

i

3.  Owners. Dealer and each of its Owners represents and warrants that the following is a complete and accurate list of all Owners of Dealer, including the full name and mailing address of each Owner, and fully describes the nature and extent of each Owner's interest in Dealer. Dealer, and each Owner as to his ownership interest, represents and warrants that each Owner is the sole and exclusive legal and beneficial owner of his ownership interest in Dealer, free and clear of all liens, restrictions, agreements and encumbrances of any kind or nature, other than those required or permitted by this Agreement.

Owner's Name and Address                        Description of Interest

Mark Baker                                      100 %
3237 Lisa Court
Tallahassee, FL 32312

**DEALER**

a_____                        MEINEKE CAR CARE CENTERS, INC.
                                                a North Carolina corporation

By:_____                        By:_____
Print Name:_____                        Ted P. Pearce
Title: _____                        Vice President and General Counsel

                                                Attest: _____

If individuals:

Mark Baker Per Mark Schultis email 5/14/09
response to forms (HW) open            4:41PM

Date:_____5/14/09_____, 200__        Date: _____June 26_____, 200_9

ii

MCC 9/2008

## SCHEDULE D - OWNERS' PERSONAL GUARANTY

### MEINEKE®
### FRANCHISE AND TRADEMARK AGREEMENT
### WITH

### DEALER NAME

Dated _____

     In consideration of, and as an inducement to, the execution of the Meineke® Franchise and Trademark Agreement dated as of <u>AGREEMENT DATE</u>(the "Agreement") by and between MEINEKE CAR CARE CENTERS, INC. ("Franchisor"), and <u>FRANCHISEE</u> ("Dealer") and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the undersigned, each of whom is an owner of an interest in Dealer as of the date of this document, hereby personally and unconditionally: (1) guarantees to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that Dealer shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and that each and every representation of Dealer made in connection with the Agreement is true, correct and complete in all respects at and as of the time given; and (2) agrees personally to be bound by, and personally liable for the breach of, each and every provision in the Agreement.

     Each of the undersigned waives: (a) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (b) notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; (c) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (d) any right he may have to require that an action be brought against Dealer or any other person as a condition of liability; and (e) any and all other notices and legal or equitable defenses to which he may be entitled relating to the validity or enforceability of this guaranty.

     Each of the undersigned consents and agrees that: (i) his direct and immediate liability under this guaranty shall be joint and several; (ii) he shall render any payment or performance required under the Agreement upon demand if Dealer fails or refuses punctually to do so; (iii) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Dealer or any other person; and (iv) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time to time grant to Dealer or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement and thereafter and shall continue until any and all indebtednesses and obligations thereunder are satisfied in full.

     **IN WITNESS THEREOF**, each of the undersigned has hereunto affixed his signature, under seal, on the same day and year as the Agreement was executed.

MCC 9/2008

**PERCENTAGE OF OWNERSHIP**          **GUARANTOR(S)**
**INTERESTS IN DEALER**

_____                              _____

_____                              _____

_____                              _____

_____                              _____


DATE:_____, 200__

MCC 9/2008

**"APPLIES ONLY TO THE RENEWAL OF THIS FRANCHISE AND TRADEMARK AGREEMENT."**

### RECIPROCAL RIGHT TO INDEPENDENCE RIDER

This Rider, effective upon signature by both parties, amends the Meineke Franchise Agreement to which it is attached ("the Franchise Agreement").

### 1.    RIGHT TO INDEPENDENCE

Notwithstanding anything to the contrary contained in the Franchise Agreement, if you give us written notice, not more than 21 months and not less than 18 months prior to the expiration of the term of the Franchise Agreement, that you desire to operate an automobile repair and maintenance business independent of us after expiration ("Independence Notice"), then we will not have any right under the Franchise Agreement to take possession of the Premises of your Center and you will not be subject to any post-termination non-competition covenant contained in the Franchise Agreement on expiration of its term. After delivery of the Independence Notice, you will have the right to establish an additional telephone number under a different name for your Center (which is not a colorable imitation of any of the Marks), so long as you continue to operate your Center as a Meineke Center and continue to promote the Marks throughout the remainder of the term of the Franchise Agreement. Your delivery of an Independence Notice constitutes an irrevocable waiver of any exclusive rights or territorial protection, whether derived from the Franchise Agreement, any of our internal policies regarding encroachment or applicable law (statutory or otherwise), and we will have the right at any time thereafter to accelerate the expiration of the term of the Franchise Agreement, without cause, effective 60 days after delivery of notice thereof ("Acceleration Notice") to you. You agree that, upon your Independence Notice, we may open a new Meineke Center anywhere within your immediate market area and solicit (or cause the dealer of the new Meineke Center to solicit) the customers of your Center without incurring any liability to you whatsoever. You further agree that upon delivery of an Acceleration Notice, you shall immediately take all appropriate action to comply with all of your post-termination obligations under the Franchise Agreement (other than any obligation to grant us possession to the Premises of your Center or to refrain from engaging in any competitive business), so that you will be in full compliance with those obligations immediately upon expiration of the 60-day period after delivery of the Acceleration Notice. Notwithstanding anything to the contrary herein, this Rider shall not constitute a waiver of our right to terminate the Franchise Agreement in accordance with its terms or otherwise after your Independence Notice, and if we so terminate the Franchise Agreement, we will have all of our rights upon termination, including any right to take possession of the Premises of your Center, and you will be subject to all of your obligations upon termination, including any post-termination non-competition covenants. For example, if after your Independence Notice, but before expiration of the term (or the accelerated expiration of the term), you discontinue operating your Center as a Meineke Center, we have the right to terminate the Franchise Agreement and to take possession of the Premises of your Center and you will be subject to any post-termination non-competition covenant and liable for all actual and consequential damages caused by your breach of the Franchise Agreement.

### 2.    WAIVER OF RENEWAL RIGHTS

Notwithstanding anything to the contrary contained in the Franchise Agreement or under applicable law, including, without limitation, any franchise relationship statute in effect in the state where your Center is located, you agree, in consideration of your right to independence as set forth in Section 1 of this Rider, that on expiration of the term of the Franchise Agreement you will have no right whatsoever to renew or extend the term of the Franchise Agreement, to enter into a successor franchise agreement or to otherwise continue your relationship with us, and you hereby irrevocably waive all rights thereto. The parties agree that the foregoing waiver is an

MCC 9/2008

integral part of this Rider and if for any reason, notwithstanding such waiver, you continue to have any right to renew the franchise, whether as a matter of contract or applicable law (statutory or otherwise), then the provisions of <u>Section</u> 1 of this Rider shall be void and of no effect.

**3.    EFFECT OF RIDER**

      This Rider shall be deemed to be part of the Franchise Agreement. All defined terms used but not defined in this Rider shall have the same meanings as ascribed to them in the Franchise Agreement. If there is any inconsistency between the terms of this Rider and the Franchise Agreement, the terms of this Rider will prevail.

      **IN WITNESS WHEREOF,** the parties have executed and delivered this Rider as of the _____ day of _____, _____.

**DEALER**

If a corporation, limited liability company or partnership:

**MEINEKE CAR CARE CENTERS, INC.**
a North Carolina corporation

By:_____

_____
a _____

(Name of corporation, limited
   liability company or partnership)

Print Name:_____
Title:_____

By:_____

Print Name:_____
Title:_____

**If individuals:**

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

- ii -

MCC 9/2008

**"APPLIES ONLY TO THE RENEWAL OF THIS FRANCHISE AND TRADEMARK AGREEMENT."**

### UNILATERAL RIGHT TO INDEPENDENCE RIDER

This Rider, effective upon signature by both parties, amends the Meineke Franchise Agreement to which it is attached ("the Franchise Agreement").

## 1. RIGHT TO INDEPENDENCE

Notwithstanding anything to the contrary contained in the Franchise Agreement, if you give us written notice, not more than 21 months and not less than 18 months prior to the expiration of the term of the Franchise Agreement, that you desire to operate an automobile repair and maintenance business independent of us after expiration ("Independence Notice"), then we will not have any right under the Franchise Agreement to take possession of the Premises of your Center and you will not be subject to any post-termination non-competition covenant contained in the Franchise Agreement on expiration of its term. After delivery of the Independence Notice, you will have the right to establish an additional telephone number under a different name for your Center (which is not a colorable imitation of any of the Marks), so long as you continue to operate your Center as a Meineke Center and continue to promote the Marks throughout the remainder of the term of the Franchise Agreement. Your delivery of an Independence Notice constitutes an irrevocable waiver of any exclusive rights or territorial protection, whether derived from the Franchise Agreement, any of our internal policies regarding encroachment or applicable law (statutory or otherwise), and we will have the right at any time thereafter to accelerate the expiration of the term of the Franchise Agreement, without cause, effective 60 days after delivery of notice thereof ("Acceleration Notice") to you. You agree that, upon your Independence Notice, we may open a new Meineke Center anywhere within your immediate market area and solicit (or cause the dealer of the new Meineke Center to solicit) the customers of your Center without incurring any liability to you whatsoever. You further agree that upon delivery of an Acceleration Notice, you shall immediately take all appropriate action to comply with all of your post-termination obligations under the Franchise Agreement (other than any obligation to grant us possession to the Premises of your Center or to refrain from engaging in any competitive business), so that you will be in full compliance with those obligations immediately upon expiration of the 60-day period after delivery of the Acceleration Notice. Notwithstanding anything to the contrary herein, this Rider shall not constitute a waiver of our right to terminate the Franchise Agreement in accordance with its terms or otherwise after your Independence Notice, and if we so terminate the Franchise Agreement, we will have all of our rights upon termination, including any right to take possession of the Premises of your Center, and you will be subject to all of your obligations upon termination, including any post-termination non-competition covenants. For example, if after your Independence Notice, but before expiration of the term (or the accelerated expiration of the term), you discontinue operating your Center as a Meineke Center, we have the right to terminate the Franchise Agreement and to take possession of the Premises of your Center and you will be subject to any post-termination non-competition covenant and liable for all actual and consequential damages caused by your breach of the Franchise Agreement.

## 2. EARLY ELECTION OF SUCCESSOR FRANCHISE

If you so request in writing not more than 21 months and not less than 18 months prior to expiration of the term of the Franchise Agreement ("Early Election Period"), we will give you a copy of our then-current form of franchise agreement (and all related agreements and documents used for renewal) and, if applicable, our then-current franchise disclosure document. You have the right to a successor franchise on the terms and conditions of such franchise agreement (and such related agreements and documents) by giving us notice thereof before the expiration of the Early Election Period, subject to all of the terms and conditions contained in the Franchise

- i -

Agreement, provided we will give you notice of our decision whether you have the right to acquire a successor franchise not later than 30 days after your notice and provided further that you execute such franchise agreement (and such related agreements and documents) before the expiration of the Early Election Period. Any such successor franchise agreement shall be effective as of the expiration date of the Franchise Agreement and shall be subject to your compliance with the Franchise Agreement throughout the remainder of its term.

3.    **EFFECT OF RIDER**

       This Rider shall be deemed to be part of the Franchise Agreement. All defined terms used but not defined in this Rider shall have the same meanings as ascribed to them in the Franchise Agreement. If there is any inconsistency between the terms of this Rider and the Franchise Agreement, the terms of this Rider will prevail.

       **IN WITNESS WHEREOF,** the parties have executed and delivered this Rider as of the _____ day of _____, _____.

**DEALER**
If a corporation, limited liability company
or partnership:

a _____

(Name of corporation, limited
 liability company or partnership)

By:_____

Print Name:_____
Title:_____

**If individuals:**

_____
(Signature)

_____
(Print Name)

_____
(Signature)

_____
(Print Name)

**MEINEKE CAR CARE CENTERS, INC.**
a North Carolina corporation

By:_____

Print Name:_____
Title:_____

- ii -

## ADDENDUM TO FRANCHISE AND TRADEMARK AGREEMENT

This Addendum to Franchise and Trademark Agreement is made by Mark Baker who reside at **3237 Lisa Court Tallahassee, FL 32312**, ("Franchisee(s)"), and Meineke Car Care Centers, Inc. ("Franchisor");

WHEREAS, Franchisee(s) executed the Meineke Franchise and Trademark Agreement on **June 26, 2009** ("Agreement") for shop **#4071** in which the designated market was listed as **Sacramento, CA**.

WHEREAS, Franchisee(s) has demonstrated, to Meineke's satisfaction, reasons why they should be able to relocate their designated market to the **Tallahasse, FL** and by this Agreement request that Meineke allow them to relocate their designated market to **Tallahassee, FL.**

NOW THEREFORE, in consideration for the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Addendum agree as follows:

1. The designated NECMA, PMSA, MSA, or County now appearing in "SCHEDULE A-MARKET AREA (a) of the Agreement shall and is hereby amended to read as follows:

**To establish and operate a Meineke Car Care Center only within the following Tallahassee, FL, which is to be selected in accordance with Article 5 of this Agreement.**

2. Save as modified in this Addendum, the general interpretative and miscellaneous provisions (including, without limitation, those dealing with severability of provisions, controlling law and jurisdiction) of the Franchise Agreement are deemed incorporated in this Addendum by reference.

3. The Franchise Agreement shall remain in full force and effect and, except as expressly set forth in this Addendum, shall not amend, modify, nullify or cancel any of the covenants or obligations contained in the Franchise Agreement. In the event of a conflict between the terms and conditions of the Franchisee Agreement and the terms and conditions of this Addendum, the terms of this Addendum shall prevail.

4. This Addendum and the Franchise Agreement constitute the entire agreement between the parties hereto relative to the subject matter they contain herein, and supersede all prior agreements, discussions, or other understandings made by the parties, whether made orally or in writing.

5. This Addendum is executed in Charlotte, North Carolina, such being deemed the place of performance under the Agreement and Addendum.

Dated this 20th day of November 2009.

_____
FRANCHISEE – Mark Baker

**MEINEKE CAR CARE CENTERS, INC.**

By:_____
Ted Pearce, Vice President and
General Council

_____
FRANCHISEE –

Attest:_____

# EXHIBIT C

## U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | ILLINOIS NORTHERN | | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 9,840 | 9,294 | 8,591 | 8,422 | 8,093 | 9,056 | | |
| | Terminations | | 9,035 | 8,509 | 8,287 | 7,929 | 8,255 | 8,805 | | |
| | Pending | | 10,173 | 9,368 | 8,605 | 8,091 | 7,711 | 7,914 | | |
| | % Change in Total Filings | Over Last Year | | 5.9 | | | | | 27 | 2 |
| | | Over Earlier Years | | | 14.5 | 16.8 | 21.6 | 8.7 | 27 | 2 |
| | Number of Judgeships | | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | Vacant Judgeship Months** | | 51.0 | 18.5 | 8.1 | 15.8 | 5.7 | 12.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 447 | 423 | 391 | 382 | 367 | 412 | 43 | 4 |
| | | Civil | 402 | 378 | 349 | 346 | 330 | 389 | 23 | 3 |
| | | Criminal Felony | 28 | 29 | 26 | 24 | 26 | 34 | 90 | 7 |
| | | Supervised Release Hearings** | 17 | 16 | 16 | 12 | 11 | 9 | 66 | 6 |
| | Pending Cases | | 462 | 426 | 391 | 368 | 351 | 360 | 25 | 2 |
| | Weighted Filings** | | 517 | 493 | 461 | 462 | 443 | 485 | 29 | 4 |
| | Terminations | | 411 | 387 | 376 | 360 | 375 | 400 | 51 | 5 |
| | Trials Completed | | 16 | 12 | 11 | 11 | 11 | 13 | 65 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 14.7 | 15.1 | 14.5 | 14.7 | 13.9 | 12.9 | 90 | 7 |
| | | Civil** | 6.2 | 6.2 | 6.2 | 6.2 | 6.5 | 6.9 | 11 | 3 |
| | From Filing to Trial** (Civil Only) | | 28.2 | 27.8 | 27.5 | 29.7 | 26.4 | 27.0 | 48 | 2 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 1,207 | 943 | 752 | 456 | 500 | 388 | | |
| | | Percentage | 13.7 | 11.7 | 10.2 | 6.5 | 7.4 | 5.6 | 80 | 7 |
| | Average Number of Felony Defendants Filed Per Case | | 1.5 | 1.6 | 1.8 | 1.7 | 1.8 | 1.9 | | |
| | Jurors | Avg. Present for Jury Selection | 47.30 | 49.67 | 47.17 | 45.20 | 45.07 | 51.46 | | |
| | | Percent Not Selected or Challenged | 38.4 | 32.8 | 36.2 | 31.8 | 30.9 | 36.9 | | |

### 2010 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 8844 | 214 | 146 | 1219 | 51 | 250 | 1522 | 1119 | 500 | 461 | 1826 | 26 | 1510 |
| Criminal* | 621 | 2 | 131 | 133 | 60 | 141 | 50 | 21 | 10 | 36 | 14 | 5 | 18 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.

\*\* See "Explanation of Selected Terms."

Case: 1:10-cv-07653 Document #: 16  Filed: 03/02/11 Page 118 of 118 PageID #:183

## U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **FLORIDA NORTHERN** | | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | Numerical Standing | |
| | Filings* | | 2,044 | 2,091 | 2,079 | 2,062 | 2,100 | 1,842 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Terminations | | 2,017 | 2,062 | 1,985 | 2,084 | 1,918 | 2,209 | | |
| | Pending | | 1,813 | 1,779 | 1,733 | 1,635 | 1,669 | 1,477 | | |
| | % Change in Total Filings | Over Last Year | | -2.3 | | | | | 65 | 5 |
| | | Over Earlier Years | | | -1.7 | -.9 | -2.7 | 11.0 | 22 | 4 |
| | Number of Judgeships | | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | .0 | .9 | 6.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 511 | 524 | 520 | 516 | 525 | 461 | 28 | 4 |
| | | Civil | 422 | 434 | 433 | 409 | 408 | 376 | 18 | 5 |
| | | Criminal Felony | 64 | 61 | 58 | 71 | 83 | 61 | 49 | 5 |
| | | Supervised Release Hearings** | 25 | 29 | 29 | 36 | 34 | 24 | 48 | 4 |
| | Pending Cases | | 453 | 445 | 433 | 409 | 417 | 369 | 28 | 2 |
| | Weighted Filings** | | 546 | 550 | 539 | 521 | 538 | 468 | 23 | 4 |
| | Terminations | | 504 | 516 | 496 | 521 | 480 | 552 | 23 | 4 |
| | Trials Completed | | 39 | 39 | 44 | 49 | 48 | 31 | 6 | 1 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 5.8 | 5.8 | 5.6 | 5.1 | 5.0 | 6.2 | 10 | 2 |
| | | Civil** | 8.0 | 8.0 | 7.7 | 7.5 | 7.6 | 8.8 | 33 | 6 |
| | From Filing to Trial** (Civil Only) | | 22.6 | 16.0 | 16.5 | 22.0 | 19.0 | - | 27 | 6 |
| | Civil Cases Over 3 Years Old** | Number | 57 | 41 | 45 | 38 | 58 | 39 | | |
| OTHER | | Percentage | 3.8 | 2.8 | 3.1 | 2.8 | 4.3 | 3.3 | 32 | 6 |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.4 | 1.8 | 1.3 | 1.4 | 1.5 | | |
| | Jurors | Avg. Present for Jury Selection | 34.47 | 32.07 | 33.00 | 36.13 | 32.64 | 39.22 | | |
| | | Percent Not Selected or Challenged | 23.7 | 26.2 | 25.2 | 28.7 | 24.0 | 23.2 | | |

### 2010 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 1689 | 80 | 22 | 652 | 42 | 35 | 99 | 150 | 85 | 23 | 399 | - | 102 |
| Criminal* | 254 | 1 | 67 | 44 | 55 | 16 | 3 | 20 | 2 | 18 | 5 | 9 | 14 |

\*  Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.

\*\* See "Explanation of Selected Terms."